UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
:
UNITED STATES OF AMERICA :
:
-v- : 09 Cr. 722 (MGC)
:
PAUL GREENWOOD, and :
STEPHEN WALSH, :
:
              Defendants. :
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STEPHEN WALSH'S MOTION FOR RELEASE OF FUNDS FOR ATTORNEY'S FEES AND COSTS

SONNENSCHEIN NATH & ROSENTHAL LLP

Glenn C. Colton (GC-2493)
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: 212-398-5797
gcolton@sonnenschein.com

Mark A. Flessner (*admitted pro hac vice*)
233 S. Wacker Drive, Suite 7800
Chicago, Illinois 60606
Telephone: 312-876-3136
mflessner@sonnenschein.com

*Attorneys for Defendant Stephen Walsh*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND ......................................................................................................................... 2

    A. The Government Initiates Various Proceedings in February 2009 ............................... 2

    B. All of Mr. Walsh's Assets Were Frozen Without An Adversarial Hearing ................... 3

ARGUMENT ............................................................................................................................... 4

    I. MR. WALSH HAS A CONSTITUTIONAL RIGHT TO USE HIS UNTAINTED ASSETS TO PAY FOR CRIMINAL DEFENSE COUNSEL OF HIS CHOICE ............... 4

    II. 7 HALF MOON LANE IS AN UNTAINTED ASSET UNTRACEABLE TO THE ALLEGED FRAUD AND THEREFORE SHOULD BE UNFROZEN TO ALLOW FOR THE PAYMENT OF CRIMINAL DEFENSE COUNSEL OF MR. WALSH'S CHOICE ..................................................................................... 7

    III. THE GOVERNMENT SHOULD NOT BE ALLOWED TO USE THE CIVIL ASSET FREEZE TO THWART MR. WALSH'S RIGHT TO RETAIN THE CRIMINAL DEFENSE COUNSEL OF HIS CHOICE ............................................................................ 8

        A. The USAO, CFTC and SEC Are Working Together to Investigate and Prosecute the Instant Case and This Motion Should Be Addressed in Light of That Reality .............. 8

        B. Adopting a Civil Freeze Standard Will Functionally Overrule *Monsanto* and Deprive Criminal Defendants of Their Fifth and Sixth Amendment Rights. ........................... 10

    IV. MR. WALSH'S REQUEST FOR FUNDS IS REASONABLE IN LIGHT OF THE COMPLEXITY OF THIS CASE ..................................................................................... 11

CONCLUSION ......................................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**                                                 **Page(s)**

*Brady v. Maryland*,
   373 U.S. 83, 83 S.Ct. 1194 (1963) ............................................................................................8

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617, 109 S.Ct. 2646 (1989) ........................................................................................5

*Powell v. Alabama*,
   287 U.S. 45, 53 S.Ct. 55 (1932) ................................................................................................4

*Sec. & Exch. Comm'n v. Coates*,
   No. 94 Civ. 5361, 1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) ............................................5, 6

*Sec. & Exch. Comm'n v. Dowdell*,
   175 F. Supp. 2d 850 (W.D. Va. 2001) ....................................................................................10

*Sec. & Exch. Comm'n v. Pinez*,
   989 F. Supp. 325 (D. Mass. 1997) ............................................................................................5

*Sec. & Exch. Comm'n v. Sekhri*,
   No. 98 Civ. 2320, 2000 WL 1036295 (S.D.N.Y. July 26, 2000) ............................................10

*United States v. E-Gold, Ltd.*,
   521 F.3d 411 (D.C. Cir. 2008) ..................................................................................................5

*United States v. Monsanto*,
   924 F.2d 1186 (2d Cir. 1991) ....................................................................................................5

*United States v. Moya-Gomez*
   860 F.2d 726 (7th Cir. 1988) .....................................................................................................7

*United States v. Petters*,
   No. 08-5348, 2009 WL 803482 (D. Minn., Mar. 25, 2009) ................................................6, 12

*United States v. Stein*,
   495 F. Supp. 2d 390 (S.D.N.Y. 2007) .....................................................................................12

*United States v. Stein*,
   541 F.3d 130 (2d Cir. 2008) ...............................................................................................4, 11

**OTHER AUTHORITIES**

FED. R. CRIM. P. 16 ........................................................................................................................8

U.S. Const. Amends. V, VI.................................................................................................... passim

