# EXHIBIT A

```
Approved: _____        09 MAG     502
         JOHN J. O'DONNELL
         JESSICA A. ROTH
         Assistant United States Attorneys

Before:  HONORABLE DOUGLAS F. EATON
         United States Magistrate Judge
         Southern District of New York
```

------------------------------x
UNITED STATES OF AMERICA      :   SEALED COMPLAINT
                              :
     - v. -                   :   Violation of
                              :   15 U.S.C. §§ 78j(b),
PAUL GREENWOOD, and           :   78ff; 17 C.F.R. §
STEPHEN WALSH,                :   240.10b-5; 18 U.S.C.
                              :   §§ 371, 1343, 1346, and
                              :   2.
          Defendants.         :
                              :   COUNTY OF OFFENSE:
                              :   NEW YORK
------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    JAMES C. BARNACLE, JR., being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE

(Conspiracy To Commit Securities Fraud and Wire Fraud)

    1. From at least in or about 1996 through in or about February 2009, in the Southern District of New York and elsewhere, PAUL GREENWOOD and STEPHEN WALSH, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (1) to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and (2) to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

    2. It was a part and object of the conspiracy that PAUL GREENWOOD and STEPHEN WALSH, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national

securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (1) employing devices, schemes and artifices to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the investing public and other persons and entities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

3. It was further a part and object of the conspiracy that PAUL GREENWOOD and STEPHEN WALSH, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, namely, a scheme to defraud investors and enrich themselves at the expense of investors, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

## Overt Acts

4. In furtherance of the conspiracy and to effect its illegal objects, PAUL GREENWOOD and STEPHEN WALSH, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. On or about July 6, 2007, a wire transfer was effected in the amount of $500,000 to a bank account in New York, New York, that was in the name of STEPHEN WALSH's wife.

    b. On or about November 13, 2007, a wire transfer was effected in the amount of $300,000 to a bank account in New York, New York, that was in the name of PAUL GREENWOOD.

    c. On or about January 8, 2008, a wire transfer was effected in the amount of $500,000 to a bank account in New York, New York, that was in the name of STEPHEN WALSH's wife.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Securities Fraud)

5. From at least in or about 1996 through at least in or about February 2009, in the Southern District of New York and elsewhere, PAUL GREENWOOD and STEPHEN WALSH, the defendants, unlawfully, willfully, and knowingly, by use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons in connection with the purchase and sale of securities, to wit, GREENWOOD and WALSH made or caused to be made false representations to investors regarding their investments, omitted to disclose material facts to investors regarding their use and misappropriation of investor funds, and enriched themselves at the investors' expense.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT THREE
(Wire Fraud)

6. From at least in or about 1996 up through and including in or about February 2009, in the Southern District of New York and elsewhere, PAUL GREENWOOD and STEPHEN WALSH, the defendants, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, unlawfully, willfully, and knowingly, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit, GREENWOOD and WALSH caused numerous transfers of funds via wire from bank and securities accounts that they controlled in New York, New York, to other persons and entities for the purpose of diverting investor funds to their own personal use, all in furtherance of a scheme to

3

defraud investors and enrich themselves at the expense of the investors.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7. I have been a Special Agent with the FBI for approximately 3 years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for participating in such offenses.

8. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC"), documents provided by investors, a review of bank and trading records, a review of documents created and maintained by entities controlled by PAUL GREENWOOD and STEPHEN WALSH, the defendants, and information provided to me by witnesses who participated in conversations and written communications with defendants GREENWOOD and WALSH. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Relevant Entities and Individuals

9. Based upon my review of publicly available documents and my conversations with representatives of the SEC and the CFTC, I know that WG Trading Company Limited Partnership ("WG Trading") is a Delaware limited partnership operating as a commodity pool, is a registered broker-dealer under the Securities Exchange Act of 1934, and is a member of the New York Stock Exchange, Inc. WG Trading has offices in Greenwich, Connecticut, Jersey City, New Jersey, and North Hills, New York, and executes securities trades through the New York Stock Exchange in New York, New York. The managing general partners of WG Trading are PAUL GREENWOOD and STEPHEN WALSH, the defendants, both of whom are registered with the CFTC as operators of a commodity pool and with the SEC as principals of a registered broker-dealer.

