# EXHIBIT B

09   CV   1749

**In The United States District Court**
**For The Southern District Of New York**

COMMODITY FUTURES TRADING
COMMISSION,

                                    Plaintiff,

vs.

Stephen Walsh, Paul Greenwood, Westridge
Capital Management, Inc., WG Trading Investors,
LP, WGIA, LLC,

                                    Defendants,

Westridge Capital Management Enhancement
Funds Inc., WG Trading Company LP,  WGI
LLC, K&L Investments, and Janet Walsh,

                                    Relief Defendants.

Civil Action No.

Complaint For Injunctive And Other
Equitable Relief And Civil Monetary
Penalties Under The Commodity
Exchange Act

## I.   SUMMARY

1.      From at least 1996 to the present (the "relevant period"), Stephen Walsh ("Walsh") and Paul Greenwood ("Greenwood") orchestrated a scheme involving the misappropriation of at least $553 million from commodity pool participants.  The National Futures Association ("NFA") uncovered this massive fraudulent scheme as a result of audits it recently conducted regarding Walsh and Greenwood.  Victims of this fraud include state retirement pension plans as well as university foundations.

2.      During the relevant period, Walsh and Greenwood misappropriated approximately $553,000,000 for the purposes of paying personal expenses and hiding trading losses.  The primary means by which they effectuated their fraud was through various entities, which they owned and controlled, Westridge Capital Management, Inc. ("Westridge"), WG Trading Investors, LP ("WG Trading Investors"), and WGIA, LLC ("WGIA").  The two pools

operated by Walsh and Greenwood to perpetrate their fraud are WG Trading Company LP ("WG Trading Company") and Westridge Capital Management Enhancement Funds, Inc. ("WCME").

2.      Through misrepresentations and omissions of material fact, Walsh, Greenwood, Westridge, WG Trading Investors, and WGIA (collectively, the "Defendants"), have engaged, are engaging, or are about to engage in acts or practices that violate the anti-fraud provisions of Sections 4b(a)(2) and 4o(1)(A) &(B) of the Commodity Exchange Act (the "CEA" or "Act"), 7 U.S.C. §§ 6b(a)(2) and 6o(1)(A) & (B) (2006), and Section 4b(a)(1) of the Act as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (effective June 18, 2008), to be codified at 7 U.S.C. § 6b(a)(1).

3.      Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices, as more fully described below.

4.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commission brings this action to enjoin such acts and practices, prevent the dissipation of assets, and compel compliance with the provisions of the Act.  In addition, the Commission seeks civil monetary penalties, an accounting, restitution, disgorgement and such other equitable relief as the Court may deem necessary or appropriate under the circumstances.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6.     Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e) (2006), in that the Defendants transacted business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

## III.     THE PARTIES

### PLAINTIFF

7.     Plaintiff **Commodity Futures Trading Commission ("CFTC" or "Commission")** is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2006), and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2008).

### DEFENDANTS

8.     Defendant **Stephen Walsh** is an individual residing in Sands Point, New York. Walsh is registered with the Commission as a commodity pool operator ("CPO") (NFA ID # 279714), and his registered address is WG Trading Co. LP, One Lafayette Place, 2nd Floor, Greenwich, CT 06830.  Walsh is listed as a co-CPO with Greenwood for WG Trading Co. Walsh represents to prospective pool participants that he is a member of the University at Buffalo Foundation Board and serves on the investment committee, and that he served as co-chairman of the New York Islanders Hockey Team and a member of the Board of Governors of the National Hockey League from 1991-1998.

9.     Defendant **Paul Greenwood** is an individual residing in North Salem, New York. Greenwood is registered with the Commission as a CPO (NFA ID # 279710), and his registered

business address is WG Trading Co. LP, One Lafayette Place, 2nd Floor, Greenwich, CT 06830.

Greenwood is listed as a co-CPO with Walsh for WG Trading Company.

