UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                          :

        - v -                                              :       09 Cr. 722 (MGC)

PAUL GREENWOOD,                                     :
STEPHEN WALSH,
                                                   :

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

COMMODITY FUTURES TRADING                          :
COMMISSION,
                                                   :

        - v -                                              :       09 Civ. 1749 (GBD)

STEPHEN WALSH, ET AL.,                             :

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE                            :
COMMISSION,
                                                   :

        - v -                                              :       09 Civ. 1750 (GBD)

WG TRADING INVESTORS, L.P., ET AL.,                :

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS PAUL GREENWOOD'S
AND STEPHEN WALSH'S MOTIONS FOR
<u>RELEASE OF FUNDS  FOR ATTORNEY'S FEES AND COSTS</u>**


                                      PREET BHARARA
                                      United States Attorney for the
                                      Southern District of New York

John J. O'Donnell
Marissa Molé
Assistant United States Attorneys
  *Of Counsel*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ............................................................ 3

    A.    The Charges and The Offense Conduct ................................. 3

    B.    The SEC and CFTC Actions ........................................... 6

        1.    The February 25, 2009 Temporary Restraining Orders .............. 7

        2.    The May 22, 2009 Preliminary Injunctions ....................... 9

    C.    The Pending Motions ............................................... 10

ARGUMENT .................................................................... 11

I.    The Motions Should Be Decided By The Court That Entered The Orders ........... 11

    A.    Authority For The SEC and CFTC Actions ............................. 12

    B.    Defendants' Opportunity To Be Heard Before Judge Daniels .............. 13

    C.    The Present Motions Attempt An End-Run Around Judge Daniels .......... 14

II.    The Asset Freeze Orders Do Not Violate The Fifth Or Sixth Amendments .......... 15

III.    The Assets The Defendants Seek To Release Do Not
Have The Value Asserted, And Are Tainted By The Fraud ...................... 22

    A.    The Walsh Residence ............................................... 23

    B.    Greenwood's Collectibles ........................................... 24

IV.    The Amounts Sought To Be Released Are Unreasonable ....................... 25

CONCLUSION .................................................................. 26

**TABLE OF AUTHORITIES**

**Cases**

Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989) . . . . . . . . . . . . . . . . . . . . . 17

CFTC v. Kimberlynn Creek Ranch, 276 F.3d 187 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 16

In re Joint Eastern & Southern Districts Asbestos Litigation,
    800 F. Supp. 643 (C.D. Ill. 1992), aff'd, 71 F.3d 1319 (7th Cir. 1995) . . . . . . . . . . . . . 14

SEC v. Coates, 94 Civ. 5361 (KMW),
    1994 WL 455558 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

SEC v. Cobalt Multifamily Investors, I LLC, 06 Civ. 2360 (KMW)(MHD),
    2007 WL 1040309 (S.D.N.Y. April 2, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SEC v. Current Fin. Servs., 62 F. Supp. 2d 66 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SEC v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) . . . . . . . . . . . . . 16

SEC v. Dresser Industries, Inc.,628 F.2d 1368 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 12

SEC v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SEC v. Forte, 598 F. Supp. 2d 689 (E.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

SEC v. Grossman, 887 F. Supp. 649 (S.D.N.Y. 1995),
    aff'd,101 F.3d 109 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

SEC v. Infinity Group Co., 212 F.3d 180 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir.1972) . . . . . . . . . . . . . . . . . . . . . 12

SEC v. Princeton Economic Int'l Ltd., 99 Civ. 9667 (RO),
    2000 WL 1559673 (S.D.N.Y. October 19, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17, 18

SEC v. Roor, 99 Civ. 3372 (JSM),
    1999 WL 553823 (S.D.N.Y. July 29, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SEC v. Sekhri, 98 Civ. 2320 (RPP),

2000 WL 1036295 (S.D.N.Y. July 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

SEC v. Stein, 07 Civ. 3125 (GEL),
    2009 WL 1181061 (S.D.N.Y. Apr. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

Standard Sanitary Manufacturing v. United States, 226 U.S. 20 (1912) . . . . . . . . . . . . . . . . . . 12

United States v. Fiore, 381 F.3d 89 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Flour Corp., 436 F.2d 383 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Jefferson, 615 F. Supp. 2d 448 (E.D. Va. 2009) . . . . . . . . . . . . . . . . . . . . . 15

United States v. Kordel, 397 U.S. 1 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Monsanto, 924 F.2d 1186 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 17, 18

United States v. Reeder, No. 05-10376,
    2006 WL 3431224 (5th Cir. Nov. 29, 2006), cert. denied, 550 U.S. 952 (2007) . . . . . . 15

Zambrana v. Califano, 651 F.2d 842 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statutes and Rules**

7 U.S.C. § 6o(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 13(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 13a-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 78u(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

15 U.S.C. § 78ff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the November 25, 2009 motion filed by defendant Paul Greenwood ("Greenwood") and the December 22, 2009 motion filed by defendant Stephen Walsh ("Walsh"). The defendants seek to have this Court modify orders entered by the Honorable George B. Daniels in civil enforcement actions filed by the United States Securities and Exchange Commission ("SEC") and the United States Commodity Futures Trading Commission ("CFTC"), pursuant to which Judge Daniels ordered that assets of Greenwood and Walsh be frozen based upon an evidentiary showing that Greenwood and Walsh had perpetrated a fraudulent scheme that had defrauded investors out of hundreds of millions of dollars. In these cases, the SEC and the CFTC sought preliminary injunctive relief to stop the fraud and restrain assets in order to preserve them for investors. They further sought the appointment of a receiver to marshal the assets for the benefit of the investors. On May 22, 2009, after extensive briefing, and several conferences at which the defendants were present and represented by counsel, Judge Daniels granted the requested relief. By this motion, the defendants seek to have this Court intervene in the civil cases being handled by Judge Daniels and order the release of vast sums of money (Greenwood seeks $1 million; Walsh seeks $4.5 million) so that they can pay their current counsel.

