**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                           :
UNITED STATES OF AMERICA                   :
                                           :
     -v-                                   :        09 Cr. 722 (MGC)
                                           :
PAUL GREENWOOD, and                        :
STEPHEN WALSH,                             :
                                           :
                    Defendants.            :
------------------------------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STEPHEN WALSH'S PRE-DISCOVERY MOTIONS

SONNENSCHEIN NATH & ROSENTHAL LLP
Glenn C. Colton (GC-2493)
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: 212-398-5797
gcolton@sonnenschein.com

Mark A. Flessner (*admitted pro hac vice*)
233 S. Wacker Drive, Suite 7800
Chicago, Illinois 60606
Telephone: 312-876-3136
mflessner@sonnenschein.com

*Attorneys for Defendant Stephen Walsh*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ......................................................................................................................... 3

ARGUMENT ............................................................................................................................... 8

I.  THE GOVERNMENT FAILED TO FOLLOW REQUIRED PROCEDURAL
    SAFEGUARDS AND THEREFORE SHOULD BE ORDERED TO RETURN ALL
    OF STEPHEN WALSH'S PERSONAL PROPERTY TO THE RECEIVER AND TO
    REFRAIN FROM OBTAINING PERSONAL PROPERTY ABSENT LAWFUL
    PROCESS ON NOTICE ...................................................................................................... 8

    A.  The Government Has Used the Civil Receivership to Circumvent Critical
        Procedural Safeguards Designed to Protect Mr. Walsh's Rights .......................... 8

    B.  The Government Should Be Ordered to Return Stephen Walsh's Personal
        Documents and Materials to the Civil Receiver ..................................................... 9

    C.  If the Government Seeks to Obtain Mr. Walsh's Personal Documents and
        Materials in the Future, It Should Be Required to Issue Subpoenas to the
        Receiver with Notice to Mr. Walsh Sufficient to Allow Him to Object in
        Advance of Production ......................................................................................... 12

II. MR. WALSH IS ENTITLED TO THE USE OF APPROPRIATE SAFEGUARDS
    TO PROTECT PRIVILEGED DOCUMENTS AND MATERIALS, AND TO THE
    RETURN OF THOSE DOCUMENTS AND MATERIALS ........................................... 13

    A.  Mr. Walsh is Entitled to the Return of His Personal Privileged Materials and
        the Use of Appropriate Safeguards to Protect Against the Prosecution Team's
        Review of These Materials ................................................................................... 14

    B.  The Government Should Return All Corporate Privileged Materials to the
        Receiver and Should Employ Appropriate Safeguards to Protect Against the
        Prosecution Team's Review of These Materials .................................................. 15

    C.  The Government Should Set Forth the Procedures, If Any, It Has Employed to
        Protect Defendants' Privileges ............................................................................ 16

    D.  The Court Should Hold Potential Future Motions Regarding the Privilege or
        Privileged Materials in Abeyance ........................................................................ 16

III. STEPHEN WALSH IS ENTITLED TO A BILL OF PARTICULARS ......................... 17

A.    The Indictment Does Not Apprise Mr. Walsh of the Charges Against Him
      with the Requisite Particularity, and He Faces a Veritable Mountain of
      Discovery ............................................................................................. 17

B.    Mr. Walsh is Entitled to the Requested Particulars to Allow Him to Prepare
      His Defense to the Charges in the Indictment and to Avoid Unfair Surprise ....... 19

IV.   THE DEADLINE FOR SUBMISSION OF A MOTION FOR SEVERANCE
      SHOULD BE HELD IN ABEYANCE PENDING FURTHER DEVELOPMENT OF
      THE FACTUAL RECORD IN THIS ACTION ............................................................. 27

A.    Any Motion for Severance is Not Yet Ripe for Adjudication, and the Court
      Should Hold Mr. Walsh's Motion for Severance in Abeyance pending
      Development of the Factual Record .................................................................... 28

B.    Discovery May Reveal Several Arguments in Favor of Severing Mr. Walsh's
      Trial from Mr. Greenwood's............................................................................... 29

      1.    Discovery May Reveal Disparity in the Degrees of Messrs. Walsh and
            Greenwood's Involvement in the Alleged Fraudulent Conduct ............... 29

      2.    If the Majority of the Evidence is Likely to Incriminate Mr.
            Greenwood Rather than Mr. Walsh, This Could Create Spillover
            Prejudice ................................................................................................. 30

      3.    Mr. Walsh and Mr. Greenwood Might Present Antagonistic Defenses ... 30

V.    MR. WALSH IS ENTITLED TO DISCOVERY FROM ALL GOVERNMENTAL
      ENTITIES INVOLVED IN THIS INVESTIGATION AND PROSECUTION ............. 31

A.    The Government's *Brady* Obligations Extend to All Governmental Entities
      Involved in the Investigation and Prosecution...................................................... 31

B.    Mr. Walsh is Entitled to Discovery From the Agencies and Entities Involved
      in This Prosecution on Behalf of the Government Including All Exculpatory
      Information in the Possession of Those Agencies and Entities ............................. 33

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Evans*,
514 U.S. 1, 115 S. Ct. 1185 (1995)..................................................................................8

*Brady v. Maryland*,
373 U.S. 83, 83 S. Ct. 1194 (1963)........................................................................2, 31, 33

*Ferreira v. United States*,
354 F. Supp. 2d 406 (S.D.N.Y. 2005)...........................................................................11

*Giglio v. United States*,
405 U.S. 150, 92 S. Ct. 763 (1972).......................................................................2, 31, 33

*In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981*,
522 F. Supp. 977 (S.D.N.Y. 1981).................................................................................12

*Horton v. United States*,
983 F. Supp. 650 (E.D. Va. 1997) .................................................................................32

*Nat'l City Trading Corp. v. United States*,
635 F.2d 1020 (2d Cir. 1980).........................................................................................14

*In re Search of 5444 Westheimer Road Suite 1570, Houston, Texas, on May 4, 2006*,
No. H-06-238, 2006 WL 1881370 (S.D. Tex. July 6, 2006) ...........................................14

*See v. City of Seattle*,
387 U.S. 541, 87 S. Ct. 1737 (1967)...............................................................................10

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .........................................................................................10

*United States v. Barr*,
605 F. Supp. 114 (S.D.N.Y. 1985)....................................................................................9

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000)...............................................................................20

*United States v. Bin Laden*,
397 F. Supp. 2d 465 (S.D.N.Y. 2005)..............................................................................32

*United States v. Blanco*,
392 F.3d 382 (9th Cir. 2004) ....................................................................................31, 32

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987)....................................................................................17, 19, 20

*United States v. Chang An-Lo*,
    851 F.2d 547 (2d Cir. 1988)................................................................27

*United States v. Chuang*,
    696 F. Supp. 910 (S.D.N.Y. 1988)........................................................14

*United States v. Ganim*,
    225 F. Supp. 2d 145 (D. Conn. 2002)...................................................19

*United States v. Gilbert*,
    504 F. Supp. 565 (S.D.N.Y. 1980)........................................................30

*United States v. Heatley*,
    No. 96 Cr. 515, 1997 WL 12961 (S.D.N.Y. Jan. 14, 1997).................29

*United States v. Kercado*,
    No. 91 Cr. 685, 1992 WL 196778 (S.D.N.Y. Aug. 3, 1992)................29

*United States v. Lino*,
    No. 00 Cr. 632, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001)....................19

*United States v. Mango*,
    No. 96-CR-327, 1997 WL 222367 (N.D.N.Y. May 1, 1997)..............17, 19, 20

*United States v. Morgan*,
    690 F. Supp. 2d 274 (S.D.N.Y. 2010)......................................................9

*United States v. Nachamie*,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000)..................................................20, 22

*United States v. Rodriguez*,
    734 F. Supp. 116 (S.D.N.Y. 1990)........................................................29

*United States v. Rodriguez*,
    No. 08 Cr. 1311, 2009 WL 2569116 (S.D.N.Y. Aug. 20, 2009).........29

*United States v. SDI Future Health, Inc.*,
    464 F. Supp. 2d 1027 (D. Nev. 2006)...............................................13, 14

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)................................................................30, 31

*United States v. Santiago*,
    174 F. Supp. 2d 16 (S.D.N.Y. 2001)................................................27, 28

*United States v. Shi Yan Liu*,
    239 F.3d 138 (2d Cir. 2000)...............................................................10

*United States v. Soliman*,
No. 06-CR-236, 2008 WL 4757300 (W.D.N.Y. Oct. 29, 2008)........................10

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003)...........................................................30

*United States v. Stein*,
428 F. Supp. 2d 138 (S.D.N.Y. 2006)...............................................31

*United States v. Upton*,
856 F. Supp. 727 (E.D.N.Y. 1994) ..............................................28, 30

*United States v. Vilar*,
No. S3 05 Cr. 621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ................9, 10