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
    -v-                                       :   09 Cr. 722 (MGC)
                                              :
PAUL GREENWOOD, and                           :
STEPHEN WALSH,                                :
                                              :
                        Defendants.           :
                                              :
------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STEPHEN WALSH'S
MOTION FOR RELEASE OF FUNDS FOR ATTORNEY'S FEES AND COSTS**

There are basic principles of Constitutional law directly implicated by the instant motion. First, Stephen Walsh is presumed innocent. Second, he has a right to counsel guaranteed by the Sixth Amendment. Third, under the Fifth Amendment, he is entitled to due process of law before he can be deprived of his property necessary to hire counsel of choice to defend him in a criminal case. The government has sought to disenfranchise Mr. Walsh of these critical and fundamental rights because the civil enforcement arms of the same sovereign filed companion civil actions and chose to effectuate an asset freeze in civil rather than criminal court. Plainly, fundamental rights are not so easily or capriciously erased as the government posits.

The law in this circuit (and most others) is clear: a criminal defendant has a right to counsel of his or her choice unless the government, after an adversarial hearing sufficient to satisfy the dictates of due process, can demonstrate that there is probable cause that **both** (a) the defendant committed the crimes charged in the indictment **and** (b) the assets the defendant seeks to use to pay the counsel of choice are traceable to the alleged fraud. That the sovereign chose to freeze Mr. Walsh's assets in civil court rather than via criminal process does not, and indeed cannot, alter Mr. Walsh's constitutional rights or overrule governing circuit precedent.

In the instant case, the government cannot meet its burden because one of the assets currently frozen, Stephen Walsh's home, was purchased with funds directly traceable to his 1983 purchase of his prior home. In other words, Mr. Walsh's home is an asset not traceable to the charged fraud that is alleged to have started *thirteen years after* he purchased the home; thus, it is an asset that should be available to him to use to vindicate his Sixth Amendment right to retain counsel of choice.

## BACKGROUND

### A. The Government Initiates Various Proceedings in February 2009

On February 24, 2009, the United States Attorney's Office ("USAO") filed a criminal complaint against Stephen Walsh and his co-defendant, Paul Greenwood, in the above-captioned action. (Dkt. #1) *See* Declaration of Glenn C. Colton, Dec. 22, 2009 ("Colton Dec."), ¶ 2 & Ex. A. Just one day later, the Commodity Futures Trading Commission ("CFTC") and the Securities & Exchange Commission ("SEC") filed civil actions against Messrs. Greenwood and Walsh and various entities, *see Commodity Futures Trading Comm'n v. Walsh, et al.*, 09 Civ.1749 (GBD); *Sec. & Exch. Comm'n v. WG Trading Investors, et al.*, 09 Civ. 1750 (GBD), alleging essentially the same fraudulent conduct for the same period – from 1996 to February 2009. *See* Colton Dec., ¶ 2 & Exs. B, C.

Messrs. Greenwood and Walsh were indicted in the above-captioned action on July 24, 2009 (Dkt. # 31). *See* Colton Dec.,¶ 5 & Ex. H. Like the civil and criminal complaints, the Indictment relates to alleged fraudulent conduct beginning "in or about 1996." Colton Dec., Ex. H at ¶¶ 4-5. Mr. Walsh pled not guilty on July 31, 2009. Discovery has been proceeding slowly because, *inter alia*, the government shipped many of the relevant documents thousands of miles away – from the tri-state area to California – and because no progress has been made in producing what likely will be substantial electronic discovery. *See* Colton Dec., ¶¶ 6-8.

### B. All of Mr. Walsh's Assets Were Frozen Without An Adversarial Hearing

Apparently, the USAO has not requested seizure warrants or other orders to restrain Mr. Walsh's assets; rather, the SEC and the CFTC, working side-by-side with the USAO, moved in the companion civil cases for injunctive relief restraining all of Mr. Walsh's assets. *See id.*, ¶ 3. Judge Daniels granted that relief on February 25, 2009, and issued Restraining Orders freezing all of Mr. Walsh's assets and placing them in the control of a Court-appointed receiver. *See id.*, ¶ 3 & Exs. D, E. On May 22, 2009, at a time before a United States District Judge was assigned to preside over the criminal case, Judge Daniels extended the Orders freezing all of Mr. Walsh's assets "until further order of the Court." *See id.*, ¶ 4 & Exs. F, G. The May 22, 2009 Orders were issued without an adversarial hearing and without the benefit of live testimony. Mr. Walsh has been without access to his assets since late February 2009. *See* Declaration of Stephen Walsh, Dec. 22, 2009 ("Walsh Dec."), ¶ 10.[1] Thus, Mr. Walsh currently has no means to pay counsel of his choice to defend him in the instant case – a case in which he faces the possibility of being sentenced to the functional equivalent of life in prison.