10. Based upon my review of publicly available documents and my conversations with representatives of the SEC and the CFTC, I know that WG Trading Investors, LP ("WG Investors"), is a Delaware limited partnership, having its principal place of business in Greenwich, Connecticut. WG Investors maintains an account and executes transactions, including various payments by wire transfer, through a broker-dealer headquartered in New York, New York. WG Investors is a limited partner in WG Trading. The managing general partners of WG Investors are PAUL GREENWOOD and STEPHEN WALSH, the defendants. WG Investors is not registered with the SEC or the CFTC.

11. Based upon my review of publicly available documents and my conversations with representatives of the SEC and the CFTC, I know that Westridge Capital Management, Inc. ("Westridge"), is a Delaware corporation with its principal place of business in Santa Barbara, CA. Westridge is registered with the SEC as a registered investment adviser and is an investment adviser to the WCM Fund ("WCM Fund"), a listed commodity pool organized under the laws of the British Virgin Islands, and other investors. Based upon my review of documents obtained by the CFTC, the WCM Fund has approximately 16 participants, including charitable and university foundations, retirement and pension plans, and other institutions. Westridge is owned by PAUL GREENWOOD and STEPHEN WALSH, the defendants, and another individual ("the Marketer").

## The Investment Scheme

12. Based upon my review of documents provided to investors, and my conversations with representatives of the SEC and the CFTC about their interviews with investors, I have learned that, from at least in or about 1996, through and including in or about February 2009, PAUL GREENWOOD and STEPHEN WALSH, the defendants, and others known and unknown, solicited funds from institutional investors, including charitable and university foundations, pension and retirement plans, and other institutions. I have learned that investors were told by Westridge, and others, both orally and in writing, the following:

    a. Westridge and WG Trading operate as one group with common ownership for the management of investor funds.

    b. Investors were offered the opportunity to invest through different mechanisms. First, an investor could purchase a limited partnership interest in WG Trading. Second, an investor could invest through WG Investors by delivering funds to WG Investors in exchange for a promissory note from WG Investors to the investor, which note would pay interest at a

5

rate similar to the rate of return realized by a
limited partnership interest in WG Trading. The
investors were told that the majority of their
funds would be passed through to WG Trading for
investment pursuant to the strategy described below
in subparagraph 12(c). Third, an investor could
purchase an interest in the WCM Fund, which in turn
would invest the fund through WG Investors in
exchange for a promissory note issued by WG
Investors to the WCM Fund.

    c.    For all of the foregoing types of investments, the
investor funds would be invested by WG Trading and
Westridge pursuant to a strategy called "equity
index arbitrage," which is a form of "enhanced
indexing." Equity index arbitrage is the buying
and simultaneously selling through futures of an
equity index (such as the S&P 500). The marketing
materials represented that "the market exposure of
this arbitrage is zero."

    d.    The enhanced indexing strategy proposed by
Westridge and WG Trading has consistently
outperformed the S&P 500 Index. For example, in
marketing materials that Westridge sent to a state
public employees' pension fund on or about November
9, 2006, Westridge represented that the enhanced
indexing trading strategy had overperformed the S&P
500 index for the past 10 ½ years. In addition,
Westridge made the following representations
concerning its annualized percentage performance
returns:

|  | S&P 500 | Westridge |
| --- | --- | --- |
| 3 years ending 6/30/06 | 11.21% | 11.75% |
| 5 years ending 6/30/06 | 2.49% | 3.09% |
| 10 years ending 6/30/06 | 8.39% | 9.94% |

13. I have reviewed the following materials concerning an
investment by a public state-sponsored university ("Investor 1"):
(a) an investment management agreement dated November 1, 2002
between Investor 1 and Westridge ("Management Agreement"); (b) a
side letter between Investor 1 and Westridge, WG Trading, WG
Investors, and PAUL GREENWOOD and STEPHEN WALSH, the defendants
("Side Letter"); and (c) a Senior Promissory Note dated November
22, 2002 executed by WG Investors for the benefit of Investor 1
("Investor 1 Note"), pursuant to which WG Investors has agreed to
pay $28,222,000 plus interest as specified in the Investor 1 Note.