10.     Defendant **Westridge Capital Management, Inc.** ("Westridge") is a Delaware

corporation with a principal place of business in Santa Barbara, CA.  Westridge is registered

with the Securities and Exchange Commission as a registered investment adviser and is the

investment adviser for the Westridge Capital Management Enhancement Funds pool.

Greenwood and Walsh are partners holding a controlling interest in Westridge.

11.     Defendant **WG Trading Investors, LP** is a Delaware limited partnership with a

principal place of business in Greenwich, CT.  The managing general partners of WG Trading

Investors are Greenwood and Walsh.

12.     Defendant **WGIA, LLC** ("WGIA") is a Delaware limited liability company.

Upon information and belief, WGIA is owned by Greenwood, Walsh and others.

**RELIEF DEFENDANTS**

13.     Relief Defendant **WG Trading Co. LP** is a commodity pool (NFA ID P4703)

operated by Greenwood and Walsh as co-CPOs with a principal place of business in Greenwich,

CT.  WG Trading Co. is a registered broker-dealer under the Securities and Exchange Act of

1934.  The managing general partners of WG Trading Co. are Greenwood and Walsh, and WG

Trading Investors is a limited partner.

14.     Relief Defendant **Westridge Capital Management Enhancement Funds, Inc.** is

a commodity pool with an address in Tortola, British Virgin Islands.  Information obtained by

the National Futures Association indicates that this pool has 16 participants, including university

foundations and retirement and pension plans.

15.     Relief Defendant **K & L Investments, LLC** is a Connecticut limited liability company with a principal place of business in Greenwich, CT.  Upon information and belief, the managing general partner of K&L Investments is Paul Greenwood, and it is owned by Walsh and Greenwood.

16.     Relief Defendant **WGI, LLC** is a Connecticut limited liability company with a principal place of business in Greenwich, CT.  Upon information and belief, WGI, LLC is owned by Paul Greenwood and Stephen Walsh.

17.     Relief Defendant **Janet B. Walsh** is an individual residing in New York, New York.  Ms. Walsh is the ex-wife of Defendant Steven Walsh.

## IV.     FACTS

**A.     Statutory Background**

18.     A "commodity pool" is any investment trust, syndicate or similar form of enterprise engaged in the business of investing its pooled funds in trading commodity futures and/or commodity options.  CFTC Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1) (2008).

19.     A "CPO" is any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.  Section 1a(5) of the CEA, 7 U.S.C. § 1(a)(5) (2006).

20.     A "participant" is any person who has any direct financial interest in a commodity pool.  CFTC Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2008).

## B.    The NFA Audit

21.    On February 5, 2009, the NFA commenced audits of Walsh and Greenwood at their

Greenwich location.  Among other matters, NFA conducted the audits to clarify issues relating to

a loan made by the Westridge Capital Management Enhancement Funds to WG Trading

Investors.[1]  Specifically, the NFA had recently reviewed several promissory notes issued to the

Westridge Capital Management Enhancement Funds from WG Trading Investors that were

purportedly signed by a director of WG Trading Investors.  These notes, including the most

recent dated December 31, 2008, in the amount of approximately $325 million, appeared to be

issued at the end of each calendar year and provided that interest on the note is to be paid in an

amount that mirrors the rate of return (gross of fees) earned by a WG Trading Co.  Although

these notes were purportedly signed by a director of WG Trading Investors, that person denied

executing the notes in a conversation with NFA staff on February 11, 2009.  The NFA also

conducted the audit to understand the relationship between WG Trading Investors and WG

Trading Co.  Although Greenwood was present when the NFA arrived at the office, he left

shortly thereafter after telling the NFA to refer its questions to the compliance officer.