The motions should be denied. First, the defendants' motions are procedurally flawed. The asset freezes were entered in the civil cases pending before Judge Daniels, and there is no criminal freeze of the defendants' assets. Moreover, contrary to the way the proceedings before Judge Daniels were described in the defense papers, the asset freezes were properly entered after the defendants had notice and an opportunity to be heard specifically on the issue of

1

a carve-out for their attorneys' fees, among other issues. Thus, any application to modify those rulings is only properly made in those civil actions; the defendants should not be permitted to make an end-run around one District Judge's decision by asking another District Judge to undo that decision.

Second, the CFTC and the SEC presented substantial evidence to Judge Daniels that Greenwood and Walsh defrauded victims out of hundreds of millions of dollars and, in fact, have signed promissory notes that are due and payable to their victims in the amounts of $293 million and $261 million, respectively. Although the receiver has marshaled some assets for the benefit of investors, the receiver currently estimates that there will be a shortfall of several hundred millions dollars – far more than the value of the defendants' frozen assets. Courts have clearly held that where – as here – the frozen assets are woefully inadequate to satisfy investor losses or any disgorgement remedy that might be ordered, a defendant is not entitled to a release of assets to pay for attorneys' fees.

Third, both defendants overstate the value of the assets that they seek to use to pay their attorneys. They then seek the unprecedented relief of having the Court order the investors to loan them cash to fund their defense, when their only remedy should be to take possession of the actual assets and bear the burden of liquidating the assets to generate cash for their attorneys. More troubling, Walsh's motion fails to disclose the fact that he used millions of dollars in investor funds to acquire ownership of his house from his ex-wife.

Fourth, the amounts that Greenwood and Walsh seek to have released for attorneys' fees are unreasonable and excessive.

Accordingly, the defendants' motions are without merit and should be denied in

their entirety.

# STATEMENT OF FACTS

## A.      The Charges And The Offense Conduct

Greenwood and Walsh were arrested on February 25, 2009, pursuant to a criminal

complaint charging them with conspiracy, securities fraud, and wire fraud, in violation of 15

U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 371, 1343, 1346, and 2. (A

copy of the Complaint is attached to the Declaration of John J. O'Donnell, dated January 15,

2010 ("O'Donnell Dec."), as Exhibit A). On July 24, 2009, a Grand Jury in this district returned

Indictment 09 Cr. 722 (MGC), which charged Greenwood and Walsh in six counts with the

following: (1) conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C.

§ 371; (2) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5,

and 18 U.S.C. § 2; (3) commodities fraud, in violation of 7 U.S.C. §§ 6o(1) and 13(a)(2), and 18

U.S.C. § 2; (4) and (5) two counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and

(6) money laundering, in violation of 18 U.S.C. §§ 1957 and 2.[1] (O'Donnell Dec., Exhibit B).

The Indictment charges that from 1996 through February 2009, Greenwood and

Walsh, as the principals of a brokerage firm called WG Trading Company, Limited Partnership

("WG Trading Company"), orchestrated a scheme to defraud investors out of hundreds of

millions of dollars. In furtherance of their fraudulent scheme, Greenwood and Walsh solicited

funds under false pretenses, failed to invest investors' funds as promised, and misappropriated

---

[1]      After their arrest, the Government engaged in discussions with counsel for both
Greenwood and Walsh concerning a potential resolution of the charges against them. Thus, the
time under the Speedy Trial Act within which the Government would have been required to seek
an Indictment was extended several times with the specific consent of the defendants.

and converted investors' funds to their own personal benefit without the knowledge or authorization of the investors. Specifically, the Indictment alleges that Greenwood and Walsh, and others, solicited more than $7.6 billion from institutional investors, including charitable and university foundations, pension and retirement plans, and other institutions. (Indictment, ¶ 6). Greenwood and Walsh, and their co-conspirators, told investors, both orally and in writing, that investor funds would be invested pursuant to a strategy called "equity index arbitrage," which involved buying and simultaneously selling, through futures, the stocks of a well-known equity index (such as the Standard and Poors 500 Index (the "S&P 500 Index")). The marketing materials provided to investors for WG Trading and its affiliates represented that the equity index arbitrage strategy was a low risk strategy that had consistently outperformed the results of the S&P 500 Index for a period of more than 10 years. (Id.)

At all relevant times, according to the Indictment, investors were offered the opportunity to invest in WG Trading through different mechanisms. First, an investor could purchase a limited partnership interest in WG Trading. Second, an investor could invest through an entity called WG Trading Investors L.P. ("WG Investors") by delivering funds to WG Investors in exchange for a promissory note from WG Investors to the investor, which would pay interest at a rate similar to the rate of return realized by a limited partnership interest in WG Trading. The investors were told that WG Investors was itself a limited partner of WG Trading, and that the majority of their funds would be passed through to WG Trading for investment pursuant to the equity index arbitrage strategy. Third, an investor could purchase an interest in an offshore fund, which in turn would invest the investor funds through WG Investors in exchange for a promissory note issued by WG Investors to the offshore fund. (Indictment, ¶ 7).