*United States v. Walker*,
922 F. Supp. 732 (N.D.N.Y. 1996) .................................................17

*United States v. Young*,
745 F.2d 733 (2d Cir. 1984)..........................................................10

*United States v. Zuno-Arce*,
44 F.3d 1420 (9th Cir. 1995) ........................................................32

*Winston v. Lee*,
470 U.S. 753, 105 S. Ct. 1611 (1985)..............................................8

## STATUTES AND OTHER AUTHORITIES

U.S. Const. amend. IV ...................................................... *passim*

Fed. R. Crim. P. 7(f) ....................................................................17

Fed. R. Crim. P. 16 .............................................................2, 31, 33

Fed. R. Crim. P. 14(a)...................................................................27

Fed. R. Crim. P. 41(g)........................................................10, 11, 12

Department of Justice Criminal Division, Computer Crime and Intellectual Property Section,
*Searching and Seizing Computers and Obtaining Electronic Evidence Manual*, Chapter 2: Searching and Seizing Computers with a Warrant: Legal Limitations on the Use of Search Warrants to Search Computers, § 2 (Privileged Documents) (3d Ed. 2009),
*available at* http://www.cybercrime.gov/ssmanual/02ssma.html ......................13

United States Attorney's Manual 9-5.001(B)(2) ........................................31

United States Attorney's Manual Criminal Resource Manual 165, *available at*
http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00165.htm ...32, 33

# PRELIMINARY STATEMENT

The Government, through coordination and participation of the various regulatory and prosecutorial agencies, orchestrated and carried out a multi-prong strategy involving both civil suits and criminal charges to pursue the Defendants in this case. Surely, the Government is entitled to exercise its discretion in deciding what charges to bring and the courts or fora in which to file. What the Government cannot do is use the multi-court, multi-prong attack to end-run the critical protections of the Fourth Amendment or to trample Defendants' legal privileges. However, it appears that the Government has done exactly that.

Throughout this criminal case, the Government has taken the position that the Constitutional protections guaranteed to the Defendants can be reduced or eliminated simply by virtue of having cooperating agencies obtain orders from a civil judge. This Court has already rejected the Government's attempt to deprive Defendants of their Sixth Amendment rights in this manner. (*See* Memorandum Opinion and Order, Mar. 9, 2010, ECF No. 75.) The same result is warranted with respect to the Fourth Amendment issues. It is beyond dispute that before the Government can obtain documents or things from a Defendant, the Government must meet the threshold requirements governing search warrants and/or subpoenas -- both of which are governed by the Fourth Amendment. However, here, the Government appears to take the position that they can get whatever they want, whenever they want -- whether privileged or irrelevant -- from the Receiver in the civil case without having to meet any standard other than the ability to reach the Receiver by phone or email. Stated another way, it appears that the Government has taken the position that Defendants have no Fourth Amendment rights because the Government's coordinated attack included the appointment of a receiver in a companion civil case. The Government is wrong.

Defendants have not waived their personal legal privileges, the companies the Government alleges they controlled have not waived the corporate legal privileges, and the Defendants certainly have not waived their Fourth Amendment rights. Therefore, the instant motion requests that the Court order relief that includes, *inter alia,* return of all privileged documents, use of taint teams to avoid exposure to privilege documents, return of all materials improperly obtained by using the Receiver to avoid lawful process and the Fourth Amendment, and the institution of procedures that will protect the Defendants' Fourth Amendment rights and legal privileges going forward.

In addition to the above, Mr. Walsh requests that the Court order that Defendants receive required discovery from all of the agencies that are part of the prosecution team. Plainly, the Government should not be allowed to skirt its Rule 16, *Brady*, *Giglio*, or any other discovery obligation by hiding behind the difference between the SEC, CFTC and DOJ. The law does not permit hiding the ball based on such undue and legally deficient formalism.

Finally, by this motion, Mr. Walsh seeks a Bill of Particulars in order to remedy the complete lack of detail provided in the bare bones Indictment in this case. That Indictment, despite charging a thirteen year alleged conspiracy, contains precious few details. Rather, it resorts to bald generalities, often referring to unidentified alleged victim "investors," an unidentified co-conspirator, "other[] known and unknown" participants in the alleged scheme, and vague alleged "untrue statements," omissions, and other "devices, schemes, and artifices" allegedly used to "defraud" unidentified "clients and participants, and prospective clients and participants." Such a dearth of detail regarding such a lengthy alleged conspiracy cries out for a Bill of Particulars to apprise Defendants of the charges against them and to avoid unfair surprise at trial.

## BACKGROUND

**The Government Regulatory and Prosecutorial Agencies Filed Simultaneous and Coordinated Civil and Criminal Actions Against the Defendants and Have All Been Part of the Prosecution Team**

On February 24, 2009, the United States Attorney's Office ("USAO") filed a criminal complaint against Stephen Walsh and his co-defendant, Paul Greenwood (hereinafter, collectively the "Defendants"), in the above-captioned action. (ECF No. 1.) The next day, the Commodity Futures Trading Commission ("CFTC") and the Securities & Exchange Commission ("SEC") filed civil actions against Messrs. Greenwood and Walsh and various entities, *see Commodity Futures Trading Comm'n v. Walsh, et al.*, 09 Civ. 1749 (GBD); *Sec. & Exch. Comm'n v. WG Trading Investors, et al.*, 09 Civ. 1750 (GBD). All three complaints concerned essentially the same alleged fraudulent conduct alleged to have occurred over a thirteen-year period from 1996 to February 2009. (*See* Declaration of Glenn C. Colton, dated June 25, 2010 (the "Colton Dec."), ¶ 2; *see also* Affirmation of [AUSA] John J. O'Donnell In Support of Motion to Intervene and Stay Discovery at ¶ 7, July 31, 2009, 09 Civ. 1749 ECF No. 198 (stating that the CFTC and SEC complaints were filed the same day as Defendants' arrest, and that the civil complaints "are based upon the same [alleged] fraudulent conduct of Greenwood and Walsh that is charged in the Indictment . . . .")

It appears clear that from the outset, the USAO, FBI, CFTC, and SEC have worked together in the Government's criminal investigation of the Defendants. Indeed, FBI Special Agent James C. Barnacle, Jr. swore in the criminal complaint that he based his allegations, in part, on "documents and information provided to [him] by representatives of the [SEC] and the [CFTC]" and his "conversations with representatives of the SEC and the CFTC." (ECF No. 1, ¶¶ 8-12). Representatives from the CFTC and SEC also attended proffer sessions between Mr.

Walsh, AUSA John O'Donnell, and Agent Barnacle on March 5, 2009 and May 6, 2009.

(Colton Dec., ¶ 3.)

Messrs. Greenwood and Walsh were indicted in the above-captioned action on July 24,

2009 (ECF No. 31). The six-count Indictment charges the Defendants with Conspiracy to

Commit Securities Fraud and Wire Fraud, Securities Fraud, Commodities Fraud, Wire Fraud,

and Money Laundering, based on their alleged involvement in a purported thirteen-year "scheme

to defraud investors in WG Trading and WG Investors." (*See generally* ECF No. 31 & *Id.*, ¶ 5.)

Mr. Walsh pled not guilty to these charges on July 31, 2009. (Colton Dec., ¶ 6.)

**The Court in the SEC and CFTC Actions Appointed a Receiver to Preserve the Civil Defendants' Assets and Property**

In conjunction with the filing of the SEC and CFTC actions on February 25, 2009, the

SEC and CFTC moved *ex parte* for injunctive relief seeking, *inter alia*, the appointment of a

receiver for the individual defendants as well as for various corporate entities allegedly

controlled by Messrs. Walsh and Greenwood and named along with them as defendants in the

civil complaints.[1] (*See* Colton Dec., ¶ 4.) Judge Daniels granted this requested relief on

February 25, 2009, and issued Statutory Restraining Orders in both cases appointing Robb Evans

& Associates LLC as the temporary Receiver (the "Receiver") over the civil defendants. (*See*

*id.*) Judge Daniels extended these Orders on May 22, 2009, and they currently remain in place.

(*Id.*, ¶ 5.)

Judge Daniels' Orders (the "CFTC Order, "SEC Order," and collectively, "Receivership

Orders") specified that the Receiver has the "full powers of an equity receiver," (CFTC Order, at

¶ 22), and that the Receiver's duties entail, *inter alia*, "preserv[ing] the *status quo*," "preserv[ing]

---

[1] Two of these corporate entities, WG Trading Company Limited Partnership ("WG Trading") and WG Trading Investors, LP ("WG Investors"), are also referenced throughout the Indictment.

the books, records, and documents" of the corporate entities, preserving the value of the corporate entities' assets and property, and preventing the "further dissipation" of these assets and property. (SEC Order, at 18-19; CFTC Order, at ¶ 23.) The Receivership Orders empowered the Receiver to take control of the civil defendants' funds, property, and assets, including those of Mr. Walsh, Mr. Greenwood, WG Trading, WG Investors, Westridge Capital Management, Inc., WGIA, LLC, Westridge Capital Management Enhancement Funds Inc., and WGI LLC. (SEC Order, at 19; CFTC Order, at ¶ 24.)