Despite the gravity of the charges and the potential sentence, the asset freeze currently in place includes property unrelated to the alleged fraud – namely, Mr. Walsh's residence at 7 Half Moon Lane, Sands Point, New York ("7 Half Moon Lane").[2] The history of 7 Half Moon Lane makes plain that the property is unconnected to any alleged misconduct. In 1983, Mr. Walsh and his then-wife purchased a home at 38 Arden Lane, Sands Point, NY (formerly known as 145

---

[1] Mr. Walsh does receive social security benefits and approximately $1,180 per month (from a job he recently took -- with the receivers express consent -- to reduce expenses being borne by the receivership estate). However, these inflows must be spent in accordance with the receiver's dictates. *See* Walsh Dec., ¶ 13.

[2] 7 Half Moon Lane is specifically named in the SEC Temporary Restraining Order (Colton Dec. Ex. E, at 8), and is also subject to restraint in the CFTC Order (Colton Dec. Ex. D, at ¶ 15).

Middle Neck Road, Sands Point, NY). *See* Walsh Dec., ¶ 4. The Walshes paid approximately $900,000 for the property, which included a house and ten acres of land. *See id.* The house was built in the 1920's and had all of its original fixtures at the time of purchase. *See id.*, ¶ 5. Upon closing on the purchase of 38 Arden Lane, the Walshes began a three-year renovation project – ending in 1986 (ten years before the alleged wrongdoing) – in which they renovated the house at a cost of approximately $2,000,000. *See id.*

In 1999, the Walshes sold their home at 38 Arden Lane, as well as the real estate, by splitting the property into separate parcels. *See id.*, ¶ 6. The Walshes received a total of approximately $4,500,000 on these transactions. *See id.* They used $3,150,000 of the proceeds to purchase, without a mortgage, their new home at 7 Half Moon Lane. *See id.*, ¶ 7. The home at 7 Half Moon Lane, which after the Walsh's divorce is now owned individually by Stephen Walsh, was purchased with funds obtained many years before the events at issue in the instant case. *See id.*, ¶ 8. That home has appreciated in value since 1999. In 2007, when Mr. Walsh was considering selling 7 Half Moon Lane, a senior representative from the predominant real estate broker for Sands Point (and the North Shore of Long Island) represented that the property could sell for between $7,000,000 and $10,000,000. *See id.*, ¶ 9.

## ARGUMENT

### I. MR. WALSH HAS A CONSTITUTIONAL RIGHT TO USE HIS UNTAINTED ASSETS TO PAY FOR CRIMINAL DEFENSE COUNSEL OF HIS CHOICE

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. An important element of this right is "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Stein*, 541 F.3d 130, 154 (2d Cir. 2008) (*quoting United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557 (2006)); *see Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55 (1932) ("It is

hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.") The right to counsel does not extend to use of tainted funds to obtain counsel. *See, e.g., Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646 (1989). A criminal defendant, however, retains his Sixth Amendment right to use his or her funds to pay for counsel of choice **unless** the government, after an adversarial hearing sufficient to satisfy the demands of due process, can establish probable cause to demonstrate **both** (a) that the defendant committed the crimes charged **and** (b) that the funds at issue are traceable to the alleged fraud. *United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir. 1991); *accord United States v. E-Gold, Ltd.*, 521 F.3d 411, 416-19 (D.C. Cir. 2008) (adopting the procedures set forth in *Monsanto* and collecting cases from other circuits holding that such adversarial hearings are Constitutionally required).

Mr. Walsh's Constitutional right to use funds not traceable to the alleged fraud to pay criminal defense counsel of his choice was not, and indeed cannot be, erased through relaxed procedures in a related civil case. Indeed, "[a]lthough a court may impose an asset freeze in a civil case, notwithstanding a companion criminal case, these circumstances dictate that *the court pay particular attention to the defendant's Fifth and Sixth Amendment rights.*" *Sec. & Exch. Comm'n v. Coates*, No. 94 Civ. 5361, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994) (emphasis supplied); *see also Sec. & Exch. Comm'n v. Pinez*, 989 F. Supp. 325, 337 n. 12 (D. Mass. 1997) (noting that the court allowed modification of its civil asset freeze to provide funds for attorneys' fees in the related criminal action and referred the matter to the judge presiding over the defendant's criminal detention hearing for a determination of the reasonableness of the requested fees).