Based upon my review, I have learned the following:

    a. In or about November 2002, Investor 1 made an initial investment of approximately $28 million with Westridge by transmitting cash to WG Investors and by execution of the Management Agreement. Pursuant to the Investor 1 Note, the interest accruing and payable on the note "shall be the performance of a hypothetical investment equal in amount to the principal amount of this Note invested in a limited partnership interest of [WG Trading]." The Investor 1 Note was signed by PAUL GREENWOOD, the defendant, on behalf of WG Investors.

    b. In the Side Letter, GREENWOOD (who signed individually and for WG Trading and WG Investors) and WALSH represented that "the only business of WG trading is index arbitrage and that WG trading does not employ any other investment strategies. In addition, the WG parties shall strive to ensure that the University's aggregate investment will always maintain precisely one hundred percent (100% exposure) to the S&P 500."

    c. I have learned from documents obtained by representatives of the CFTC and other publicly filed documents, that Investor 1 has invested in excess of $65 million with WG Investors, including an investment of approximately $21 million on or about February 6, 2009.

    14. I have reviewed a Senior Promissory Note dated April 1, 2004, issued by WG Investors for the benefit of a corporate pension plan ("Investor 2"), which relates to an investment of approximately $10,000,000 by Investor 2 ("Investor 2 Note"). Pursuant to the Investor 2 Note, which was executed by PAUL GREENWOOD, the defendant, on behalf of WG Investors, "[f]or purposes of determining the interest accruing and payable on the Note, the index shall be the performance of a hypothetical investment equal in amount to the principal of this Note invested in a limited partnership interest of . . . WG Trading." The Investor 2 Note included a side letter, also signed by GREENWOOD, which stated that WG Trading "represents that its only business is index arbitrage and does not employ any other investment strategies" and that "permissible investments include only the purchase or sale of index stocks versus the futures for that index so long as the futures price is determined at the expiration by the value of the underlying asset purchased or sold."

15. According to documents obtained by the CFTC and the National Futures Association ("NFA"), based upon information provided by WG Investors, the NFA has identified several investors who have invested directly or indirectly with WG Investors. These investors include charitable and university foundations, retirement and pension plans, and other institutional investors. The notes issued and payable by WG Investors reflecting these investments total at least approximately $668 million.

### Misappropriation Of Investor Funds

16. On or about February 5, 2009, the NFA commenced audits of PAUL GREENWOOD and STEPHEN WALSH, the defendants, as well as WG Trading, the WCM Fund, and others. Based upon information uncovered during these audits, the NFA issued a Notice of Member Responsibility Action on February 12, 2009 (the "MRA"), which, in substance: (a) suspended GREENWOOD and WALSH from NFA membership until further notice; (b) prohibited GREENWOOD and WALSH, and any person acting on their behalf, from soliciting any customer or pool participant funds, or placing any trades in any pools or accounts that they control (other than liquidating trades); (c) prohibited GREENWOOD and WALSH, and any person acting on their behalf, from disbursing or transferring any funds from any accounts (bank, trading, or other accounts) that either one owns or controls, without prior approval from NFA; and (d) required GREENWOOD and WALSH to provide notice of the MRA to all pool participants in any commodities pool which GREENWOOD and WALSH operate or control.

17. I have reviewed the MRA and the accompanying declaration of a Director in the NFA's Compliance Department, and have learned the following:

   a. The NFA's review of the books and records of the WCM Fund indicate that as of December 31, 2008, the WCM Fund reported total assets of approximately $400 million and virtually no liabilities. Of the $400 million in assets, $76 million appeared to be held in futures positions, cash, and treasury bills, at other NFA member futures commission merchants. The remaining $324 million was reflected as a note receivable from WG Investors.

   b. The NFA staff reviewed several promissory notes issued to the WCM Fund by WG Investors that were purportedly signed by a person identified as a Director of WG Investors (the "Director"). The notes, including a note dated December 31, 2008 in the amount of approximately $325 million (which I have reviewed), purport to pay interest at a rate

8

that mirrors the rate of return that would be earned by a limited partner in WG Trading (excluding fees). Although the notes were purportedly signed by the Director, he denied to the NFA that he executed the notes.

c. The NFA obtained financial records for WG Investors as of December 31, 2008. Those records reflect that WG Investors had approximately $812 million in assets. Based upon its review of the financial records and conversations with an employee of WG Trading, the NFA found that the assets of WG Investors included the following: (i) a purported note receivable from GREENWOOD in the amount of approximately $293 million; (ii) a purported note receivable from WALSH in the amount of approximately $261 million; and (iii) approximately $147 million that was purportedly invested in entities owned or controlled by GREENWOOD and WALSH. WG Investors had only approximately $93.8 million held with WG Trading. In addition, the financial records for WG Investors reflect approximately $8.2 million in purported "employee advances."

d. Because more than $794 million of the assets of WG Investors were receivables from GREENWOOD and WALSH, or investments in entities that they controlled, the NFA sought to question GREENWOOD and WALSH about the activities of WG Trading, WG Investors, and the other related commodity pools. Other than brief telephone conversations, neither GREENWOOD nor WALSH has agreed to speak to representatives of the NFA.