22.    The compliance officer provided the NFA with a financial record for WG Trading

Investors which reflected that, as of December 31, 2008, WG Trading Investors had

approximately $812 million in assets.  The financial records also indicated that WG Trading

---

[1] As noted above, Westridge Capital Management Enhancement Funds is an exempt commodity pool pursuant to
Commission Regulation 4.7, 17 C.F.R. 4.7 (2008).  As such, it was required to obtain annual audited financial
statements prepared and certified by a nationally recognized public accounting firm.  The notes to the December 31,
2007 financial statements for this pool received by the NFA in early 2008 indicated that "the fund invests
approximately 89% of its total assets in structured notes issued by WG Trading Investors Limited Partnership, a
Delaware limited partnership, and a related party to Westridge Capital Management Enhancement Funds Inc. by
virtue of key management personnel in common.  The notes bear interest at the rate of an index.  The index is a
hypothetical limited partnership interest in WG Trading Company Limited Partnership."  An additional note in the
certified statements referred to related party transactions and states "Notes Receivable – Unsecured note bearing
interest at the rate of an index and repayable at any month end on 30 days notice.  The index is hypothetical limited
partnership interest in WG Trading Company L.P."

Investors was a pool participant and had approximately $93.8 million invested in the WG

Trading Co. pool. This amount represents approximately 29% of the Westridge Capital

Management Enhancement Funds' total loan to WG Trading Investors. WG Trading Investors'

financial records also reflected that it had unidentified accounts payable of approximately $194.5

million.

     23.     The NFA also reviewed the financial records for WG Trading Co. and noted that

this listed pool had approximately $1.3 billion in assets. However, the pool's records reflect that

of this $1.3 billion amount, approximately $531.5 million was in accounts receivable. Notably,

these accounts receivable had never appeared in any annual report filed by the pool with the

NFA.[2] Although WG Trading Co.'s financial records list WG Trading Investors' pool interest as

approximately $93.8 million, the records also reflect that WG Trading Co.'s largest account

receivable is from WG Trading Investors in the amount of $194.5 million. This amount

corresponds with the unidentified accounts payable entry on WG Trading Investor's financial

records. The NFA subsequently made further inquiry of Greenwood as to the disposition and

location of WG Trading Investors' other assets in order to determine the location of the

remainder (approximately $230 million) of the $324 million that the Westridge Capital

Management Enhancement Funds loaned to WG Trading Investors. Those assets included

$292.8 million in "note receivables" from Greenwood and $260.7 million "note receivables"

from Walsh. The compliance officer represented that another $147 million of the assets are

investments in two entities owned by Walsh and Greenwood. These notes are almost identical in

---

[2]  As noted above, WG Trading Company is an exempt commodity pool, pursuant to Commission Regulation 4.7.
17 C.F.R. 4.7 (2008). As such, it had annual audited financial statements prepared and certified by a nationally
recognized public accounting firm. The December 31, 2007 statements received by the NFA in early 2008 did not
reflect any receivables from either pool participants or WG Trading Investors, LP. During the NFA's February 2009
audit of Walsh and Greenwood, WG Trading Co.'s financial records as of December 31, 2008 did reflect an account
receivable balance from WG Trading Investors of approximately $194.5 million, more than $100 million more than
WG Trading Investor's interest in WG Trading Co.

their terms and indicate that the respective "sum is representative of the general partner's share of losses, withdrawals and payments." Additionally, the notes state that "The outstanding balance of this note is due and payable under 90 days written notice from WG Trading Investors."

24.    Further, the financial records indicate $8.2 million of the assets are "employee advances." Therefore, the vast majority of WG Trading Investors' assets appear to be receivables from Greenwood and/or Walsh, investments in entities purported to be owned by Greenwood and/or Walsh and employee advances.

25.    The fact that more than $794 million of WG Trading Investors' assets were receivables from Walsh and Greenwood or entities that they purportedly owned greatly concerned the NFA. Therefore, the NFA determined to meet with Walsh and Greenwood to make inquiry and request documents regarding their financial wherewithal and ability to repay WG Trading Investors which in turn would enable WG Trading Investors to pay its note holders, including the Westridge Capital Management Enhancement Fund.

26.    Additionally, the NFA had questions for Walsh and Greenwood regarding their CPO activities, Westridge Capital Management's activities, WG Trading Investors' activities, and WG Trading Co.'s activities. Walsh was not present in his Greenwich office at any time during NFA staff visits on February 5th, 6th, 10th, 11th and 12th of 2009. The only two instances in which he made himself available to the NFA were a twenty minute telephone conversation covering preliminary matters on February 5th, the day that the NFA arrived at his office, and a brief telephone conversation on February 10th. During the conversation on February 5th, Walsh represented to the NFA that he and Greenwood were the only general partners of WG Trading Investors. The NFA made a number of additional attempts to contact Walsh as matters of concern arose during the audit. For example, on February 9th, the NFA attempted to contact him

at a North Hills, New York office used by Walsh. Although a secretary told NFA staff that she would give Walsh the message that the NFA had called, Walsh did not respond.  Further, NFA staff left a voicemail for Walsh that evening stating that it was urgent that he contact the NFA immediately in regard to the audit. Walsh's secretary called the NFA the next morning and told NFA that Walsh would be in a meeting all day and that he would be unavailable to the NFA.  On February 10th, NFA auditors visited Walsh's North Hills office and found that he was not there. His secretary represented that Walsh was in meetings in New York City and that he would not be available at any time on that day. Walsh did have a two minute phone call with the NFA later that day during which he acknowledged that he was aware that the NFA was making inquiries directed to him, but represented that he would not be available to deal with the inquiries for at least several more days.

27.     Greenwood has only been sporadically available to the NFA, either in person or via teleconference, but has not made himself available to meet with NFA staff since February 6th and NFA has had no contact from him at all since February 9th.  On that day, NFA staff engaged in a telephone conversation with Greenwood in which staff inquired as to the whereabouts of the funds from the Westridge Capital Management Enhancement Funds that were loaned to WG Trading Investors but not invested in the WG Trading Co. pool.  Greenwood replied that he would have to get back to the NFA about that subject and ended the conversation. He sent a subsequent email to the NFA in which he said that he would be at the Greenwich office on February 10th.  NFA auditors visited the office on February 10th and were told by an administrative assistant that Greenwood would be in meetings in New York City all day and that he would not be available to meet with the NFA. While at the office on February 10th, NFA staff observed that the administrative assistant repeatedly covered her mouth while

conversing on the telephone and was moving documents from the compliance officer's office.

## C.    The Greenwood and Walsh Investment Scheme

28.    Beginning in or about 1996, Walsh and Greenwood solicited and obtained funds from prospective and actual pool participants through Westridge, WG Trading Investors, and WGIA.  Walsh and Greenwood registered with the CFTC as CPOs in or about 1997 and thereafter set-up and/or utilized various entities to facilitate their investment schemes, including two pools: Westridge Capital Management Enhancement Funds and WG Trading Co.  As pool operators, Walsh and Greenwood owe a fiduciary duty to their pool participants.

29.    According to solicitation materials provided to actual and prospective pool participants, Westridge and WG Trading Co. "operate as one group with common ownership for the management of enhanced portfolios."

30.    Westridge, WG Trading Investors, WG Trading Company, Westridge Capital Management Enhancement Fund, WGIA, Greenwood and Walsh have, from time to time, collectively referred to themselves as the "Westridge Group," and will sometimes be so collectively referred to herein.

31.    Walsh, Greenwood, Westridge and WG Trading Investors defrauded numerous victims through falsely depicting that all pool participants' funds would be employed in a single investment strategy.  Specifically, the Defendants represented in their promotional and marketing materials that were distributed to prospective and actual pool participants the following:

   a.  Walsh, Westridge, WG Investors and WG Trading Co., collectively represented in writing to at least one client or participant that "the only business of WG Trading is index arbitrage and that WG Trading does not employ any other investment strategies";

b.  Walsh, Greenwood, and Westridge provided marketing materials to at least one

other prospective or actual pool participant stating that "[T]he process starts with

a constant long position in index futures (S&P 500 Russell 1000, etc.) for the

funds exposure chosen by the client.  This position is rolled every 90 days,

reinvesting excess performance to ensure that the portfolio is always 100%

invested.   While cash is held for variation margin purposes, the equity exposure

represents the client's total dollar investment";

c.  Walsh, Greenwood, Westridge and WG Trading Co. provided marketing

materials to at least one other participant that "we [WG Trading] are simply a

broker dealer.... doing one strategy (index arbitrage) so there are no other

accounts ... [e]veryone is a partner within WG Trading and not a separate

account....";

d.  Westridge provided a published periodical "letter to the editor" authored by its

president James L. Carder ("Carder") which contained the representation that

"[o]ur fixed-income strategy...which ...has indeed produced excess returns of

128 basis points since inception, has a constant long position in Treasury futures

to match the duration of the desired index....[and] the residual cash is enhanced

through the same index arbitrage strategy"; and

e.  Walsh, Greenwood, Westridge and WG Trading Investors provided to yet another

prospective pool participant with written answers to a questionnaire which

represented that "Westridge Capital Management, Inc. and WG Trading Co.

operate as one group with common ownership for the management of enhanced

portfolios. *WCM [Westridge]  is the group's Registered Investment Advisor and*

*is responsible for the long futures positions. WGTC[WG Trading Company] is a registered broker-dealer, whose only activity is enhanced cash management through the use of equity index arbitrage, which is the sole alpha-source for the enhanced index strategy.*" (Emphasis added.) The questionnaire answers provided by Walsh, Greenwood, Westridge and WG Trading Company to this prospective pool participant also included a pie chart describing the portfolio construction process for the investment product, which included three proportionally sized slices of the pie chart, two of which were in one color captioned "Westridge," labeled "5% collateralized the futures exposure," and "10% provides for variation margin," and the remaining 85% proportional slice of the pie chart, which was in another, color labeled "WG Trading" with the description "85% invested in equity index arbitrage." See Exhibit A. Additional written answers provided by Walsh, Greenwood, Westridge and WG Trading Company to other questions from this prospective pool participant in this questionnaire included the following statements:

    i.  "Trading is all we do and our success has been due to the fact that we trade very well …"

    ii.  "The only alpha source for the product is enhanced cash using equity index arbitrage,"

    iii.  "The only strategy employed is index arbitrage which is defined as being long stocks and short futures in the same amount for a positive spread. By definition, this is a virtually riskless trade,"

iv. "When the spread between the futures and the index is trading above the borrowing cost, the index is bought and the futures are sold. This locks in a positive return until the expiration of the futures. If the spread narrows below the borrowing cost, the stocks are sold and the futures bought to close out the position. *There is no deviation from this discipline*," (emphasis added);

v. "The only source of alpha for the Enhanced S&P 500 index product is the enhanced cash portfolio managed by WGTC [WG Trading Co.]. *There is only one strategy employed by WGTC* [WG Trading Co.] *and that is index arbitrage*" (emphasis added).

32. Defendants explicitly represented that the activity undertaken on behalf of pool participants would adhere to the investment strategy described above in paragraph 31. Specifically, Walsh, Greenwood, and Westridge entered into a written subscription agreement with at least one prospective pool participant which provided that "[a] Statement of investment policies and portfolio restrictions setting forth the investment objectives for the Account and guidelines for the implementation thereof is set forth in Exhibit A attached hereto and incorporated herein by reference. [T]he manager shall comply with the provisions of Exhibit A." Such Exhibit A stated that "the manager will deposit approximately 5% of the assets as [initial] margin for … futures contracts, will invest approximately 10% in short term cash equivalents… and will invest the remaining 85% of the assets in WG Trading Company LP to have access to the index arbitrage strategy of WG Trading."

33. Defendants explicitly represented that the only permissible use of pool participants' funds was to fully invest them in the strategy described above in paragraph 31. For

example, Walsh, Greenwood and Westridge provided marketing materials to at least one pool client or participant which represented that "Cash per se is fully invested at all times in either the Westridge liquidity pool supporting the index exposure or the equity index arbitrage exposure. This is tightly controlled in order to ensure that… the maximum possible is fully invested in the index arbitrage strategy… [and] the 85% invested in equity index arbitrage which is 100% fully invested in stocks and futures."

34.    Based on the solicitations of Greenwood and Walsh, personally and through their corporate entities, some pool participants invested funds directly into WG Trading Company by subscribing to limited partnership agreements with WG Trading Co., while other pool participants invested funds into WG Trading Co. through an arrangement that involved the execution of promissory notes, with an explicit agreement and understanding between Greenwood, Walsh, WG Trading Co. and the pool participants that the funds invested via promissory note would be traded exclusively in the manner described and promised by Greenwood, Walsh, and WG Trading Co.  Greenwood, Walsh, and the WG Trading Co. pool represented to the pool participants who entered into such promissory note arrangements that they would earn and share in the pool trading profits promised by Greenwood, Walsh and the WG Trading Co. pool in a manner and degree identical to the manner and degree that pool participants who were limited partner subscribers in the WG Trading Co. pool.

35.    Other pool participants invested funds in the WG Trading Co. pool either by subscribing to limited partnership agreements with Westridge or by entering into promissory note arrangements with Westridge or WGIA, with an explicit agreement and understanding that (a) the funds invested by the participants would be traded exclusively in the manner described above in paragraph 31 and (b) that the pool participants who invested funds with Greenwood,

Walsh, Westridge into the WG Trading Co. pool through the means of a promissory note

arrangement would earn and share in the pool trading profits promised by Greenwood, Walsh,

Westridge and the WG Trading Co. pool in a manner and degree identical to the manner and

degree that limited partner subscribers in Westridge would receive.

36.    Greenwood, Walsh and Westridge represented to all prospective pool participants

and pool participants, regardless of whether such pool participants invested with Defendants

through the means of a limited partnership agreement or promissory notes, that the exclusive

trading strategy and the exclusive means by which all pool funds would be invested by

Defendants would be in the manner described above in paragraph 31.  In particular, Westridge

would retain $15 dollars out of every $100 invested to trade futures contracts on the S&P 500

index, with $5 dollars of the aforesaid $15 dollars to be used to establish a futures trading

position in S&P 500 futures, and the other $10 dollars of the aforesaid $15 dollars to be utilized

to meet any margin calls that resulted from such futures trading.  Westridge further represented

to all prospective pool participants and pool participants, regardless of whether such pool

participants invested with Defendants through the means of a limited partnership agreement or

promissory note, that the participants' remaining funds (i.e. the remaining $85 dollars out of

every $100 invested with Westridge) would be traded in the WG Trading Co. pool exclusively

and solely according to the strategy described in paragraph 31.

37.    In addition to the activity described above, Walsh, Greenwood, Westridge, WG

Trading Investors, WGIA, the WG Trading Co. pool, and the Westridge Capital Management

Enhancement pool, solicited, accepted or received from others, funds, securities, or property,

either directly or through capital contributions, the sale of stock or other forms of securities or

otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.

38.　　A certain portion of the pool participants' funds solicited and received by the Defendants were invested or deposited with Relief Defendants WGI LLC and K&L Investments. A certain portion of the pool participants' funds solicited and received by the Defendants were transferred by wire transfer to Relief Defendant Janet Walsh and used to purchase real estate in her name.

## D.　　Misrepresentations and Omissions by Greenwood and Walsh

39.　　Contrary to their representations regarding a strict, targeted investment strategy, Greenwood and Walsh did not use a large portion of the participants' funds for investment in any strategy. Rather, pool participants' funds invested through Westridge or WGIA were often transferred to WG Trading Investors, another entity owned and controlled by Walsh and Greenwood. Greenwood and Walsh misappropriated participants' funds by siphoning funds from the accounts of WG Trading Investors.

40.　　During the relevant period, Greenwood and Walsh misappropriated approximately $553 million of approximately $1.3 billion in pool participants' funds. In addition to using new pool participants' funds to cover up prior losses, on information and belief, Greenwood and Walsh used over $160 million for personal expenses, including:

- rare books at auctions,
- horses,
- Steiff teddy bears for as much as $80,000 at various auctions, including but not limited to auctions conducted by Sotheby's, and
- a residence for Walsh's ex-wife, Janet Walsh, in the amount of at least $3 million.

41.     Following the misappropriation of pool participants' funds through WG Trading Investors, Greenwood and Walsh manufactured paperwork in the form of promissory notes in order to present the appearance that pool participants funds had been loaned to them.

42.     Greenwood and Walsh failed to disclose to the pool participants that (a) they did not intend to and in fact did not invest participants' funds as they represented orally and in writing to participants, and (b) they were misappropriating participants' funds for personal use and to conceal trading losses

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT I

### Violations of Section 4b of the Act and the Act as Amended by the CRA:  Futures Fraud

43.     The allegations set forth in paragraphs 1 through 42 are re-alleged and incorporated herein.

44.     Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), make it unlawful for any person to cheat or defraud or attempt to cheat or defraud; or willfully make or cause to be made to other persons false reports or statements, or willfully enter or cause to be entered for other persons false records; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the produce or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

45.     Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7

U.S.C. §§ 6b(a)(1)(A)-(C), make it unlawful for any person, in or in connection with any order to

make, or the making of, any contract of sale of any commodity in interstate commerce or for

future delivery that is made, or to be made, on or subject to the rules of a designated contract

market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or

defraud the other person; (B) willfully to make or cause to be made to the other person any false

report or statement or willfully to enter or cause to be entered for the other person any false

record; or (C) willfully to deceive or attempt to deceive the other person by any means

whatsoever in regard to any order or contract or the disposition or execution of any order or

contract, or in regard to any act of agency performed, with respect to any order or contract for the

other person.

46.     During the relevant period, Greenwood, Walsh and agents of Westridge, WG

Trading Investors, and WGIA violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C.

§§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and violated

Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C.

§§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008, in that they

cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to

deceive pool participants by:  misrepresenting the pool's investment strategy when soliciting

prospective participants, and failing to inform prospective and actual participants that their funds

would be misappropriated for the personal use of Greenwood and Walsh and to conceal trading

losses.

47.     Walsh, Greenwood, and others were acting as agents of Westridge, WG Trading

Investors, and WGIA when they violated the Act and, therefore, Westridge, WG Trading

Investors, and WGIA as principals, are liable for violations by Walsh, Greenwood, and other agents of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and for violations by Walsh, Greenwood, and others of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

48.     Each material misrepresentation or omission, and each misappropriation made during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and a violation of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, the effective date of the CRA.

## COUNT II

### Violations of Section 4o(1) of the Act:  Fraud by CPOs

49.     The allegations set forth in paragraphs 1 through 42 are re-alleged and incorporated herein.

50.     During the relevant time period, Walsh and Greenwood acted as CPOs in that they engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, have solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

51.     During the relevant period, Walsh and Greenwood violated Sections 4*o*(1)(A) & (B) of the Act, 7 U.S.C. §§ 6*o*(1) (2006), in that as CPOs, they directly or indirectly employed or are employing a device, scheme, or artifice to defraud commodity pool participants, or engaged or are engaging in transactions, practices or a course of business which operated as a fraud or deceit upon commodity pool participants by: misrepresenting the pool's investment strategy when soliciting prospective participants, and failing to inform participants and prospective participants that their funds would be misappropriated for the personal use of Greenwood and Walsh and to conceal trading losses.

52.     Such acts were affected by use of the mails and other means or instrumentalities of interstate commerce, directly or indirectly, to engage in the business of a CPO.

53.     Each act of misrepresentation, material omission, and each misappropriation that occurred during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4*o*(1)(A) & (B) of the Act, 7 U.S.C. §§ 6*o*(1)(A) & (B) (2006).

## COUNT III

### Disgorgement of Funds from the Relief Defendants

54.     The allegations set forth in paragraphs 1 through 42 are re-alleged and incorporated herein.

55.     Defendants have defrauded pool participants in connection with soliciting funds for the trading of commodity futures.

56.     The Relief Defendants, WGI LLC, K&L Investments, and Janet Walsh, received funds and/or property as a result of the Defendants' fraudulent conduct and have been unjustly enriched thereby.

57.    The Relief Defendants, WGI LLC, K&L Investments, and Janet Walsh, have no legitimate entitlement to or interest in all of the funds and/or property received as a result of the Defendants' fraudulent conduct.

58.    The Relief Defendants, WGI LLC, K&L Investments, and Janet Walsh, should be required to disgorge funds and/or property up to the amount they received from Defendants' fraudulent conduct or the value of those funds that they may have subsequently transferred to third parties.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Enter orders finding Greenwood, Walsh, Westridge, WG Trading Investors, and WGIA liable for violating Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and for violating Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008;

B.    Enter orders finding Greenwood and Walsh liable for violating Sections 4o(1)(A) & (B) of the Act, 7 U.S.C. §§ 6o(1)(A) & (B) (2006);

C.    Enter an order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct violative of the Sections of the Act and Sections of the Commodity Exchange Act as amended by the CRA that they have been alleged to have violated;

D.    Enter an order of permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns,

and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

1. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2. Engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3. Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4. Entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf;

5. Engaging in any business activities related to commodity interest trading; and

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008);

E. Enter an order requiring Defendants to make restitution by making whole each and every pool participant whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

F. Enter an order directing the Defendants, Relief Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants

whose funds were received by them as a result of the acts and practices which constituted

violations of the Act and Regulations, as described herein;

G.      Enter an order requiring Defendants, the Relief Defendant, and any third party

transferee and/or successors thereof, to disgorge to any officer appointed or directed by the

Court, all benefits received including, but not limited to, salaries, commissions, loans, fees,

revenues and trading profits derived, directly or indirectly, from acts or practices which

constitute violations of the Act as described herein, including pre-judgment interest;

H.      Enter an order requiring Defendants to pay civil monetary penalties under the Act,

to be assessed by the Court, in amounts of not more than the higher of (1) triple the monetary

gain to Defendants for each violation of the Act and Regulations or 2) $120,000 for each

violation of the Act on or before October 22, 2004, $130,000 for each violation of the Act from

October 23, 2004 through October 22, 2008, and $140,000 for each violation of the Act on or

after October 23, 2008;

I.       Enter an order requiring Defendants, the Relief Defendants, and any third party

transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court

all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues

and trading profits derived, directly or indirectly, from acts or practices that constitute violations

of the Act as described herein, including pre-judgment interest;

J.       Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

K.    Enter any order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Date:   February \_\_\_, 2009

Respectfully Submitted,

ATTORNEYS FOR PLAINTIFF COMMODITY
FUTURES TRADING COMMISSION
Joseph Rosenberg
Trial Attorney, Eastern Regional Office
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9765
(646) 746-9940 (facsimile)
jrosenberg@cftc.gov

Paul G. Hayeck
Associate Director, Division of Enforcement
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5312
(202) 418-5523  (facsimile)
phayeck@cftc.gov

Peter M. Haas
Chief Trial Attorney, Division of Enforcement
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5377
(202) 418-5523  (facsimile)
phaas@cftc.gov

JonMarc Buffa
Trial Attorney, Division of Enforcement
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5332
(202) 418-5523  (facsimile)
jbuffa@cftc.gov