4

Contrary to the representations that the funds would be invested pursuant to the safe, low-risk trading strategy, however, Greenwood and Walsh misappropriated the investors' funds to finance their own lavish personal lifestyles, meet periodic redemption requests of investors, make payments in connection with an investment in a publicly traded company that went bankrupt, and make payments for other investments and loans by WG Trading and WG Investors. (Indictment, ¶ 8). From on or about January 1, 1999, through on or about February 6, 2009, Greenwood caused WG Investors to divert approximately $80 million for his personal benefit, either directly to Greenwood or to others on his behalf. (Indictment ¶ 9.) These transfers enabled Greenwood to, among other things, finance a massive construction project at his home in North Salem, New York, purchase and operate a horse farm, and purchase expensive antique collectible items. Similarly, from on or about January 1, 1999, through on or about January 9, 2009, Walsh caused WG Investors to divert approximately $51 million to or for the benefit of Walsh personally. Walsh used these funds for his own lifestyle, and also to make payments to his ex-wife that he was required to pay under the terms of their divorce agreement.

In order to conceal their fraud, Greenwood and Walsh, and their co-conspirators, created and caused others to create false account statements that were sent to clients to reflect fictitious returns consistent with the returns that had been promised to those clients. (Indictment, ¶ 8). In addition, Greenwood and Walsh issued promissory notes to WG Investors, which were carried as assets on the books of WG Investors. From in or about 1998 through in or about 2008, Greenwood issued promissory notes to WG Investors totaling approximately $293 million ("Greenwood Notes"). From in or about 1998 through in or about 2008, Walsh issued promissory notes totaling approximately $261 million ("Walsh Notes"). The notes included

amounts representing: (a) the funds that were transferred to or for the benefit of Greenwood and Walsh, respectively; (b) the capitalization of purported investor earnings paid to or accrued for investors who held notes issued by WG Investors, which earnings were fictitious and fraudulent; and (c) write-offs in unprofitable investments that Greenwood and Walsh had made through WG Trading and WG Investors.

The charges in the Indictment are supported by the testimony of former employees of Greenwood and Walsh, documentary evidence (including documents directing a subordinate to effect the transfer of funds to their personal accounts and the promissory notes signed by Greenwood and Walsh), and bank and brokerage records reflecting the transfers of funds. In addition, the Government expects that it will call some, but not all, of the investors to testify concerning their investments, their meetings with the defendants and others from WG Trading, and the representations made to the victims.

## B.     The SEC And CFTC Actions

On February 25, 2009, the SEC and the CFTC each instituted a civil enforcement action against Walsh, Greenwood, and other defendants and relief defendants, both of which actions are pending before the Honorable George B. Daniels. (CFTC v. Walsh, et al., 09 Civ. 1749 (GBD)("CFTC Action"); SEC v. WG Trading Company LP, et al., 09 Civ. 1750 (GBD)("SEC Action")). The SEC and the CFTC are each specifically authorized by federal law to bring civil actions against those who violate the federal securities laws or commodities laws, and to seek equitable relief to stop ongoing frauds and prevent further losses to injured investors. 7 U.S.C. § 13a-1 (providing CFTC with authority to file actions seeking injunctive relief in federal court to prevent ongoing violations of the anti-fraud provisions of the federal commodity

laws); 15 U.S.C. §§ 78u(d)(1) and (d)(5)(SEC may bring an action in federal court seeking equitable relief necessary or appropriate for the benefit of investors).

**1.      The February 25, 2009 Temporary Restraining Orders**

Pursuant to their statutory authority, the CFTC and the SEC each sought orders temporarily restraining the defendants from violating the federal commodities and securities laws, freezing assets of the defendants, appointing a receiver to oversee the activities of the entities controlled by Greenwood and Walsh, and other emergency relief.  In support of their applications, the CFTC and the SEC each submitted evidentiary support for their contentions that the defendants had engaged in the massive fraudulent scheme that had damaged investors and was ongoing.

The CFTC provided Judge Daniels with a declaration of a CFTC investigator that attached copies of (a) written materials provided to investors that contained representations concerning the safety and security of the investments; (b) copies of brokerage records from February 2007 through February 2009 for an account in the name of WG Investors, which showed transfers of funds to or for the benefit of Greenwood and Walsh; and (c) a description of statements by a former employee of WG Trading Company that Greenwood and Walsh had misappropriated approximately $160 million for their personal expenses, and had created promissory notes to create the appearance that the funds had been "loaned" to them.  (Declaration of Patricia Gomersall, dated February 24, 2009, filed in  CFTC Action as Dkt. No. 5).[2]  In

---

[2]      In their papers on this motion, the defendants do not contest the underlying factual showing proffered by the SEC and the CFTC.  Accordingly, and because these documents are already publicly filed in the SEC and CFTC cases and are voluminous, the Government is not attaching them to its papers.  If the Court requires copies of the declarations filed by the CFTC and the SEC, the Government will provide them.

addition, the CFTC provided Judge Daniels with a declaration of Jennifer Sunu, who is the

Director of Audits with the National Futures Association ("NFA"), which is a non-profit

organization authorized by Congress to regulate the commodities and futures industry.

(Declaration of Jennifer Sunu, dated February 24, 2009, filed in CFTC Action as Dkt. No. 4).

Ms. Sunu described how she discovered during an audit of WG Trading Company that the vast

majority of the assets of WG Trading Investors consisted of receivables from Greenwood and/or

Walsh, investments in entities purported to be owned by Greenwood and/or Walsh, and

employee advances (to Greenwood and Walsh). Ms. Sunu described the promissory notes and

provided copies of them as exhibits to her declaration. (Sunu Declaration, ¶¶ 1-16). In addition,

Ms. Sunu described the NFA's efforts to contact Greenwood and Walsh, both of whom were

registered with the CFTC and therefore obligated to cooperate with the NFA in its audit. Despite

that obligation, however, Greenwood and Walsh refused to cooperate with the audit. (Sunu

Declaration, ¶¶ 17-27).

The SEC similarly provided Judge Daniels with evidentiary support for its claims

that Greenwood and Walsh had committed fraud in violation of the federal securities laws, and

that injunctive relief was necessary to stop the ongoing fraud and protect investors. This

evidence included documents establishing the false representations to investors, documents

showing the misappropriation of funds by Greenwood and Walsh, and the promissory notes.

(Declaration of Thomas P. Smith, dated February 25, 2009, filed in SEC Action as Dkt. No. 15).

Based upon this evidence, Judge Daniels entered orders in the SEC and CFTC

cases that temporarily restrained the defendants from violating the federal commodities and

securities laws, froze assets of the defendants, appointed Robb Evans & Associates LLC (the

8

"Receiver") to oversee the activities of the entities controlled by Greenwood and Walsh, and other emergency relief. (CFTC Action, Dkt No. 2; SEC Action Dkt. No. 2). Judge Daniels ordered the defendants to show cause on March 3, 2009, why the temporary restraining order should not be converted to a preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. In addition, Judge Daniels ordered the defendants to file any briefs in opposition by March 2, 2009.

## 2. The May 22, 2009 Preliminary Injunctions

Pursuant to Judge Daniels' order, on March 2, 2009, Greenwood and Walsh submitted a joint memorandum in opposition to the SEC's and CFTC's motions. In their joint memorandum, Greenwood and Walsh represented that they were "prepared to consent to an order, without admitting or denying any allegations, that provides the SEC and the CFTC with the bulk of the relief they have requested, provided that certain essential and reasonable accommodations are made to allow them living expenses and legal counsel for the defense of these actions and related criminal and civil proceedings." Memorandum Of Law Of Defendants Paul Greenwood And Stephen Walsh In Response To The Orders To Show Cause, dated March 2, 2009 at 1 (O'Donnell Dec., Exhibit F). Thus, Greenwood and Walsh did not seek to contest the factual accuracy of the allegations that they had committed a fraud. Rather, they sought to narrow the scope of the asset freeze.

Greenwood and Walsh argued – as they do here – that the asset freeze prevented them from "using money not traceable to the fraud to pay attorneys' fees in this litigation and in related criminal and civil proceedings in violation of their Fifth and Sixth Amendment rights." (Id. at 5, 7). Greenwood and Walsh raised the possibility of the Court holding a hearing

9

concerning whether the frozen assets were traceable to the fraud. They did not pursue a hearing, however, because of a desire to preserve their Fifth Amendment rights against self-incrimination. (Id. at 7). Rather, Greenwood and Walsh relied upon the Court's discretion in requesting that the assets be released or unfrozen in order to allow them to continue to make expenditures for attorney's fees and costs. (Id.)

Judge Daniels held conferences on March 3, 2009, March 26, 2009, and May 19, 2009, at which time he heard from the parties concerning, among others things, the defendants' requests for relief from the asset freeze in order to pay living expenses and attorneys' fees. (O'Donnell Dec., Exhibits C, D, and E). In addition, Judge Daniels received additional written submissions from the parties concerning the scope of the asset freeze, and the requests by the defendants for funds to cover living expenses and pay attorneys' fees. (O'Donnell Dec., Ex. G (Walsh letter), Ex. H (Walsh letter), and Ex. I (Greenwood letter). On May 22, 2009, Judge Daniels issued orders in both cases that continued the asset freezes that he had previously entered. (CFTC Action, Dkt. No. 108; SEC Action, Dkt. No. 100).

Neither Greenwood nor Walsh appealed from these orders, which they would have been entitled to do under 28 U.S.C. § 1292(a)(1). See SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993).

## C.    The Pending Motions

On November 25, 2009, Greenwood filed a motion requesting that this Court allow Greenwood to use $1 million worth of his frozen assets to pay attorneys' fees. In his motion, Greenwood contends that the Receiver is currently in possession of more than $1.5 million in antiques and collectibles that he purchased prior to the commencement of the conduct

charged in the Indictment, and suggests that the Court release $1 million in cash, in exchange for those assets to pay his attorneys' fees. (Memorandum Of Law In Support of Defendant Paul Greenwood's Motion For Attorneys' Fees And Costs, dated November 25, 2009 ("Greenwood Mem.") at 2, 7).

On December 22, 2009, Walsh filed his motion for the release of funds to pay attorneys' fees and costs. Walsh contends that his residence at 7 Half Moon Lane, Sands Point, New York ("Walsh Residence"), which Walsh estimates is worth approximately $7 to $10 million, was purchased for cash in 1999, using the proceeds of his sale of another home. Memorandum of Law In Support Of Stephen Walsh's Motion For Release Of Funds For Attorneys Fees And Costs, dated December 22, 2009 ("Walsh Mem.") at 7. Walsh asserts that, even though he purchased the Walsh Residence during the time period of the alleged fraud, because he allegedly used the proceeds from his sale of another property to buy the house for cash, the home is not traceable to the fraud. In a footnote, Walsh explains that he seeks an order releasing cash equivalent to the value of the residence. (Id. at 7 n.4).

## ARGUMENT

Greenwood's and Walsh's motions, which essentially seek to have this Court hand them millions of dollars from the limited funds available to compensate their victims, so that they can retain the counsel of their choice, should be rejected.

### I.

### The Motions Should Be Decided By The Court That Entered The Orders

Defendants' motions are an attempt to have this Court second-guess Judge Daniels' decision, which was entered after careful consideration of the arguments and evidence

presented by the defendants, including specific arguments related to carve-outs for attorneys'
fees. Defendants should not be permitted to appeal Judge Daniels' rulings by resort to another
District Court.

A.     **Authority For The SEC And CFTC Actions**

Federal law empowers the SEC and the CFTC to bring actions in federal court
seeking ancillary relief in the form of orders appointing a receiver or temporarily freezing assets,
and provides a federal court with the authority to grant such orders. See 7 U.S.C. § 13a-1
(Commodities Act); 15 U.S.C. §§ 78u(d)(1), (d)(5) (Securities Exchange Act of 1934); SEC v.
Manor Nursing Centers, Inc., 458 F.2d 1082, 1103, 1105 (2d Cir.1972); see also SEC v. Unifund
SAL, 910 F.2d 1028, 1041 (2d Cir.1990). It is well established that the federal government may
pursue civil and criminal actions either "simultaneously or successively," Standard Sanitary
Manufacturing v. United States, 226 U.S. 20, 52 (1912), and a federal statute expressly allows
the SEC and the Department of Justice to share information relating to parallel investigations, see
15 U.S.C. § 78u(d). In SEC v. Dresser Industries, Inc., the court observed that the federal
securities laws:

> Explicitly empower the [SEC] to investigate possible infractions of
> the securities laws with a view to both civil and criminal
> enforcement, and to transmit the fruits of its investigation to justice
> in the event of potential criminal proceedings.

628 F.2d 1368, 1376 (D.D.C. 1980). The fact that the criminal authorities and the civil
authorities worked in parallel to bring a stop to the massive fraud identified in this case should
hardly be surprising. As the Supreme Court has recognized, "[i]t would stultify enforcement of
federal law to require a government agency . . . invariably to choose either to forgo

recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of the criminal trial." United States v. Kordel, 397 U.S. 1, 11 (1970). See also United States v. Fiore, 381 F.3d 89, 94 (2d Cir. 2004)("Where federal administrative and prosecutorial jurisdiction overlap, subsequent criminal investigations are often inseparable from prior civil investigations . . . Securities fraud is a proper subject of both administrative and criminal investigations, and whether the administrative enforcement officials proceed before, after, or simultaneously with criminal prosecutors is often determined by fortuitous circumstances regarding possession of particular evidence, available resources, and legal issues").

 The SEC and the CFTC each have an important Congressional mandate to regulate the commodities and securities markets, and are empowered to investigate and seek to stop ongoing fraudulent schemes that harm the public. The CFTC and the SEC brought the civil cases at issue here pursuant to that mandate, and pursuant to statutes that allowed them to seek equitable relief. The fact that the agencies did so at the time the criminal authorities arrested Greenwood and Walsh, does not make their interests or their statutory authority any less important.

**B.** **Defendants' Opportunity To Be Heard Before Judge Daniels**

 The cases brought by the SEC and the CFTC were designated as related, and both cases were assigned to Judge Daniels. Applying the legal standards applicable to civil enforcement proceedings, Judge Daniels granted the civil authorities' request for temporary emergency relief, and issued an order to the defendants to show cause why the temporary orders should not be converted into a preliminary injunction. Thereafter, Judge Daniels received written

submissions from the parties, including applications by the defendants for the release of funds to pay living expenses and attorneys' fees in both civil and criminal proceedings. Judge Daniels then heard argument from the parties at three separate conferences. Moreover, although Walsh's counsel discussed with Judge Daniels the possibility of a hearing on his request for a carve-out for attorneys' fees (March 26, 2009 Tr. 24-29, O'Donnell Dec., Ex. __), Walsh did not pursue his request for a hearing. Nor did either defendant take an interlocutory appeal from the May 22, 2009 orders.

## C.   The Present Motions Attempt An End-Run Around Judge Daniels

Having failed to persuade Judge Daniels that a carve-out for attorneys' fees was warranted, and having decided not to appeal, the defendants now seek relief from this Court. This application should be rejected as a matter of judicial comity. "In general, [the] principle of 'comity' is that courts of one state or jurisdiction will give effect to [the] laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and mutual respect." In re Joint Eastern & Southern Districts Asbestos Litigation, 800 F. Supp. 643, 646 (C.D. Ill. 1992), aff'd, 71 F.3d 1319 (7th Cir. 1995)(quoting Black's Law Dictionary 242 (5th ed. 1979)). The Second Circuit has recognized that: "[g]enerally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts." Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981) (citations omitted). See also United States v. Flour Corp., 436 F.2d 383, 385 (2d Cir. 1970)(stating that comity among the district courts would obviously be furthered if the issues concerning interpretation of a judgment rendered in another court were referred back to the court which originally considered the matter). In other cases, courts have declined to consider issues that had

already been decided in another proceeding. United States v. Reeder, 05-10376, 2006 WL 3431224 (5th Cir. Nov. 29, 2006) (order resulting in seizure of business records that was entered in a separate civil case brought by the SEC was not reviewable on appeal from conviction in criminal case), cert. denied, 550 U.S. 952 (2007); United States v. Jefferson, 615 F. Supp. 2d 448, 450-51 (E.D. Va. 2009)(based on considerations of judicial comity and economy, declining to review decision on constitutional challenge to seizure of records where the issue had been extensively considered in another circuit court).

Judge Daniels carefully considered the arguments raised by the defendants in support of their request for relief from the asset freeze that he ordered. By bringing this application to this Court, the defendants seek to have this Court re-do and second guess Judge Daniels' decision. This judge shopping creates a risk of inconsistent decisions and degrades the finality of judicial decisions. Accordingly, because Judge Daniels entered the orders that the defendants seek to modify, the present motions in the criminal case are procedurally improper. Any orders modifying Judge Daniels' orders should be entered by Judge Daniels, and in the cases before Judge Daniels. The Government understands that this Court and Judge Daniels intend to consult concerning these motions. Therefore, the Government is filing its response in the civil cases, as well as the criminal case, and, like the defendants, is providing a copy of its papers to Judge Daniels.

## II.

### The Asset Freeze Orders Do Not Violate The Fifth Or Sixth Amendments

By seeking to overturn the civil freeze orders in this criminal action, the defendants are trying to import the law applicable to criminal forfeiture orders, of which there are

none here, to the civil case. However, under the appropriately applied law, courts have denied

similar requests for attorneys' fees where – as here – the frozen assets fall far short of investor

losses or any disgorgement remedy that might be ordered.

There is no dispute that federal courts have the power in civil enforcement actions

brought by the SEC and the CFTC to fashion appropriate relief and take such actions as are

necessary to prevent injury to the public, afford redress to aggrieved parties, and deter violations

of the federal securities and commodities laws. SEC v. Unifund SAL, 910 F.2d at 1041 (asset

freeze warranted in an amount sufficient to satisfy potential judgment for penalties in insider

trading case); CFTC v. Kimberlynn Creek Ranch, 276 F.3d 187, 193 (4th Cir. 2002)("[w]hen a

plaintiff seeks equitable relief . . ., a district court possesses 'inherent equitable powers to order

preliminary relief, including an asset freeze, in order to assure the availability of permanent

relief'")(quotations omitted).

The purpose of an asset freeze is "to preserve the status quo by preventing the

dissipation and diversion of assets." SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir.

2000); see also SEC v. ETS Payphones, Inc., 408 F.3d 727, 734 (11th Cir.2005) (an asset freeze

is "justified as a means of preserving funds for the equitable remedy of disgorgement"); SEC v.

Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427, 429 (S.D.N.Y.2001) ("[T]he primary

purpose of freezing assets is to facilitate compensation of defrauded investors in the event a

violation is established at trial...."). The authority temporarily to freeze a defendant's assets

carries with it the "corollary authority to release frozen personal assets, or lower the amount

frozen." Castilla, 170 F. Supp. 2d at 429 (citing SEC v. Unifund SAL, 917 F.2d 98 (2d Cir.

1990)).

The defendants argue, however, that their constitutional right to pay attorneys' fees for the counsel of their choice deprives the Court of the ability to preserve assets necessary to compensate the victims of the fraud. This is simply not correct.

As an initial matter, the Sixth Amendment right to counsel of one's choice only applies where the defendant "can afford to hire" the attorney or the attorney "is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989).[3] Moreover, citing the example of a robbery suspect who seeks to use stolen funds to hire an attorney, the Supreme Court has held that "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." Caplin & Drysdale, 491 U.S. at 626. Applying this concept in a securities case, the Seventh Circuit has concluded:

> Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.

SEC v. Quinn, 997 F.2d at 287 (citations omitted).

The defendants' reliance upon United States v. Monsanto, 924 F.2d 1186 (2d Cir. 1991) ("Monsanto IV") and SEC v. Coates, 94 Civ. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. August 23, 1994) is misplaced. (Walsh Mem. 6; Greenwood Mem. 5-6). In Monsanto

---

[3]     Both Greenwood and Walsh have other funds available to them for attorneys' fees. Greenwood's wife is a relief defendant in the SEC case, and disclosed in those proceedings that she has a substantial inheritance. Walsh, in his papers, discloses that he has a balance on account with his prior counsel's law firm, that he receives social security benefits, and that he is employed. (Walsh Mem. at 3 n. 1 and 11 n.9).

17

IV, the Second Circuit concluded that, in a case involving a <u>criminal</u> asset freeze, "the fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered <u>ex parte</u>." 924 F.2d at 1203. By its plain terms, however, <u>Monsanto</u> was limited to the criminal context, and involved violations of the federal narcotics laws. Significantly, Monsanto did not involve <u>any</u> analysis of the interests of third parties who had been victimized by the defendant.

The defendants then rely upon Judge Wood's decision in <u>SEC</u> v. <u>Coates</u>, 1994 WL 455558, for the proposition that, where a defendant is charged in a criminal case and an SEC injunctive action, the Sixth Amendment requires that an asset freeze that affects the defendant's ability to retain the counsel of his choosing may not be continued unless the Court finds, after an adversary hearing, that "(1) the SEC has established a <u>prima facie</u> case of securities law violations, and (2) the SEC has made a showing that the frozen assets are traceable to fraud." <u>Id</u>. (citing <u>United States</u> v. <u>Monsanto</u>, 924 F.2d at 1203). In making this finding, Judge Wood recognized that "a defendant is not entitled to foot his legal bill with funds that are tainted by his fraud." <u>Id</u>. (citing <u>SEC</u> v. <u>Quinn</u>, 997 F.2d at 289).[4]

Since <u>Coates</u>, numerous courts, including several in this District, have refused to release funds for attorney's fees or other expenses where either the frozen assets were tainted – or where they were insufficient for the restitution and disgorgement remedies discussed above. For

---

[4]     Notably, Judge Wood was presiding over the case brought by the SEC, and was deciding whether to modify orders that she had entered.

example, in SEC v. Stein, 07 Civ. 3125 (GEL), 2009 WL 1181061, *1 (S.D.N.Y. Apr. 30, 2009),

Judge Lynch refused to release $60,000 in assets to be used for legal fees, in part because of the

concern that there were insufficient assets "to cover the likely disgorgement and restitution

obligations" of the defendants:

> To persuade a court to unfreeze assets, the defendant must
> establish that the funds he seeks to release are untainted and that
> there are sufficient funds to satisfy any disgorgement remedy that
> might be ordered in the event a violation is established at trial. See
> SEC v. Roor, No. 99 Civ. 3372, 1999 WL 553823 at *3 (S.D.N.Y.
> July 29, 1999). The touchstone of the inquiry is equity. "[T]he
> disadvantages and possible deleterious effect of a freeze must be
> weighed against the considerations indicating the need for such
> relief." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1106
> (2d Cir. 1972). The defendant has not met his burden.

SEC v. Stein, 2009 WL 1181061, at *1. See also SEC v. Sekhri, 98 Civ. 2320 (RPP), 2000 WL

1036295, * 1-2 (S.D.N.Y. July 26, 2000) ("[A] freeze order need not be limited only to funds that

can be directly traced to defendant's illegal activity."); SEC v. Forte, 598 F. Supp. 2d 689, 693

(E.D. Pa. 2009) ("because it appears likely that the investor losses dwarf Defendant's remaining

assets, even if Defendant could show that some of the frozen funds are from 'untainted' sources,

I would not release those funds"); SEC v. Current Fin. Servs., 62 F. Supp. 66, 68 (D.D.C.

1999) (refusing to release personal funds not traceable to the fraud to pay attorneys' fees because

defendant's liability exceeded the total funds frozen); SEC v. Roor, 99 Civ. 3372 (JSM), 1999

WL 553823, at *3 (S.D.N.Y. July 29, 1999) (denying motion to release funds from mortgage of

property that pre-existed alleged fraud); SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y.

1995) ("It is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal

activity...."), aff'd, 101 F.3d 109 (2d Cir. 1996).

There is no doubt in this case that the frozen assets fall far short of that required to fully compensate the victims of the defendants' fraud. Greenwood and Walsh defrauded victims out of hundreds of millions of dollars. Based on the Receiver's current calculations, there is a shortfall of several hundred million dollars. (Declaration of Brick Kane, dated January 14, 2010 ("Kane") ¶ 3). Further, Greenwood and Walsh are clearly obligated, pursuant to the terms of their promissory notes, to pay to WG Trading Investors $293 million (Greenwood) and $261 million (Walsh).[5] (Kane Dec., ¶¶ 6-8, Exs. C, D, E). These obligations to investors are fixed, due, and uncontested, and they vastly exceed the amount of property belonging to the defendants that is subject to the asset freeze. Because Greenwood and Walsh have executed a written confirmation of their obligations to the investors that exceeds the amount of frozen assets, they have no constitutional right to use those assets to avoid their obligations. See, e.g., SEC v. Forte, 598 F. Supp. 2d at 693; SEC v. Grossman, 887 F. Supp. at 661.

Moreover, even under the Coates standard, the defendants have been accorded the due process contemplated in that decision. The CFTC and the SEC each submitted extensive documentary evidence establishing that (1) Greenwood and Walsh had perpetrated a fraudulent scheme to defraud investors; and (2) Greenwood and Walsh had misappropriated investor funds for their own benefit; and (3) at a minimum, Greenwood's and Walsh's obligations to the investors are $293 and $261 million, respectively. Moreover, as described below, the Walsh

---

[5]     Moreover, brokerage records show that the promissory notes include approximately $90 million that Greenwood personally stole from the investor account and $61 million that Walsh personally stole. (Kane Dec. ¶¶ 4-5, Exs. A, B). Even these figures, which are far less than the total disgorgement or restitution judgments that the Government expects will be entered against Greenwood and Walsh at the conclusion of the civil and criminal proceedings, dwarf the amount of personal assets that are currently frozen.

Residence is, in fact, tainted by Walsh's use of fraud proceeds to maintain the property and to acquire sole ownership of the property from his ex-wife.

Further, contrary to the defendants' arguments, Greenwood and Walsh had notice of the evidence submitted by the SEC and the CFTC and were given the opportunity to contest it before Judge Daniels. Neither Greenwood nor Walsh offered any arguments or evidence to demonstrate that the SEC's and CFTC's underlying charges lacked merit. Rather, each defendant submitted written requests for a carve-out to Judge Daniels and was represented by counsel at conferences with the Court. After having carefully considered the arguments and evidence proffered by the defendants, Judge Daniels entered the May 22, 2009 orders. To the extent that Walsh or Greenwood believe that Judge Daniels erred in issuing the May 22, 2009 orders, the defendants' recourse was to file an appeal, which they did not do.

The defendants therefore received all of the due process to which they were entitled. See, e.g., SEC v. Cobalt Multifamily Investors, I LLC, 06 Civ. 2360 (KMW)(MHD), 2007 WL 1040309, at *3 n.10 (S.D.N.Y. April 2, 2007)(Dolinger, M.J.)("although a few courts have proposed that Monsanto may apply outside the criminal forfeiture context, this case is distinguishable because there is no continuing ex parte restraint of assets – Judge Mukasey granted the Commission's application for a preliminary injunction after proceedings before him in which counsel for the Cobalt entities and [the defendant in the criminal case] appeared"); SEC v. Princeton Economic Int'l Ltd., 99 Civ. 9667 (RO), 2000 WL 1559673 at *5 (S.D.N.Y. October 19, 2000)(finding that the due process concerns voiced in Monsanto were satisfactorily addressed because the court had determined, after proceedings at which the defendant had notice and an opportunity to be heard, that the SEC and CFTC had demonstrated a prima facie case of

securities law violations, and that the assets subject to the court's receivership order were traceable to the defendant's fraud).

## III.

### The Assets The Defendants Seek To Release Do Not Have The Value Asserted, And Are Tainted By The Fraud

Walsh seeks to use his home in Sands Point, New York, to fund his defense, claiming that it is entirely untainted by proceeds he realized from the fraud. To the contrary, however, Walsh used fraud proceeds to improve and maintain the property, and to acquire ownership of the property from his ex-wife. Accordingly, the house should certainly be considered a tainted asset. Moreover, Walsh overstates the value of the house and requests a cash advance for fees based on that inflated amount. Greenwood, on the other hand, seeks to have the Court release funds that he claims are related to various collectibles that he allegedly purchased prior to 1995. These assets cannot be valued until they are sold.

Moreover, to the extent that the Court agrees to allow the defendants to use any of the frozen assets to pay for their attorneys' fees, the appropriate remedy would be for the defendants to sell the specific asset, and then use any net proceeds for the defense. An order that requires the investors to advance cash to the defendants to pay attorneys' fees against the assets would be a grave miscarriage of justice. This is especially so given the fact that Walsh is currently residing in the residence he proposes to use to fund his defense. Walsh wants to have it both ways; he wants to continue to live in the residence, rent-free, while he uses the value of the property to fund his defense through a loan from the investors. Further, the assets in question – a residential property and a collection of antique items – are neither liquid nor easily valued.

22

## A.    The Walsh Residence

Walsh contends that the Walsh Residence is worth $7 to $10 million, and that it is an "untainted asset." Neither assertion is correct.

The Receiver had the property appraised by two independent companies in April and July, 2009. These appraisals reported a value substantially lower than Walsh claims.[6] (Kane Dec., ¶ 9). Walsh is therefore vastly overstating its value in order to obtain additional funds.

Nor is the property untainted. The Receiver has reviewed Walsh's bank records for the period of January 2, 2004 through March 1, 2009. During that time, Walsh received approximately $4 million from WG Investors, which constitutes a misappropriation of investors funds. Walsh used approximately $1.1 million of those funds to pay various expenses for the upkeep of the house, including payments to the tax authorities, interior decorators, contractors (such as plumbers, electricians, landscapers), and other household expenses. (Kane Dec., ¶ 10, Ex. F). It is a fair inference that Walsh used funds that he received from investors during prior periods to pay similar expenses for the maintenance and upkeep of the residence.

The property also is tainted because Walsh used investor funds in order to obtain the house in connection with the resolution of his divorce. Prior to their divorce, Janet Walsh had title to the Walsh Residence. As part of their separation and divorce agreement, Janet Walsh conveyed full title and interest in the residence to Walsh. (Declaration of Stephen Walsh, dated December 21, 2009, ¶ 8). What Walsh fails to disclose is the fact that Walsh caused at least $3

---

[6]    The Government is not publicly filing the appraisals because the receiver is concerned that having the appraisals on the public record may adversely impact the Receivers effort to maximize the sale price for the property. Copies of the appraisals will be provided to the Court under seal if the Court requires them.

million dollars to be transferred directly from the WG Investors brokerage account to his ex-wife, Janet Walsh, in order to satisfy his personal obligations under the agreement in which he obtained ownership of the house. (Kane Dec. ¶ 12). Walsh's use of investor funds to secure his title and interest in the residence from his ex-wife is fatal to his claim that the property is not tainted.

## B. Greenwood's Collectibles

Greenwood claims that his frozen assets include the following items that he contends were purchased prior to 1996, which is the date the fraud is alleged to have commenced: (1) antiques that he claims were appraised at a value of approximately $1.1 million; and (2) Steiff collectible teddy bears valued at $659,946. (Greenwood Mem. 2). Greenwood's support for these valuations are two insurance policies that he took out in 1994 and 1995. Declaration of Paul Greenwood, dated November 23, 2009, Exs. A and B). However, these items cannot be precisely valued because there is no liquid market for them. (Kane Dec. ¶ 13).

As described above, the assets should remain frozen because Greenwood's assets come nowhere near what is necessary to compensate the investors. However, if the Court is inclined to grant the motion, the only appropriate remedy is for Greenwood to bear the expense of selling them and the risk that the sale price will be less than he thinks they are worth, and be limited to the net proceeds for his attorneys' fees. Greenwood's request for an advance of $1 million should be rejected.

24

## IV.

### The Amounts Sought To Be Released Are Unreasonable

Greenwood's counsel estimates that the cost of his defense through trial will be approximately $2 million. Walsh's counsel, by contrast, estimates that the cost of Walsh's defense will total approximately $4.5 million. (Declaration of Glenn C. Colton, dated December 21, 2009, at ¶¶ 13-15).

The defendants and their counsel have known of the Government's theory of this case for almost a year, and have had possession of and access to the core documents for many months. As the Court can see, this is not an overly complicated case: the defendants are charged with lying to investors and stealing their money. The evidence includes documents showing the transfer of funds directly from the investment account to the defendants themselves, the defendants' relatives, and people from whom the defendants purchased goods and services, as well as documents executed by the defendants pursuant to which they acknowledge their lack of right to the funds. On these facts, the defendants' estimates of what it will take to defend themselves are excessive and unreasonable.

Indeed, courts have routinely denied requests for vastly smaller sums where victim restitution or disgorgement was an issue. See SEC v. Stein, 2009 WL 1181061, at *1 (denying request for $60,000 for legal fees); SEC v. Sekhri, 2000 WL 1036295, at *1-2 (denying request for $50,000 for criminal attorney's fees). Accordingly, defendants' excessive requests should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Greenwood's

and Walsh's motions be denied.

Dated: New York, New York
       January 15, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
    JOHN J. O'DONNELL
    MARISSA MOLÉ
    Assistant United States Attorneys
    (212) 637-2490/2275