The Receivership Orders also empowered the Receiver to take and retain possession of the civil defendants' books, records, documents, and computers, and the CFTC Order further required defendants to provide the Receiver with "[a]ll keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of the Defendants . . . including but not limited to, access to the Defendants'. . . residential and business premises, means of communications, accounts, computer systems, or other property. . . ." (*Id.*) However, nothing in the Receivership Orders grants the Receiver the power to waive the civil defendants' attorney-client or other privileges with respect to the materials transferred to the Receiver's possession. Furthermore, although the Receivership Orders appear to allow representatives of the CFTC and SEC to access and inspect Defendants' books, records, and documents (CFTC Order, ¶ 33; SEC Order at 9-10), the Receivership Orders do not permit the Receiver to run copies of these materials or otherwise share any of these materials with the USAO or any other persons or entities.

**The Receiver's Substantial Involvement in the Criminal Discovery Process**

Despite the fact that the Receivership Orders do not authorize the Receiver to share the materials in its possession with the USAO or to waive any of the civil defendants' privileges

with respect to those materials, it appears that the USAO has used the Receivership Orders as a way to obtain complete, wholesale, and unfettered access to the civil defendants' books, records, documents, computers, and other property for its use in the criminal action thereby avoiding the showing that would have to be made to obtain and/or uphold search warrants or subpoenas. Indeed, the USAO has reviewed the materials in the Receiver's possession and has attempted to rely on the Receiver to meet its discovery obligations in this criminal matter. (Colton Dec., ¶ 11 & Ex. 2) (May 5, 2010 letter from AUSA O'Donnell to defense counsel (1) indicating that the Government has reviewed documents in the Receiver's possession in California; (2) enclosing indices of materials and computer data in the Receiver's possession; (3) stating that documents were available for defendants' review "through the Receiver" beginning in August 2009; and (4) stating that the Government needs to "investigate the location of [certain electronic data] with the Receiver); *see also id.*, ¶ 7 (discussing October 19, 2009 proceeding in which AUSA O'Donnell stated the Government's position that the Government can meet its criminal discovery obligations by referring the criminal Defendants to the civil Receiver).

**The Current Status of Discovery of Computer Files and Electronic Data**

The USAO has informed Messrs. Walsh and Greenwood that electronic discovery in the criminal action consists of at least 18 computer hard drives currently in the Receiver's possession and 21 computer towers purportedly used by WG Trading Company "for its securities trading" and also currently in the Receiver's possession. (Colton Dec., ¶¶ 14-16 & Ex. 1; *see also* Declaration of Kimberly Kalmanson, dated June 25, 2010 (the "Kalmanson Dec."), ¶ 9.)

Not only does the Receiver currently have possession of all of these hard drives and computer towers, but the Government's most recent discovery productions clearly reveal that it relies on the Receiver to facilitate the electronic discovery process. For example, on May 21,

2010, the Government provided Messrs. Walsh and Greenwood with "[a]n inventory prepared by the Receiver of certain hard drives removed from the Santa Barbara computers and DVD data disks containing files copied [*sic*] the hard drives," as well as "[f]our DVD data disks prepared by the Receiver containing files from the indicated hard drives." (Colton Dec., ¶ 15 & Ex. 4.)

To date, the Government has only produced selected files from 12 of these hard drives, containing approximately 106 gigabytes of electronic data. (Kalmanson Dec., ¶ 9.)

**The Current Status of Discovery of Paper Documents and Materials**

In addition to the extensive promised electronic discovery in the criminal matter, the USAO has informed Messrs. Walsh and Greenwood that document discovery consists of the contents of approximately 650 boxes of documents located around the country -- including approximately 262 boxes still in the Receiver's possession in California (some of which were allegedly kept in California in the ordinary course of business prior to the receivership, and some which were shipped to California from other locations despite the fact that the cases are pending in New York), 80 boxes sent back to New York from the Receiver's office in California and currently in the Government's possession, and 314 boxes purportedly under the Receiver's control in storage warehouses in New York (which are alleged to have been kept in the ordinary course of business in Greenwich, Connecticut, North Hills, New York, and Jersey City, New Jersey). (Colton Dec., ¶ 11 & Exs. 1, 2.) The Government has indicated that defendants may "make copies of these documents at their own expense."[2] (*Id.*, Ex. 1, at 1.)

---

[2] It appears that the Receiver provides the Government with copies of documents from these boxes. In a June 11, 2010 letter to defense counsel, the Government produced a "CD-Rom containing documents that we have obtained from the Receiver," several of which the Receiver designated as found in "Greenwich office box[es]." (Colton Dec., ¶ 12 & Ex. 3.)

On June 1 and 2, 2010, counsel for Mr. Walsh conducted a preliminary review of approximately 300 boxes of documents, some located in Government offices at 26 Federal Plaza in Manhattan, and others at storage warehouses in the Bronx and Armonk, New York. (Kalmanson Dec., ¶¶ 2, 5, 7.)  No representative from the Receiver was present for counsel's review; rather, the Government's case agent, Special Agent Barnacle, accompanied counsel as they examined the documents in all locations on those dates.  (*Id.*, ¶¶ 4-5.)  Indeed, Agent Barnacle informed counsel that he was instructed by AUSA O'Donnell to attend counsel's review at both the Government offices and at the private warehouses.  (*Id.*, ¶ 5.)

Counsel's early review of these boxes has revealed, *inter alia*, that privileged materials and documents have not been separated from non-privileged materials and documents.  Indeed, in at least one instance, counsel discovered a file of legal documents in a box with other records and papers.  (*Id.*, ¶ 8.)

## ARGUMENT

I.   **THE GOVERNMENT FAILED TO FOLLOW REQUIRED PROCEDURAL SAFEGUARDS AND THEREFORE SHOULD BE ORDERED TO RETURN ALL OF STEPHEN WALSH'S PERSONAL PROPERTY TO THE RECEIVER AND TO REFRAIN FROM OBTAINING PERSONAL PROPERTY ABSENT LAWFUL PROCESS ON NOTICE**

   A.   **The Government Has Used the Civil Receivership to Circumvent Critical Procedural Safeguards Designed to Protect Mr. Walsh's Rights**

The Government's access to an individual's private documents and materials is limited by the protections of the Fourth Amendment.  *See Winston v. Lee*, 470 U.S. 753, 767, 105 S. Ct. 1611 (1985) ("The Fourth Amendment is a vital safeguard of the right of the citizen to be free from unreasonable governmental intrusions into any area in which he has a reasonable expectation of privacy."); *see also Arizona v. Evans*, 514 U.S. 1, 10, 115 S. Ct. 1185 (1995) (discussing Fourth Amendment protections).  These Constitutional protections ensure, *inter alia*,

that Government agents cannot invade an individual's privacy without a search warrant supported by probable cause, *see, e.g.*, *United States v. Morgan*, 690 F. Supp. 2d 274, 283-84 (S.D.N.Y. 2010) (discussing probable cause requirement for search warrant), or -- if the Government elects to obtain a defendant's documents or other materials through a subpoena duces tecum -- without providing the defendant with notice and the opportunity to challenge the subpoena. *See, e.g.*, *United States v. Barr*, 605 F. Supp. 114, 118 (S.D.N.Y. 1985) (stating that notice and opportunity to challenge are two of the factors affecting the validity of a subpoena because "[a] subpoena duces tecum may violate the fourth amendment if government agents improperly impinge upon the defendant's right to contest the subpoena's validity or a court's authority to quash, alter, or enforce it.").

To our knowledge, the Government has not executed a search warrant or served a subpoena to obtain Messrs. Walsh and Greenwood's documents, property, computers, hard drives, and other materials. Rather, the Receiver in the SEC and CFTC civil actions simply took possession of all of these materials from Messrs. Walsh and Greenwood, WG Trading, WG Investors, and the other civil defendants, and it apparently makes these materials available to the Government wholesale. Thus, the Government has effectively gained unfettered access to *all* of Mr. Walsh's personal documents, electronic files, and property without adhering to the critical Constitutional and procedural safeguards governing the search and seizure of these materials.

**B.     The Government Should Be Ordered to Return Stephen Walsh's Personal Documents and Materials to the Civil Receiver**

Patently, the Government has no right to **all** of Stephen Walsh's personal papers. The Fourth Amendment abhors general searches, and courts routinely strike down overbroad warrants that purport to authorize such general searches. *See, e.g.*, *United States v. Vilar*, No. S3 05 Cr. 621, 2007 WL 1075041, at *21-23 (S.D.N.Y. Apr. 4, 2007) (finding that portions of a

search warrant violated the Fourth Amendment's requirement that "[a] warrant must not only be founded in probable cause, but it must also state *with particularity* 'the place to be searched, and the persons or things to be seized.'") (emphasis in original) (*quoting* U.S. Const. amend. IV)); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.") (internal quotations and alterations omitted); *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984) (describing the purposes of the particularity requirement).

Similarly, courts routinely quash or modify overbroad subpoenas. *See In re Subpoena Duces Tecum*, 228 F.3d 341, 347 (4th Cir. 2000) ("Articulating a standard for evaluating whether an administrative subpoena satisfies the Fourth Amendment, the Supreme Court has stated that the subpoena must be '*sufficiently limited in scope, relevant in purpose, and specific in directive* so that compliance will not be unreasonably burdensome.'") (*quoting See v. City of Seattle*, 387 U.S. 541, 544, 87 S. Ct. 1737 (1967) (emphasis added)); *Vilar*, 2007 WL 1075041, at *43-44, 47-50 (recognizing that "[a] subpoena may be quashed or modified pursuant to [Fed. R. Crim. P.] 17(c)(2) if the subpoena fails to identify with particularity the documents to be produced," and modifying a subpoena for failure to satisfy the requisite level of particularity). Here, in essence, the Government has accomplished exactly that which the law and the courts would not tolerate had lawful process and procedures been followed.

When, as here, the Government is improperly in possession of a defendant's materials or property, the remedy is the return of the inappropriately-seized items. *See, e.g.*, Fed. R. Crim. P. 41(g); *United States v. Soliman*, No. 06-CR-236, 2008 WL 4757300, at *8 (W.D.N.Y. Oct. 29, 2008) (requiring the Government to "cull through [] documents" and "identify and return those materials not covered by the warrant"). Specifically, Fed. R. Crim. P. 41(g) provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

It is well-settled that to prevail on a motion for the return of property under Rule 41(g), the defendant must demonstrate that: "(1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the Government's need for the property as evidence has ended." *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) (internal quotation omitted).

Here, Mr. Walsh respectfully submits that the civil Receiver, appointed to control and preserve his funds, property, and assets, is the only entity currently entitled to lawful possession of his personal documents, materials, and other property. Indeed, the Receivership Orders required Mr. Walsh to provide the Receiver with all of these materials and granted the Receiver custody and control over them.[3] (Colton Dec., ¶ 4.) Thus, the first prong of the Rule 41(g) test is satisfied. It is beyond dispute that none of Mr. Walsh's personal materials are contraband. Rather, they constitute items such as personal medical files, personal legal files, and personal journals.[4] Thus, the second prong of the Rule 41(g) test is also satisfied. Finally, as set forth

---

[3] Thus, Mr. Walsh seeks the return of his personal property and documents to the Receiver -- not to himself, as well as the implementation of appropriate procedures to protect his rights as a criminal defendant.

[4] Because Mr. Walsh has not yet had the opportunity to review all of the materials in the Receiver's and the Government's possession, he cannot specifically identify all of the materials he seeks to have returned. Rather, he asks that the Government employ a reasonableness approach to identifying and returning his personal information, and to provide him with an index of all personal and potentially personal files. Mr. Walsh also reserves the right to request the return of specific personal property he may identify in his review of the mass of material.

above, the Government obtained all of these materials in contravention of Mr. Walsh's Fourth Amendment rights,[5] and it likely has in its possession materials that would otherwise be beyond the permissible scope of a search warrant or a subpoena. *Cf. In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981,* 522 F. Supp. 977, 982-85 (S.D.N.Y. 1981) (holding in the context of a grand jury subpoena that a corporate officer's pocket calendar was protected from disclosure by the Fifth Amendment because it was the officer's "private papers," and requiring the production of such personal information "would be contrary to normal expectations concerning such documents" and akin to compelled testimony). Return of Mr. Walsh's personal materials to the Receiver is thus warranted under Rule 41(g), and Mr. Walsh respectfully requests that the Court enter an Order requiring the Government to return these materials, and all copies thereof, to the Receiver.

      **C.**      **If the Government Seeks to Obtain Mr. Walsh's Personal Documents and Materials in the Future, It Should Be Required to Issue Subpoenas to the Receiver with Notice to Mr. Walsh Sufficient to Allow Him to Object in Advance of Production**

To ensure the protection of Mr. Walsh's Fourth Amendment rights going forward in this criminal action, Mr. Walsh respectfully requests that the Court enter an Order directing the USAO, FBI, and any other agency involved in the investigation and/or prosecution of Mr. Walsh, not to seek or obtain any of Mr. Walsh's personal documents, materials, or information from the Receiver without first issuing a subpoena to the Receiver for these items. Mr. Walsh further requests that he be given notice of, and the opportunity to challenge, any such subpoena before production is made.

---

[5] Because the USAO for the Southern District of New York made the request for these materials to the Receiver from this district, and because the Government currently stores the materials it obtained from the Receiver within this district, Mr. Walsh submits that his 41(g) motion is appropriately before this Court.

## II. MR. WALSH IS ENTITLED TO THE USE OF APPROPRIATE SAFEGUARDS TO PROTECT PRIVILEGED DOCUMENTS AND MATERIALS, AND TO THE RETURN OF THOSE DOCUMENTS AND MATERIALS

In addition to the Fourth Amendment protections afforded a criminal defendant by traditional criminal procedures such as the requirements that must be met to obtain and uphold search warrants and subpoenas, a defendant is entitled to protection of his privileged documents and electronic materials.  For example, the affidavit supporting a search warrant normally sets forth the measures the agents will take to prevent the review of privileged information by the prosecution team.  *See, e.g.*, *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1031 (D. Nev. 2006) (noting that supporting affidavit for search warrant set forth procedures to handle confidential medical information); Dep't of Justice Criminal Division, Computer Crime & Intellectual Property Section, *Searching and Seizing Computers and Obtaining Electronic Evidence Manual*, Chapter 2:  Searching and Seizing Computers with a Warrant:  Legal Limitations on the Use of Search Warrants to Search Computers, § 2 (Privileged Documents) (3d Ed. Sept. 2009), *available at* http://www.cybercrime.gov/ssmanual/02ssma.html (last visited June 25, 2010) (stating that "special care" should be taken if the search could result in the seizure of privileged files).

The Government also commonly safeguards privileges during a search by employing "taint teams" -- attorneys and investigators who are walled off from other members of the prosecution team, and who review seized materials for privilege.  *See SDI Future Health, Inc.*, 464 F. Supp. 2d at 1031 (noting that with respect to the search at issue, "taint agents" reviewed materials potentially covered by attorney-client privilege).

The Government's apparent circumvention of traditional procedural protections here raises serious concerns as to whether appropriate care has been taken to protect Mr. Walsh's and/or the corporate entities' various privileges, and to prevent against review of privileged

materials by the prosecution team.[6]  The Receiver plainly has no power to waive Mr. Walsh's

personal privileges, and the Receivership Orders do not empower the Receiver to waive the

corporate entities' privileges, yet the Receiver appears to take direction from the USAO and has

provided the prosecution team with copies of and/or access to **<u>all</u>** of the materials in its

possession.  Mr. Walsh has no way to ensure that members of the prosecution team have not

been exposed to his privileged documents and materials, especially where - as here - defense

counsel's preliminary review of materials suggests that privileged legal documents are

intertwined with other non-privileged documents and records.  (*See* Kalmanson Dec., ¶ 8.)

> **A.      Mr. Walsh is Entitled to the Return of His Personal Privileged Materials and the Use of Appropriate Safeguards to Protect Against the Prosecution Team's Review of These Materials**

When the Government discovers privileged documents and materials during the course of

a search, it typically returns these privileged items to the defendant after the search is complete.

*See United States v. Chuang*, 696 F. Supp. 910, 915 (S.D.N.Y. 1988) (stating that to the extent

the Government obtained privileged materials during a search, the appropriate "remedy is

suppression and return of the documents in question. . . .") (*quoting Nat'l City Trading Corp. v.

United States*, 635 F.2d 1020, 1026 (2d Cir. 1980)); *In re Search of 5444 Westheimer Rd. Suite

1570, Houston, Tex., on May 4, 2006*, No. H-06-238, 2006 WL 1881370, at *2-3 (S.D. Tex. July

6, 2006) (requiring taint team to review seized materials, identify privileged information, and

return all privileged documents to the defendant); *SDI Future Health, Inc.*, 464 F. Supp. 2d at

1031.

---

[6] The materials currently in the Receiver's and/or the Government's possession could be
protected by several privileges, including but not limited to the attorney-client, doctor-patient,
therapist-patient, pastoral, and spousal privileges.

Therefore, Mr. Walsh respectfully requests that the Court enter an Order requiring the return of all of Mr. Walsh's personal privileged documents and materials -- and all copies thereof -- to Mr. Walsh. To effectuate this Order, Mr. Walsh respectfully requests that the Court order the Government to utilize a taint team to review all of the documents and materials currently in both the Government's and the Receiver's possession. To the extent that the taint team identifies any of Mr. Walsh's privileged materials in the Government's possession, those documents and all copies thereof should be returned immediately. To the extent that the taint team identifies any of Mr. Walsh's privileged materials in the Receiver's possession, the Government should be ordered to direct the Receiver to return these materials, and all copies thereof, to Mr. Walsh. (*See* Colton Dec., ¶ 8 (demonstrating that the Receiver takes direction from AUSA O'Donnell).)

**B.    The Government Should Return All Corporate Privileged Materials to the Receiver and Should Employ Appropriate Safeguards to Protect Against the Prosecution Team's Review of These Materials**

Furthermore, in order to ensure the protection of the corporate entities' privileges, Mr. Walsh respectfully requests that the Court enter an Order directing the Government, after the taint team's review of the materials in the Government's possession, to return any privileged corporate material to the Receiver -- the entity currently authorized to maintain and protect the corporate entities' documents, books, records, and other materials.

Mr. Walsh further requests that during the taint team's review of the material in the Receiver's possession, the taint team be required to segregate the corporate entities' privileged material from other non-privileged documents and materials. Mr. Walsh further seeks an Order requiring the Government not to seek or obtain any privileged corporate materials from the Receiver, and also requiring the Government to direct the Receiver not to provide the Government with any of the corporate entities' privileged materials.

**C.** **The Government Should Set Forth the Procedures, If Any, It Has Employed to Protect Defendants' Privileges**

Finally, in order to determine what procedures, if any, the Government has already employed to protect against the prosecution team's exposure to and/or review of privileged and potentially privileged materials in the Government's and/or the Receiver's possession, Mr. Walsh also respectfully requests that the Court enter an Order requiring the Government to set forth in detail: (1) the process through which Government agents request, receive, and review the documents and information under the Receiver's control; (2) the manner in which the Government obtained possession of the documents, information, and materials currently in its own possession, and the process through which Government agents have reviewed these materials; (3) the processes and procedures, if any, used to protect against the prosecution team's exposure to privileged materials; (4) whether any privileged materials have been discovered in the course of the Government's investigation of Messrs. Walsh and Greenwood; and (5) whether the prosecution team has seen or reviewed any privileged materials.

**D.** **The Court Should Hold Potential Future Motions Regarding the Privilege or Privileged Materials in Abeyance**

Depending on the Government's response to this motion and the information requested, Mr. Walsh may need to apply to the Court for further relief. Specifically, Mr. Walsh may need to move to suppress certain documents on the basis of privilege, and may need to move for disqualification of the prosecution team if the Government's response indicates that it has not employed adequate procedures to protect against the team's review of privileged materials. Furthermore, Mr. Walsh may request that the Court hold a taint hearing if it appears that the prosecution team may have discovered evidence based on information contained in privileged materials. Mr. Walsh respectfully requests that the Court hold all of these potential motions --

and any other potentially necessary motions on this issue -- in abeyance pending his receipt of the requested information and materials from the Government.

## III.    STEPHEN WALSH IS ENTITLED TO A BILL OF PARTICULARS

A criminal defendant may seek a bill of particulars under Fed. R. Crim. P. 7(f) "in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy" if he is prosecuted a second time for the same offense. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "In determining whether a bill of particulars is warranted, the court should consider 'the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise available to the defendants.'" *United States v. Mango*, No. 96-CR-327, 1997 WL 222367, at *9 (N.D.N.Y. May 1, 1997) (*quoting United States v. Walker*, 922 F. Supp. 732, 739 (N.D.N.Y. 1996)). Here, these factors weigh heavily in favor of granting Mr. Walsh's requested particulars.

### A.    The Indictment Does Not Apprise Mr. Walsh of the Charges Against Him with the Requisite Particularity, and He Faces a Veritable Mountain of Discovery

The Indictment in this case alleges, *inter alia*, that Messrs. Greenwood and Walsh (1) participated in a complex thirteen-year "scheme to defraud investors in WG Trading and WG Investors," (2) committed fraud in the sale of securities and commodities, (3) committed wire fraud, and (4) engaged in money laundering. (*See generally* ECF No. 31.) Despite the gravity of these charges, however, the Indictment contains remarkably little detail as to the defendants' alleged conduct and the nature of their purported fraud. Rather, the Indictment speaks almost exclusively in generalities, referring to unidentified alleged victim "investors" (*e.g.*, ¶ 5), an unidentified co-conspirator and "other[] known and unknown" participants in the alleged scheme (*e.g.*, ¶¶ 5, 8), and vague alleged "untrue statements," omissions, and other "devices, schemes,

and artifices" allegedly used to "defraud" unidentified "clients and participants, and prospective clients and participants" (*e.g.*, ¶¶ 17, 19, 21).  Without more than these broad statements, it will be extremely difficult -- if not impossible -- for Mr. Walsh to know the specific conduct the Government plans to challenge at trial, and thus virtually impossible for him to prepare a defense.

Furthermore, even where the Indictment *does* purport to contain specific examples of defendants' conduct -- for example, in a list of alleged wire transfers purportedly made by Messrs. Greenwood and Walsh in furtherance of the alleged fraudulent scheme -- this specific conduct is charged as being "among other[]" unidentified wire transfers.  (*Id.*, ¶¶ 15, 21).  This open-ended phrasing leaves the Government free to introduce evidence of *any* wire transfer that occurred between 1996 and February 2009, regardless of whether the transfer is listed in the Indictment, and claim that the evidence supports a finding of Mr. Walsh's guilt.  The potential for unfair surprise in such an approach is manifest.

Similarly, Count Six of the Indictment charges that Messrs. Greenwood and Walsh allegedly engaged in "**_a_** monetary transaction in criminally derived property that was of a value greater than $10,000," implying that only one alleged transaction is at issue in this case.  (ECF No. 31, ¶ 23) (emphasis added).  However, the Forfeiture Allegation as to Count Six seeks forfeiture of all property involved in and/or traceable to the defendants' alleged "money laundering **_offenses_**," implying that the Government may at some point challenge additional alleged money laundering transactions and seek forfeiture based on them, even though these additional purported transactions are not specified in the Indictment.  (*Id.*, ¶ 26) (emphasis added).  This internal inconsistency only amplifies the extreme difficulty Mr. Walsh faces in preparing his defense to these charges and the potential for unfair surprise at trial.

Compounding the difficulties created by the inconsistency and lack of detail in the Indictment, is the fact that discovery in this action is incredibly voluminous. To date, the discovery of which the Government has apprised Mr. Walsh includes the contents of 18 computer hard drives, 21 computer towers, and approximately 650 boxes of documents.[7] (Colton Dec., ¶¶ 11, 14, 16.) Aside from providing Mr. Walsh with indices of this information and indicating its "preliminary" belief that approximately one-third of the 650 boxes may be irrelevant to this action, (*Id.*, ¶ 11 & Exs. 1, 2), the Government has provided little, if any, additional guidance as to which of these materials are relevant to the Indictment's skeletal and amorphous charges.

**B.      Mr. Walsh is Entitled to the Requested Particulars to Allow Him to Prepare His Defense to the Charges in the Indictment and to Avoid Unfair Surprise**

Given the circumstances as described above, case law supports providing Mr. Walsh with a bill of particulars. For example, in *Bortnovsky*, the Second Circuit reversed defendants' convictions and found that the district court abused its discretion in denying defendants' request for particulars to identify the dates of allegedly phony burglaries and the identity of false documents the Government intended to challenge at trial. *See* 820 F.2d at 574-75; *see also United States v. Lino*, No. 00 Cr. 632, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (granting request for particulars regarding alleged bribes, including whom defendant intended to bribe and the amount of the bribe); *Mango*, 1997 WL 222367, at *10-13 (granting request for particulars including identities of alleged co-conspirators and specific information regarding alleged fraudulent representations, including speaker, date, and to whom the representation was made); *United States v. Ganim*, 225 F. Supp. 2d 145, 155-56 (D. Conn. 2002) (holding that use of the

---

[7] This estimate only includes materials currently in the Government's and/or the Receiver's possession -- it does not appear to include all the material from third parties and other Governmental entities that the Government plans to use in its case-in-chief. (Colton Dec., ¶ 13.)

phrase "among others" in the indictment warranted a bill of particulars to clarify which evidence the Government intended to produce against the defendant).

Providing access to massive discovery does not cure the Indictment's lack of particularity. As the *Bortnovsky* Court noted, the Government does not "fulfill its obligation [to the defendant] merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." *Id.* at 575; *see also United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."); *Mango*, 1997 WL 222367, at *10 ("[I]t is not enough that the United States has provided defendants with over 600 boxes of documents together with indices to them.").

The decision in *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), is particularly instructive. There, the court concluded that a bill of particulars was warranted where the Government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims [but had not] informed the defendants which of these claims were false and in what way they were false." *Id.* at 571. To facilitate defendants' preparation for trial and to prevent unfair surprise, the *Nachamie* Court ordered the Government to identify defendants' un-indicted co-conspirators, as well as to identify specific details about the alleged falsity of the Medicare claims the Government intended to raise at trial. *Id.* at 576.

The same result is warranted here. The instant Indictment has left Mr. Walsh in the dark as to the particulars of the charges against him, and the promised mass of electronic data and hundreds of thousands of pages of documents cannot cure the lack of specificity as to the alleged

conduct the Government intends to challenge at trial.  Therefore, in accordance with the

foregoing precedent, Mr. Walsh requests the following particulars with respect to the Indictment:

a.  With respect to Page 2, ¶ 5, identify the known "others" who are alleged to have solicited funds under false pretenses, failed to invest investors' funds as promised, and misappropriated and converted investors' funds.

b.  With respect to Page 2, ¶ 5, identify the "others" who are alleged to have personally benefited from the alleged scheme.

c.  With respect to Page 2, ¶ 5, identify the alleged "false pretenses" under which "Greenwood, Walsh, and others known and unknown" allegedly solicited funds.

d.  With respect to Page 2, ¶ 5, identify the investors whose funds were allegedly converted for "the personal benefit of Greenwood, Walsh, and others, without the knowledge or authorization of the investors."

e.  With respect to Page 2, ¶ 5, identify the investors whose funds were allegedly not invested "as promised."

f.  With respect to Page 2, ¶ 5, identify the alleged "promise[s]" made to investors about the investment of their funds, including (1) who made the alleged promises; (2) when the alleged promises were made; (3) whether the alleged promises were made orally or in writing; and (4) what were the alleged promises.

g.  With respect to Pages 2-3, ¶ 6, identify the known "others" who are alleged to have solicited more than $7.6 billion from institutional investors.

h.  With respect to Pages 2-3, ¶ 6, identify the "institutional investors."

i.  With respect to Page 3, ¶ 6, identify the co-conspirators who allegedly made oral and written representations to investors regarding the "equity index arbitrage" investment strategy.

j.  With respect to Page 3, ¶ 6, identify in detail or provide copies of the alleged "marketing materials provided to investors for WG Trading and its affiliates."

k.  With respect to Page 3, ¶ 6, identify the alleged "affiliates" of WG Trading.

l.  With respect to Pages 3-4, ¶¶ 6-8, identify the "investors" and "clients."

m.  With respect to Page 4, ¶ 8, identify the "other things" which Walsh and Greenwood allegedly "used investor funds" to do.

n.      With respect to Page 4, ¶ 8, identify the "periodic redemption requests of other investors," including (1) who made the request; (2) when the request was made; (3) whether the request was made orally or in writing; and (4) the amount requested.

o.      With respect to Page 4, ¶ 8, identify the alleged "publicly traded company that went bankrupt."

p.      With respect to Page 4, ¶ 8, identify the alleged "other investments and loans by WG Trading and WG Investors," including (1) which investments and loans; (2) when each investment or loan was made; (3) whether the investment or loan was made by WG Trading or WG Investors; and (4) the amount of each investment or loan.

q.      With respect to Page 4, ¶ 8, identify the "others" who Greenwood, Walsh, and CC-1 allegedly caused to create false account statements.

r.      With respect to Page 4, ¶ 8, identify the "clients" to whom allegedly false account statements were allegedly sent, and state who sent the allegedly false account statements.

s.      With respect to Page 4, ¶ 8, identify the alleged "returns that had been promised those clients," including (1) what returns were promised; (2) when the returns were promised; (3) who promised the returns; and (4) whether the returns were promised orally or in writing.

t.      With respect to Pages 4-5, ¶¶ 8 & 10, identify by name "CC-1."[8]

u.      With respect to Page 5, ¶ 9, identify the known "others" who allegedly "caused WG Investors to divert approximately $51 million to or for the benefit of Walsh."

v.      With respect to Page 5, ¶ 9, identify by name the "recipient banks in the Southern District of New York" which allegedly received wire transfer payments from a WG Investors account.

w.      With respect to Page 5, ¶ 9, identify by account number the "WG Investors account" which allegedly made wire transfer payments to "recipient banks in the Southern District of New York."

_____

[8] Because the Indictment does not charge a crime of violence, it is extremely unlikely that revealing the identity of CC-1 will endanger this individual or compromise the Government's investigation in any way. *See, e.g.*, *Nachamie*, 91 F. Supp. 2d at 573 ("[T]his case charges Medicare fraud - not narcotics trafficking or murder - and defendants must be provided with the names of known unindicted co-conspirators.").

x.      With respect to Page 5, ¶ 9, identify by (1) date; (2) amount; and (3) recipient the specific wire transfers comprising the $51 million allegedly diverted from WG Investors "to or for the benefit of Walsh."

y.      With respect to Page 5, ¶ 9, specify whether the composition of the $51 million allegedly diverted from WG Investors "to or for the benefit of Walsh" includes payments made other than by wire transfer, and identify any such alleged payments by (1) date; (2) amount; (3) recipient; and (4) method of payment.

z.      With respect to Page 5, ¶ 9, identify by (1) date; (2) amount; (3) recipient; and (4) method of payment of the alleged payments directed to "members of [Greenwood's and Walsh's] families."

aa.      With respect to Page 5, ¶ 9, identify by (1) date; (2) amount; (3) recipient; and (4) method of payment of the alleged payments directed to "entities that [Greenwood and Walsh] or their family members controlled," and specify whether Greenwood or Walsh controlled each entity.

bb.      With respect to Page 5, ¶ 9, identify the "persons and entities" from whom Greenwood and Walsh allegedly purchased "goods (including antiques and collectibles) and services;" including (1) the recipient of the payment; (2) when the payment was made; (3) how payment was made; (4) what goods and/or services were purchased; and (5) whether the goods and/or services were purchased by Greenwood or Walsh.

cc.      With respect to Page 5, ¶ 10, state the dates, amounts, and investors from whom Greenwood and Walsh allegedly misappropriated funds.

dd.      With respect to Page 5, ¶ 10, detail the specific direction allegedly given to CC-1 by Walsh and state (1) when Walsh allegedly gave such direction; and (2) by what means Walsh allegedly gave such direction.

ee.      With respect to Page 5, ¶ 10, identify by (1) date and (2) amount each of the promissory notes allegedly "issued" by Walsh.

ff.      With respect to Pages 5-6, ¶ 11, set forth how much of each alleged "Walsh Note" was (1) funds transferred to or for the benefit of Walsh; (2) funds transferred to or for the benefit of Greenwood; (3) capitalization of purported investor earnings; and (4) write-offs in unprofitable investments.

gg.      With respect to Page 5, ¶ 11, specify whether the promissory notes allegedly issued by Walsh included any amounts other than (1) funds allegedly transferred to or for the benefit of Walsh; (2) funds allegedly transferred to or for the benefit of Greenwood; (3) capitalization of purported investor earnings; and (4) alleged write-offs in unprofitable investments, and identify any such alleged amounts.

hh.      With respect to Page 6, ¶ 11, identify the alleged "investors who held notes issued by WG Investors," including (1) the investor's name; (2) the date WG Investors allegedly issued the note; and (3) the amount of the alleged note.

ii.      With respect to Page 6, ¶ 11, identify by (1) date and (2) amount the alleged "unprofitable investments that Greenwood and Walsh had made through WG Trading and WG Investors."

jj.      With respect to Pages 6-8, ¶¶ 12-15, identify the known "others" referred to in the statutory conspiracy allegations.

kk.      With respect to Page 6, ¶ 13, identify the "means and instrumentalities of interstate commerce" allegedly used by Greenwood, Walsh, "and others known and unknown."

ll.      With respect to Page 7, ¶ 13, identify the "securities" allegedly purchased and sold by Greenwood, Walsh, "and others known and unknown."

mm.      With respect to Page 7, ¶ 13(1), identify the "devices, schemes and artifices to defraud" allegedly used by Greenwood, Walsh, "and others known and unknown."

nn.      With respect to Page 7, ¶ 13(2), identify the alleged "untrue statements of material facts," including (1) what were the alleged untrue statements; (2) who made the alleged untrue statements; (3) when were the alleged untrue statements made; and (4) whether the alleged untrue statements were made orally or in writing.

oo.      With respect to Page 7, ¶ 13(2), identify the alleged omissions of material facts, including (1) what were the alleged omissions; (2) who committed the alleged omission; and (3) when were the alleged omissions were committed.

pp.      With respect to Page 7, ¶ 13(3), identify the alleged "acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons."

qq.      With respect to Page 7, ¶ 13(3), identify the "persons" upon whom the alleged "fraud and deceit" was operated.

rr.      With respect to Page 8, ¶ 15, identify the alleged "other" overt acts referred to but not particularized in ¶¶ 15(a)-(c).

ss.      With respect to Page 8, ¶ 15(a), (1) identify by name, account number, and owner the "bank account in New York, New York" that allegedly received a wire transfer in the amount of $500,000 in the name of Walsh's ex-wife; (2) identify whether the alleged wire transfer was effected by Walsh, Greenwood, "others," or some combination thereof; and (3) identify where the alleged transfer originated.

tt.    With respect to Page 8, ¶ 15(b), (1) identify by name, account number, and owner the "bank account in New York, New York" that allegedly received a wire transfer in the amount of $300,000 in the name of Greenwood; (2) identify whether the alleged wire transfer was effected by Walsh, Greenwood, "others," or some combination thereof; and (3) identify where the alleged transfer originated.

uu.    With respect to Page 8, ¶ 15(c), (1) identify by name, account number, and owner the "bank account in New York, New York that allegedly received a wire transfer in the amount of $50,000 in the name of Walsh's ex-wife; (2) identify whether the alleged wire transfer was effected by Walsh, Greenwood, "others," or some combination thereof; and (3) identify where the alleged transfer originated.

vv.    With respect to Page 9, ¶ 17, identify the "means and instrumentalities of interstate commerce" allegedly used by Greenwood and Walsh.

ww.    With respect to Page 9, ¶ 17, identify the "securities" allegedly purchased and sold by Greenwood and Walsh.

xx.    With respect to Page 9, ¶ 17(a), identify the "devices, schemes, and artifices to defraud" allegedly employed by Greenwood and Walsh.

yy.    With respect to Page 9, ¶ 17(b), identify the alleged "untrue statements of material facts," including (1) what were the untrue statements; (2) who made the untrue statements; (3) when were the untrue statements made; and (4) whether the untrue statements were made orally or in writing.

zz.    With respect to Page 9, ¶ 17(b), identify the alleged omissions of material facts, including (1) what were the omissions; (2) who committed the omission; and (3) when were the omissions committed.

aaa.    With respect to Page 9, ¶ 17(c), identify the alleged "acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons."

bbb.    With respect to Page 9, ¶ 17(c), identify the "persons" upon whom the alleged "fraud and deceit" was operated.

ccc.    With respect to Page 10, ¶ 19, identify the "means and instrumentalities of interstate commerce" allegedly used by Greenwood and Walsh.

ddd.    With respect to Page 10, ¶ 19(a), identify the "devices, schemes, and artifices" allegedly employed by Greenwood and Walsh.

eee.    With respect to Page 10, ¶ 19(b), identify the "clients and participants" and "prospective clients and participants" allegedly "defraud[ed]" by Greenwood and Walsh.

fff.     With respect to Page 10, ¶ 19(b), identify the "transactions, practices, and courses of business which operated and would operate as a fraud and deceit upon clients and participants, and prospective clients and participants."

ggg.     With respect to Page 10, ¶ 19(c), state whether the "clients and participants" and "prospective clients and participants" are the same as those referenced in ¶ 19(a), and if not, identify the "clients and participants" and "prospective clients and participants."

hhh.     With respect to Page 11, ¶ 21, identify the "other" interstate fax transmissions referred to, but not particularized.

iii.     With respect to Page 11, ¶ 21, identify the "investors" allegedly defrauded by Greenwood and Walsh.

jjj.     With respect to Page 11, ¶ 21, identify by name, account number, and owner the alleged "bank and securities accounts" controlled by Greenwood and Walsh.

kkk.     With respect to Page 11, ¶ 21, identify by name the "other persons and entities" who allegedly received interstate fax transmissions directing wire transfers.

lll.     With respect to Page 11, ¶ 21, for each interstate fax transmission referenced in the chart, specify (1) the alleged sender and recipient; (2) the telephone number from which the transmission was sent; (3) the telephone number from which the transmission was received; (4) whether the transmission was allegedly caused by Greenwood or Walsh; (5) the persons to whom, and/or the entities to which, investor funds were allegedly transferred pursuant to each such transmission; (6) the exact date of the wire communication; and (7) the exact amount of the wire transfer referenced in the fax.

mmm.     With respect to Page 12, ¶ 23, identify the "others" whom Greenwood and Walsh allegedly caused to "engage in a monetary transaction in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity. . . ."

nnn.     With respect to Page 12, ¶ 23, identify the "monetary transaction in criminally derived property" in which Greenwood and Walsh allegedly engaged and caused others to engage, and state whether there are additional such "monetary transaction[s]" not set forth in the Indictment.

ooo.     With respect to Page 12, ¶ 23, identify the "criminally derived property" that is the subject of the alleged "monetary transaction," and state (1) the value of the property; (2) whether this property was allegedly derived

from securities fraud, commodities fraud, or wire fraud; and (3) from where was this property allegedly derived.

ppp.   With respect to Page 12, ¶ 23, for each alleged "transfer[] of investor funds," specify (1) the date of the transfer; (2) the amount of the transfer; (3) the means used to accomplish the transfer; (4) the names, account numbers, and owners of the bank accounts to which such funds were transferred; and/or (5) the individuals and entities to which such funds were transferred.

qqq.   With respect to Page 12, ¶ 23, identify the "investors" to whom the alleged transfers were never disclosed and/or who did not authorize the alleged transfers.

The Government has no reasonable basis to oppose Mr. Walsh's request for these particulars. Mr. Walsh is not now seeking identification of the specific proof that the Government seeks to admit at trial, nor is he requesting that the Government disclose its trial strategy to him. Instead, he simply wants to know for which of his alleged conduct and business dealings over a thirteen-year period the Government now seeks to hold him criminally liable. This information is crucial to the preparation of Mr. Walsh's defense and the avoidance of unfair surprise at trial.

## IV.   THE DEADLINE FOR SUBMISSION OF A MOTION FOR SEVERANCE SHOULD BE HELD IN ABEYANCE PENDING FURTHER DEVELOPMENT OF THE FACTUAL RECORD IN THIS ACTION

Trial courts, in their discretion, may order separate trials under Fed. R. Crim. P. 14(a), where a joint trial "appears to prejudice a defendant or the government." *See id.*; *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988). Courts in the Second Circuit often look to six factors in determining whether to grant severance motions: (1) the number of defendants and the number of counts in the indictment; (2) the indictment's complexity; (3) the estimated length of the trial; (4) disparities in the alleged degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others. *See, e.g.*, *United States v. Santiago*,

174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001). No one of these factors is dispositive; instead, each "is intended to provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants." *Id.* The standard is thus a fact-intensive one, and is based in large part upon the evidence that will be admissible at trial.

### A. Any Motion for Severance is Not Yet Ripe for Adjudication, and the Court Should Hold Mr. Walsh's Motion for Severance in Abeyance pending Development of the Factual Record

A defendant bears the burden of demonstrating the need for severance by showing that "a joint trial would result in substantial prejudice and that he [] will be denied a fair trial." *United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994) (citations omitted). Although Mr. Walsh may eventually be able to meet this burden, his motion for severance is premature at this point because discovery is still in its infancy and the factual record in this action is barely developed. Indeed, the Government is currently engaged in the ongoing process of producing electronic data to Mr. Walsh, and there remain hundreds of boxes of hard copy documents and files -- stored in at least four separate locations (including California) -- of which Mr. Walsh's counsel has only recently had the opportunity to begin a cursory on-site review.

Further highlighting the need to hold Mr. Walsh's motion for severance in abeyance is the facial insufficiency of the Indictment. As discussed above, the Government has not yet advised Mr. Walsh of the specific alleged conduct that it intends to challenge at trial. Mr. Walsh needs particulars to prepare his defense and supplement the bare-bones Indictment, which currently does little more than charge crimes with vague, hyperbolic, and open-ended statements. Moreover, Defendants are only now making the first of their pre-trial motions. Severance often hinges on the admissibility of evidence, and clearly, the Court has not yet had the opportunity to rule on any evidentiary matters.

Courts in this district have been amenable to holding motions for severance in abeyance pending the resolution of pre-trial motions and development of a factual record. *See*, *e.g.*, *United States v. Kercado*, No. 91 Cr. 685, 1992 WL 196778, at *2 (S.D.N.Y. Aug. 3, 1992); s*ee also United States v. Rodriguez*, 734 F. Supp. 116, 118, n.1 (S.D.N.Y. 1990). Additionally, some courts faced with premature motions to sever have dismissed the motions without prejudice, granting leave to amend at a later date. *See*, *e.g.*, *United States v. Rodriguez*, No. 08 Cr. 1311, 2009 WL 2569116, at * 11 (S.D.N.Y. Aug. 20, 2009); *United States v. Heatley*, No. 96 Cr. 515, 1997 WL 12961, at *4 (S.D.N.Y. Jan. 14, 1997).

Given the vastly undeveloped nature of the record, Mr. Walsh cannot properly assess his need to make a motion for severance at this time. However, cognizant of the Court's motion deadline and desiring to avoid any potential preclusion for failure to comply with the Court's schedule, Mr. Walsh respectfully requests that the Court hold any motion for severance in abeyance pending development of the factual record.

### B. Discovery May Reveal Several Arguments in Favor of Severing Mr. Walsh's Trial from Mr. Greenwood's

Upon a more fully-developed record, it may be possible to demonstrate prejudice of a joint trial from: (1) disparity in the degrees of defendants' involvement in the alleged fraudulent conduct; (2) spillover prejudice; and (3) antagonistic defenses.

### 1. Discovery May Reveal Disparity in the Degrees of Messrs. Walsh and Greenwood's Involvement in the Alleged Fraudulent Conduct

The Indictment charges primarily that "Greenwood and Walsh" or "Greenwood, Walsh, and others" participated in the allegedly fraudulent conduct. However, Mr. Walsh has requested that the Government amplify these skeletal allegations with specifics regarding the identities of these "others" and the extent of Mr. Walsh's and Mr. Greenwood's individual alleged participation in the charged scheme. This necessary supplemental information, in conjunction

with a more fully developed factual record, could reveal disparate levels of involvement between Messrs. Walsh and Greenwood in the alleged fraudulent conduct.

2.      If the Majority of the Evidence is Likely to Incriminate Mr. Greenwood Rather than Mr. Walsh, This Could Create Spillover Prejudice

Severance is warranted where "the sheer volume and magnitude of the evidence against one defendant [] dwarfs the proof presented against his co-defendant. . . ." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). A co-defendant is entitled to severance where failure to sever would force the defendant "to endure a trial involving many incidents of misconduct which do not involve [him]," and which could ultimately confuse and/or prejudice the jury against him. *See, e.g.*, *Upton*, 856 F. Supp. at 736.

In a joint trial, the Government may introduce evidence primarily implicating Mr. Greenwood -- particularly if Messrs. Walsh and Greenwood were disparately involved in the alleged fraudulent scheme. Should this happen, Mr. Walsh will face the scenario contemplated by *Upton*, in which he will be forced to endure a trial with an abundance of evidence of alleged misconduct that only implicates his co-defendant. *See* 856 F. Supp. at 736. Furthermore, if faced with evidence of alleged wrongdoing technically admissible only as to Mr. Greenwood, the jury may be confused by the facially similar roles held by Messrs. Walsh and Greenwood in their companies and find it hard to distinguish between the defendants' roles and alleged involvement in any alleged scheme. This, too, could impermissibly increase the risk of prejudice to Mr. Walsh. *See, e.g.*, *United States v. Gilbert*, 504 F. Supp. 565, 571 (S.D.N.Y. 1980).

3.      Mr. Walsh and Mr. Greenwood Might Present Antagonistic Defenses

In certain circumstances, severance will be granted where co-defendants employ defense tactics which implicate one another, because of the high degree of prejudice involved. *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998). Courts will grant severance of trials on the

basis of antagonistic defenses when "acceptance of one party's defense would tend to preclude the acquittal of the other." *United States v. Stein*, 428 F. Supp. 2d 138, 144 (S.D.N.Y. 2006) (*quoting Salameh*, 152 F.3d at 116)). Here, Messrs. Walsh and Greenwood's defenses may be mutually antagonistic, in that acceptance of either may tend to preclude the acquittal of the other.

While these grounds, and others, may warrant severance of defendants' trials, the factual record ultimately supporting such a motion has yet to develop. Thus, Mr. Walsh's motion for severance should be held in abeyance pending development of the record.

## V.   MR. WALSH IS ENTITLED TO DISCOVERY FROM ALL GOVERNMENTAL ENTITIES INVOLVED IN THIS INVESTIGATION AND PROSECUTION

Finally, Mr. Walsh respectfully submits that the Court should exercise its authority to order the Government to identify every investigative, regulatory, and prosecutorial agency that has participated at any time in the instant investigation and prosecution, and to provide Mr. Walsh with any and all Rule 16, exculpatory, and impeachment material or information in the possession, custody, or control of the identified agencies.

### A.   The Government's *Brady* Obligations Extend to All Governmental Entities Involved in the Investigation and Prosecution

It is well-settled that the Government's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny apply not only to the prosecutor in a given criminal matter, but also to all members of the prosecution team -- defined as "federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." United States Attorney's Manual ("USAM") 9-5.001(B)(2); *see also United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004) ("The obligation under *Brady* and *Giglio* [*v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972)] is the obligation of the government, not merely the obligation of the prosecutor.") When the Government's investigation of a criminal defendant involves other agencies, therefore,

"[e]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does." *Blanco*, 392 F.3d at 393-94 (*quoting United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995); *see also Horton v. United States*, 983 F. Supp. 650, 654 (E.D. Va. 1997) ("The prosecutor's constructive knowledge of material evidence extends [] to federal agencies participating in the same investigation of the defendant.") (internal quotations and citations omitted); *United States v. Bin Laden*, 397 F. Supp. 2d 465, 484 (S.D.N.Y. 2005) (applying a "totality of the circumstances" test to determine whether an agency could fairly be described as part of the prosecution team).

The Department of Justice has specifically recognized the importance of adjusting the definition of the prosecution team to fit the circumstances of an individual action in cases where, as here, the action is "complex" and involves "parallel proceedings with regulatory agencies (SEC, FDIC, EPA, etc.), or other non-criminal investigative or intelligence agencies. . . ." USAM Criminal Resource Manual 165: "Guidance for Prosecutors Regarding Criminal Discovery," Memorandum for Department Prosecutors from Deputy Attorney General David W. Ogden (Jan. 4, 2010) (the "Ogden Memo"), *available at* http://www.justice.gov/usao/eousa/ foia_reading_room/usam/title9/crm00165.htm (last visited June 25, 2010). The Ogden Memo further cautions prosecutors to "err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." *Id.* at Step 1(A). According to the Ogden Memo, factors to be considered in determining whether an agency is a member of the prosecution team include:

- Whether the prosecutor and the agency conducted a joint investigation or shared resources related to investigating the case;
- Whether the agency played an active role in the prosecution, including conducting arrests or searches, interviewing witnesses, developing prosecutorial strategy, participating in

targeting discussions, or otherwise acting as part of the prosecution team;

\* \* \*

- Whether the prosecutor has obtained other information and/or evidence from the agency;

\* \* \* [and]

- The degree to which the interests of the parties in parallel proceedings diverge such that information gathered by one party is not relevant to the other party.

*Id.* at Step 1(A).

### B. Mr. Walsh is Entitled to Discovery From the Agencies and Entities Involved in This Prosecution on Behalf of the Government Including All Exculpatory Information in the Possession of Those Agencies and Entities

Here, the SEC and CFTC clearly have been involved in the investigation from the outset and should be considered members of the "prosecution team" for the Government's discovery and *Brady* obligations. These agencies provided SA Barnacle with information and documents forming the basis for many of the allegations in the criminal complaint; representatives of the agencies attended proffer meetings between the FBI, USAO, and Mr. Walsh; and the information gathered by one agency here is clearly relevant to the other agencies because the complaints in the civil and criminal actions all allege the same allegedly fraudulent conduct occurring over the same alleged thirteen-year period. (Colton Dec., ¶¶ 2, 3.) Thus, by the Department of Justice's own standards, the SEC and CFTC are members of the prosecution team in this action, and Mr. Walsh requests that the Court require the Government to satisfy its discovery obligations, *i.e.*, Rule 16, *Brady*, and *Giglio* obligations, with respect to materials in the SEC's and CFTC's possession.

Furthermore, to the extent that additional agencies have also participated in the investigation and prosecution, Mr. Walsh requests that the Court require the Government to identify these agencies and specify the nature and extent of these agencies' involvement. To the

extent that the Court determines that these additional agencies should also be deemed part of the prosecution team in this case, then Mr. Walsh requests that the Government's discovery obligations be extended to materials in the possession of those agencies, as well.

## CONCLUSION

For the foregoing reasons, Mr. Walsh respectfully requests that this Court grant his Pre-Discovery Motions and order the relief requested herein.

Dated:  New York, New York
      June 25, 2010

SONNENSCHEIN NATH & ROSENTHAL LLP

By:             /s/
      Glenn C. Colton (GC-2493)
      1221 Avenue of the Americas
      New York, New York 10020-1089
      Telephone:  212-398-5797
      gcolton@sonnenschein.com

      Mark A. Flessner (*admitted pro hac vice*)
      233 S. Wacker Drive, Suite 7800
      Chicago, Illinois 60606
      Telephone:  312-876-3136
      mflessner@sonnenschein.com

      *Attorneys for Defendant Stephen Walsh*