Judge Wood's decision in *Coates* is particularly instructive. In *Coates*, the defendant sought to modify an asset freeze order entered in a civil action brought by the SEC. *See* 1994

WL 455558, at *1. The defendant requested the release of funds not derived from the alleged fraud, in part to retain an attorney to defend him in a related criminal action. *Id.* at *1, 3. As the *Coates* Court correctly noted, although *Monsanto* concerned the propriety of an asset freeze in connection with criminal drug conspiracy charges, the Constitutional reasons for requiring the hearing are "equally applicable" in the civil asset freeze context. *See id.* at *3. Thus, the Court ultimately held:

> [I]n light of the fact that my order freezing [defendant's] personal assets may hinder his ability to obtain counsel of choice in the related criminal case, I conclude that that order may not be continued through trial in the absence of an adversary hearing as to whether (1) the SEC has established a *prima facie* case of securities law violations, and (2) the SEC has made a showing that the frozen assets are traceable to fraud.

*Id.* (citing *Monsanto*, 924 F.2d at 1203; *Sec. & Exch. Comm'n v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993)).

The decision in *United States v. Petters*, No. 08-5348, 2009 WL 803482 (D. Minn., Mar. 25, 2009), is also instructive. In *Petters*, the court held it "has the authority to release receivership funds in the interest of fundamental fairness if wrongdoing is not yet proven and the restrained property is a defendant's only means of securing counsel." *Id.* at *2. The *Petters* Court reasoned: "[the defendant] has plead not guilty, and has the benefit of the presumption of innocence. He faces potential penalties that are effectively life imprisonment if convicted. He is entitled to quality legal representation as he challenges the Government's case against him." *Id.* at *3.

As a criminal defendant without access to funding for the defense counsel of his choice because of a blanket pretrial asset freeze in companion civil proceedings, Mr. Walsh is in the same position as the defendants in *Coates* and *Petters*, and he is entitled to the same protections of his Fifth and Sixth Amendment rights. Unless the government can meet its burden after an

adversarial hearing of demonstrating probable cause that Mr. Walsh committed the charged crimes and that his assets are traceable to those charged crimes, the asset freeze must be modified to allow Mr. Walsh the opportunity to use untainted funds for criminal defense counsel of his choice. The Second Circuit – and the Constitution – require nothing less.

II. **7 HALF MOON LANE IS AN UNTAINTED ASSET UNTRACEABLE TO THE ALLEGED FRAUD AND THEREFORE SHOULD BE UNFROZEN TO ALLOW FOR THE PAYMENT OF CRIMINAL DEFENSE COUNSEL OF MR. WALSH'S CHOICE**

The factual record clearly demonstrates that 7 Half Moon Lane is unconnected to the purported fraud with which Mr. Walsh has been charged. Specifically, as demonstrated in the Walsh Declaration and the Statement of Facts, *supra*, the funds used to purchase 7 Half Moon Lane came directly from the Walshes' sale of 38 Arden Lane, a property the Walshes purchased and renovated more than a decade before the start of the conduct alleged in the Indictment. *Monsanto* and *Coates* clearly establish Mr. Walsh's right to an adversarial hearing. The fact that 7 Half Moon Lane is plainly an untainted asset makes it clear that the government cannot meet its burden at such a hearing.[3] Mr. Walsh respectfully requests that the Court release 7 Half Moon Lane from the asset freeze orders to allow Mr. Walsh to exercise his Sixth Amendment rights and pay the fees and costs of defense to counsel of his choice.[4]

---

[3] Of course, Mr. Walsh stands ready to participates in an adversarial hearing to vindicate his Fifth and Sixth Amendment rights if the Court finds that there are factual issues remaining.

[4] The receiver currently has possession of other liquid and/or near-liquid assets of Mr. Walsh's, the value of which exceeds $5,000,000. *See* Walsh Dec., ¶ 12. Because securing a sale or mortgage of 7 Half Moon Lane could take months, and because of the immediacy of Mr. Walsh's need to pay defense counsel, *cf. United States v. Moya-Gomez*, 860 F.2d 706, 726 (7th Cir. 1988) ("The defendant needs the attorney *now* if the attorney is to do him any good."), Mr. Walsh respectfully seeks an Order in the first instance releasing the value of the property from the asset freeze – cash that can be replaced by sale of the untainted assets *if* the government eventually prevails.

## III. THE GOVERNMENT SHOULD NOT BE ALLOWED TO USE THE CIVIL ASSET FREEZE TO THWART MR. WALSH'S RIGHT TO RETAIN THE CRIMINAL DEFENSE COUNSEL OF HIS CHOICE

Despite the binding nature of *Monsanto* and the persuasive logic of *Coates*, government counsel has indicated that they will argue that this Court is powerless to examine or modify the asset freeze orders because they were entered in connection with the SEC and CFTC actions and not part of the criminal case; however, as discussed *supra*, and as both Judge Daniels and this Court have recognized, the asset freeze orders currently in place directly implicate Mr. Walsh's rights as a criminal defendant. Any attempt to separate the civil and criminal actions is belied by the specific history of these proceedings and the general manner in which the SEC, CFTC, and USAO investigate and prosecute alleged financial frauds.

### A. The USAO, CFTC and SEC Are Working Together to Investigate and Prosecute the Instant Case and This Motion Should Be Addressed in Light of That Reality

It defies credulity to consider the SEC and CFTC actions against Mr. Walsh as completely separate from this criminal case when the complaints in all three actions encompass the same subject matter and were filed *only one day* apart. Patently, the SEC, CFTC, and USAO coordinated prior to filing these actions. The coordinated manner in which the three agencies are investigating and litigating the allegations against Mr. Walsh is brought into sharp focus by the facts that: (a) the USAO has been relying on the receiver appointed in the SEC and CFTC actions to meet its discovery obligations, including, *inter alia*, its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), and Rule 16 of the Federal Rules of Criminal Procedure; and (b) the receiver is taking his instructions not from the SEC or CFTC attorneys who are litigants in the case in which he was appointed, but from the lead prosecutor from the USAO. *See* Colton Dec. ¶ 10 (the receiver's office asserted a need to obtain permission from AUSA John O'Donnell to release documents) & ¶ 9 (the USAO informed the Court of its view

- 8 -

that referring criminal defense counsel to the receiver satisfied the government's discovery obligations). In addition, the complaint filed by the USAO and sworn by the FBI case agent contains numerous allegations specifically based on information provided by the SEC and CFTC. *See* Colton Dec., Ex. A, at ¶¶ 8-15. SEC and CFTC representatives also attended proffer sessions between Mr. Walsh, the FBI, and the USAO.

Additionally, recent public statements by United States Attorney General Eric Holder and SEC Director of Enforcement Robert Khuzami demonstrate that these agencies are coordinating the criminal cases with the civil enforcement efforts. In a speech last month at the Financial Fraud Enforcement Task Force Press Conference, Attorney General Holder touted the cooperation between the DOJ and the SEC in the prosecutions of individuals charged with alleged financial frauds. *See* Justice News: Attorney General Eric Holder Speaks At The Financial Fraud Enforcement Task Force Press Conference (Nov. 17, 2009) *available at* http://www.justice.gov/ag/speeches/2009/ag-speech-091117.html (last visited Dec. 22, 2009). Similarly, at that same press conference, Director Khuzami stated:

> As the Director of Enforcement of the SEC, and a former federal prosecutor with the Department of Justice, I have seen first-hand the benefits of coordinated civil and criminal enforcement efforts.
>
> And coordination is a virtue that we at the SEC have learned well.
>
> In fact, in FY 2009, *more than 150 of the SEC's enforcement cases were filed in coordination with criminal charges filed by the DOJ and others*, an increase of 30 percent over FY 2008.

Speech by SEC Staff: Remarks at Dep't of Justice Press Conference (Nov. 17, 2009) *available at* http://www.sec.gov/news/speech/2009/spch111709rsk.htm (last visited Dec. 22, 2009) (emphasis supplied).

Counsel for Mr. Walsh is not arguing in this motion that the USAO-SEC-CFTC cooperation is improper. We simply highlight the reality and extent of the cooperation and

coordination between the various arms of the sovereign to insure that the government not be permitted to rely upon fictional distinctions between governmental agencies and their litigation strategies to impede Mr. Walsh's exercise of his Constitutional rights to counsel and to due process.[5]

### B. Adopting a Civil Freeze Standard Will Functionally Overrule *Monsanto* and Deprive Criminal Defendants of Their Fifth and Sixth Amendment Rights.

Any argument that the Court should view the asset restraining orders solely as a part of the civil actions – and thereby subject them only to the standard of review necessary to maintain a blanket asset freeze in the civil context should be given short shrift.[6] Adopting such an approach would be tantamount to overruling *Monsanto* in every white-collar criminal prosecution where the government chooses to also file a civil action because the government would always seek to freeze assets in the civil proceedings. Of course, neither *Monsanto* nor the Constitution allows the government to choose, on its own and without court supervision, what level of constitutional protection applies. Indeed, allowing the government such latitude would be an engraved invitation to "unjustified governmental interference with the right to defend

---

[5] In a recent article about the roles of various enforcement agencies, former SEC Commissioner Roberta S. Kamel noted: "It is unseemly when different parts of the government go to court to fight one another, directly or by proxy." *See* Roberta S. Kamel, *Will Harmony Prevail Between the SEC and CFTC?*, N.Y. L. J., Dec. 17, 2009, at 3.

[6] Such an argument would be understandable from the government's perspective if winning was properly their sole objective -- which of course it is not. In the typical civil context, the government often does not need to make a showing that the assets covered by a freeze order are traceable to the defendant's allegedly illegal activity. *See, e.g., Sec. & Exch. Comm'n v. Sekhri*, No. 98 Civ. 2320, 2000 WL 1036295, at *1 (S.D.N.Y. July 26, 2000). As discussed herein, this standard lacks the procedural protections necessary to safeguard a criminal defendant's Constitutional rights, and even under this civil standard, the Court's "central concern" should be the "fairness of the proceedings." *Sec. & Exch. Comm'n v. Dowdell*, 175 F. Supp. 2d 850, 854, 856 (W.D. Va. 2001) (noting that in the civil context, the court must weigh "the disadvantages and possible deleterious effect of a freeze . . . against the considerations indicating the need for such relief," and ordering counsel to provide estimates of their fees for representing the defendant on a preliminary injunction motion because "[t]his is a complex legal matter, and lawyers are essential to the presentation of issues related to it").

oneself using whatever assets one has or might reasonably and lawfully obtain." *Stein*, 541 F.3d at 156.

## IV. MR. WALSH'S REQUEST FOR FUNDS IS REASONABLE IN LIGHT OF THE COMPLEXITY OF THIS CASE

To ensure that he is able to defend himself fully against the government's charges, Mr. Walsh seeks access to untainted funds in the amount of $4.5 million (from the value of 7 Half Moon Lane) to pay Sonnenschein Nath & Rosenthal ("Sonnenschein") for its work as his criminal defense counsel. This figure includes $4 million in anticipated fees and $500,000 to cover discovery costs.[7] Mr. Walsh and the undersigned counsel request that these funds be released to Sonnenschein in installments, beginning with a $1.5 million initial release upon the Court's decision on this motion.[8] Sonnenschein will place the released funds into a client trust account and draw down on the funds based on hourly billings, which Sonnenschein will invoice and present to Mr. Walsh every month for his review and approval. *See* Colton Dec., ¶ 15. Sonnenschein will promptly return to the receiver any money left in the client trust account after judgment is entered. *See id.*[9]

---

[7] The discovery cost figure could vary dramatically depending on what we find in the as-yet-to-be-produced materials. We therefore reserve the right to request additional cost reimbursement from the Court. However, if the cost figure is below $500,000, we will return the remainder to the receiver after judgment is entered in this case.

[8] As previously noted, Sonnenschein has already allowed Mr. Walsh's account to accumulate past due payables. The first release of funds would initially be used in part to bring the account current. Sonnenschein then anticipates that the release of the remaining $3 million would occur in $1 million installments: (1) after the time that we file the primary motions; (2) six months prior to trial; and (3) three months prior to trial.

[9] The Court should be aware that prior to Judge Daniels' entering the asset freeze, Mr. Walsh retained Richard Weinberg from Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C. Mr. Walsh used personal funds to pay a retainer to Mr. Weinberg's firm. Currently $112,500 remains available from that retainer, and Mr. Weinberg's firm has agreed to transfer the $112,500 to Sonnenschein Nath & Rosenthal LLP upon appropriate documentation and upon further order of this Court.

In light of the complexity of this case – and the potential penalties Mr. Walsh faces if convicted – Mr. Walsh's request for $4.5 million for his criminal defense is eminently reasonable. Mr. Walsh has been charged with being part of an allegedly fraudulent scheme spanning thirteen years. To date, the government has already identified over 500 boxes of documents and extensive electronic files potentially relevant to these allegations, all of which must be reviewed to prepare a defense and to determine the existence of exculpatory information. *See* Colton Dec., ¶¶ 7-8; *see also Petters*, 2009 WL 803482, at *3 ("The allegations of massive fraud necessitate a large scale document review . . . .").[10]

The document review, coupled with other trial preparations and likely motion practice, will require "extensive time and expertise by defense counsel." *Id.*, *see also* Colton Dec., ¶¶ 13-14 (setting forth hourly billing rates and time estimates). Undersigned counsel for Mr. Walsh also estimate that given the complexity of this case and the expanding universe of documents and potential evidence, trial will likely last longer than the four weeks estimated by Mr. Greenwood's counsel, and could necessitate seven to eight weeks of trial time. *See* Colton Dec., ¶ 14.

Further demonstrating the reasonableness of Mr. Walsh's request, these proposed attorneys' fees and costs are a mere fraction of the defense costs reported in other recent high-profile white collar cases. *See United States v. Stein*, 495 F. Supp. 2d 390, 424 (S.D.N.Y. 2007) (noting costs of "$14.9 million (Kumar - Computer Associates), $17.7 million and $8 million for each of two trials (Kozlowski - Tyco); $24 million (Shelton - Cendant), $25 million (Rigases -

---

[10] Although counsel for Mr. Greenwood informed the Court in Mr. Greenwood's Motion for Attorney's Fees and Costs, filed November 22, 2009 (Dkt. # 45, 46), that the government had estimated 100 boxes of documents, counsel for the government informed the parties at the December 1, 2009 Status Conference that it had identified over 330 additional boxes of potentially relevant documents still in storage in the tri-state area. *See* Colton Dec., ¶ 7. The fact that the amount of discovery continues to increase further illustrates the complexity of this case and Mr. Walsh's need for representation by defense counsel with expertise in this field.

Adelphia), $32 million (Scrushy - HealthSouth), and $25 and $70 million (Lay and Skilling, respectively - Enron)"); *see also* Law.com, Judge Sets Trial Date for Allen Stanford as Attorneys Tussle Over Fees, http://www.law.com/jsp/article.jsp?id=1202437080661&Judge_Sets_Trial_Date_for_Allen_Stanford_as_Attorneys_Tussle_Over_Fees (last visited Dec. 22, 2009) (estimating attorneys' fees between $20 million and $100 million for four defendants). Also, the Court should be aware that Sonnenschein has agreed to charge rates discounted from its typical rates. *See* Colton Dec., ¶ 14, n.3.

Ultimately, if the Court does not modify the asset freeze orders to allow the release of the untainted property, Sonnenschein will be unable to continue representing Mr. Walsh in this matter. Undersigned counsel have already performed substantial work on Mr. Walsh's behalf in excess of funds received from prior counsel's unused retainer (including the preparation and filing of this motion), and the firm has begun to receive invoices from outside vendors for services rendered in this matter, including, *inter alia*, processing for future review the documents that Mr. Walsh has managed to get from the government. *See* Colton Dec., ¶ 12. Sonnenschein cannot continue advancing credit for these services without the prospect of repayment, and Mr. Walsh has no other means to secure the firm's representation. Modification of the asset freeze is therefore the only way to ensure that Mr. Walsh can exercise his Constitutional right to secure the counsel of his choice to defend him.

## CONCLUSION

For the foregoing reasons, Mr. Walsh respectfully requests that this Court grant his Motion for Release of Funds for Attorneys' Fees and Costs.

Dated: New York, New York            SONNENSCHEIN NATH & ROSENTHAL LLP
December 22, 2009

By: _____/s/_____
　　　　Glenn C. Colton (GC-2493)
　　　　1221 Avenue of the Americas
　　　　New York, New York 10020-1089
　　　　Telephone: 212-398-5797
　　　　gcolton@sonnenschein.com

　　　　Mark A. Flessner (admitted pro hac vice)
　　　　233 S. Wacker Drive, Suite 7800
　　　　Chicago, Illinois 60606
　　　　Telephone: 312-876-3136
　　　　mflessner@sonnenschein.com

*Attorneys for Defendant Stephen Walsh*