18. I have reviewed the following documents: (a) 12 promissory notes issued by PAUL GREENWOOD, the defendant, in favor of WG Investors, from January 1998 through and including January 2008 ("GREENWOOD Notes"); (b) 12 promissory notes issued by STEPHEN WALSH, the defendant, in favor of WG Investors, from January 1998 through and including January 2008 ("WALSH Notes"); and (c) a promissory note dated March 1, 1996 issued jointly by WALSH and GREENWOOD in the amount of approximately $23 million ("1996 Note"). Based on my review of these notes, I have learned the following:

a. The total amount of the GREENWOOD Notes, plus one-half of the 1996 Note, is approximately $293 million. The total amount of the WALSH

9

Notes, plus one-half of the 1996 Note, is approximately $261 million.

b. All of the GREENWOOD Notes and the WALSH Notes, except two, state that the amount of the note "is representative of general partner's share of losses, withdrawals and payments" during the preceding year and that the note is "due and payable under 90 days written notice from [WG Investors]" (i.e., the entity that GREENWOOD and WALSH, as managing general partners, control).[1] The 1996 Note, which appears to be made under the predecessor names of WG Trading and WG Investors, states that it "is representative of the 'negative balance' on the capital account of [WG Trading's predecessor] created by [WG Trading's predecessor's] share of the economic losses in [WG Investor's predecessor].."

19. I have spoken to an employee of WG Trading (the "Employee") and have learned the following:

a. The Employee has been employed by WG Trading since at least in or about 1991, and, during all relevant times, had signature authority over an account maintained by WG Investors at a broker-dealer headquartered in New York, New York (the "Account").[2]

b. From time to time, PAUL GREENWOOD and STEPHEN WALSH, the defendants, directed the Employee to wire funds from the Account to their own bank accounts, bank accounts in the name of their family members, and bank accounts of other persons and entities to pay for personal expenditures of GREENWOOD and WALSH that were unrelated to the business of WG Investors. The Employee recalled effecting transfers to pay for, among other things: (a) the purchase of expensive

---

[1] The May 31, 1999 GREENWOOD Note and May 31, 1999 WALSH Note each state that the note is "representative of general partner's share of deferred interest receivable during the previous years."

[2] The information provided by the Employee has been corroborated by information obtained from other sources, including documents and bank and brokerage records obtained in this investigation.

    collectible items by GREENWOOD; (b) the purchase of horses by GREENWOOD; (c) transfers of cash to WALSH's then-wife; and (d) transfers of cash for the purchase of an apartment for WALSH's ex-wife pursuant to a divorce settlement.

  c. At the beginning of each calendar year, the Employee added up the transfers that GREENWOOD and WALSH had directed for their personal benefit and prepared a promissory note for GREENWOOD and WALSH to sign that included the amounts of money that GREENWOOD and WALSH had taken from the Account.

  d. From time to time, GREENWOOD directed the Employee to understate the losses reported to investors and include a portion of the losses in the promissory notes executed by GREENWOOD and WALSH. Thus, the GREENWOOD Notes and the WALSH Notes include amounts reflecting funds misappropriated for the personal benefit of GREENWOOD and WALSH and losses fraudulently hidden from investors.

  20. I have reviewed the records for the Account of WG Investors covering the time period of approximately February 1, 2007 through approximately December 22, 2008. These records reflect, among other things, outgoing wire transfers totaling millions of dollars to bank accounts in the names of PAUL GREENWOOD and STEPHEN WALSH, the defendants, and members of their families.

  WHEREFORE, the deponent prays that arrest warrants be issued for PAUL GREENWOOD and STEPHEN WALSH, the defendants, and that they be imprisoned or bailed as the case may be.

           _____
           JAMES C. BARNACLE, JR.
           SPECIAL AGENT
           FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
24th day of February 2009

_____
THE HONORABLE DOUGLAS F. EATON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK