UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
UNITED STATES OF AMERICA,

                                            OPINION

        -against-

                                            09 Cr. 722 (MGC)


PAUL GREENWOOD and STEPHEN WALSH,

                Defendants.

---------------------------------X

APPEARANCES:

        PREET BHARARA
        United States Attorney for the
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007

        By:  John J. O'Donnell, Esq.
             Marissa B. Molé, Esq.

        SNR DENTON USA LLP
        Attorneys for Defendant
        1221 Avenue of the Americas
        New York, New York 10020

        By:  Mark A. Flessner, Esq.
             Glenn C. Colton, Esq.
             Kimberly Kalmanson, Esq.

**Cedarbaum, J.**

Defendant Stephen Walsh has been charged with conspiracy to commit securities fraud and wire fraud, as well as the substantive crimes of securities fraud, commodities fraud, money laundering, and wire fraud. In order to pay the fees of his privately retained counsel in this criminal action, Walsh applies for the release of assets frozen in parallel civil enforcement actions brought by the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC"). For the reasons that follow, Walsh's application is denied.

## BACKGROUND

On February 25, 2009, the CFTC and the SEC filed civil enforcement actions against Walsh, Paul Greenwood, and several entities, alleging fraudulent conduct between 1996 and February 2009. Judge Daniels, who presides over the civil actions, issued a restraining order freezing the assets of all defendants, including Greenwood and Walsh. A criminal indictment was filed against Walsh and Greenwood on July 24, 2009. On July 28, 2010, Greenwood entered a guilty plea to all counts of the indictment.

Walsh filed a motion in this criminal action on December 22, 2009, requesting that the court unfreeze certain assets to allow him to pay attorney's fees. He argued that his residence

at 7 Half Moon Lane, Sands Point, New York ("Half Moon Lane"),

had been purchased with proceeds from the sale of a property, 38

Arden Lane, Sands Point, New York ("Arden Lane"), that had been

purchased prior to the period of the alleged fraud.  On February

4, 2010, Judge Daniels and I, sitting together, heard oral

argument on the motion.

We held that Walsh was entitled to receive up to $900,000

-- the 1983 purchase price of Arden Lane -- if the Government

could not meet its burden at a Monsanto-type probable cause

hearing.  CFTC v. Walsh, 09 CV 1749, 1750 (GBD), 09 CR 722

(MGC), 2010 WL 882875, at *1, *3 (S.D.N.Y. Mar. 9, 2010).  In

Monsanto, the Supreme Court held that under the forfeiture

statute relating to drug crimes, "assets in a defendant's

possession may be restrained [pre-trial] . . . on a finding of

probable cause to believe that the assets are forfeitable."

United States v. Monsanto, 491 U.S. 600, 615-16, 109 S. Ct. 2657

(1989).  On remand, the Second Circuit held that the Fifth and

Sixth Amendments require an adversarial, post-restraint, pre-

trial hearing to determine whether restraint of the assets

needed to retain counsel of choice is supported by probable

cause.  United States v. Monsanto, 924 F.2d 1186, 1203 (2d Cir.)

(en banc), <u>cert. denied</u>, 112 S. Ct. 382 (1991). The Government initially chose not to seek a <u>Monsanto</u> hearing.[1]

In March 2011, the receiver appointed by Judge Daniels sold Half Moon Lane. The net proceeds were approximately $3,800,000. Anticipating that he would need more than $900,000 for defense costs, Walsh made an application for the remaining portion of the sale proceeds to pay his counsel, and the Government and Walsh agreed that a <u>Monsanto</u> hearing should be held.

On May 24, May 25, and June 28, 2011, I held a <u>Monsanto</u> hearing. The Second Circuit has advised that the Federal Rules of Evidence should not be followed at a <u>Monsanto</u> hearing, "thus allowing the use of hearsay testimony and precluding unwarranted exposure of Government witnesses." <u>Id.</u> at 1198. The Government presented FBI Special Agent James Barnacle to testify about his investigation and his interviews with witnesses. Counsel for Walsh cross-examined Barnacle, and both sides offered documentary evidence.

## DISCUSSION

At a <u>Monsanto</u> hearing, the Government bears the burden of establishing probable cause to believe that "(a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are

---

[1] On October 13, 2011, Judge Daniels and I ordered the receiver to pay Walsh's attorneys $678,202, which was the amount available from the $900,000, minus costs previously awarded.

properly forfeitable." Monsanto, 924 F.2d at 1203. Monsanto

involved an asset freeze in the context of forfeiture resulting

from alleged narcotics violations. The logic of holding a post-

freeze, pre-trial hearing applies equally to an asset freeze in

a civil enforcement action that affects the defendant's ability

to retain counsel in a parallel criminal action. See SEC v.

Coates, No. 94 Civ. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y.

Aug. 23, 1994).

## I. Probable Cause: Criminal Activity

The following is a summary of the evidence introduced by

the parties at the Monsanto hearing. My findings are based on

the credible testimony of Agent Barnacle and the documentary

evidence.

Greenwood and Walsh were the general partners of WG Trading

Company LP ("WG Trading Company"), an SEC-registered broker-

dealer and CFTC-registered commodity pool operator. Barnacle

testified that starting in 1996, Greenwood, Walsh, and

individuals under their management solicited funds from

investors for an equity index arbitrage strategy. This strategy

involved shorting futures in the S&P 500 and purchasing the

underlying stocks. Greenwood and Walsh ran the strategy in

connection with an entity called the Westridge Group, which

consisted of WG Trading Company and Westridge Capital

Management, an investment adviser that was 51% owned by Walsh

4

and Greenwood.[2]  Barnacle testified that investors were told that they could invest in WG Trading Company through three different mechanisms.  First, an investor could purchase a limited partnership interest in WG Trading Company.  Second, an investor could become a noteholder in a separate entity, WG Trading Investors, through a promissory note.  Investors were told that their funds would pass through to WG Trading Company, and the note would pay interest at a rate based on the return achieved in WG Trading Company.  Third, an investor could purchase an interest in an offshore entity, and that money would flow into WG Trading Investors and through to WG Trading Company.  According to Barnacle, investors were told that their money would ultimately end up in WG Trading Company's index arbitrage strategy.

## A. "Notes Receivable"

Barnacle testified that WG Trading Investors' financials included $553,506,346.05 in "notes receivable."  Deborah Duffy, the compliance officer for WG Trading Company, explained to Barnacle that this was the sum of the promissory notes signed by Walsh and Greenwood.  The notes represented money owed to WG Trading Investors for personal advances, as well as losses and other expenses incurred by WG Trading Company.  Greenwood told

[2] From 1996 to 1997, Westridge Group also promoted an additional, similar strategy.  From 1997 onward, investors were informed that the only strategy was the index arbitrage strategy.

Barnacle that they billed expenses to WG Trading Investors rather than WG Trading Company in order to make WG Trading Company's returns appear higher.  According to Barnacle, based on the records and his conversations with Greenwood and Duffy, Walsh drew a little over $50,000,000 for personal expenses from WG Trading Investors.  Walsh's share of the promissory notes, which included his share of WG Trading Company's losses and expenses, totaled approximately $260,000,000.  The promissory notes state that the outstanding balance is due and payable on ninety days' written notice from WG Trading Investors.  The court-appointed receiver requested repayment on March 12, 2009.

### B. Unauthorized Investments

As noted above, Barnacle testified that investors were told that their funds would be invested only in accordance with the index arbitrage strategy.  The Government offered into evidence a presentation discussing the strategy in detail.  It also offered an agreement among the University of Pittsburgh, Westridge Capital Management, WG Trading Investors, and WG Trading Company.  This agreement provided that "[e]ach of the WG parties represents to the University that the only business of WG Trading [defined to include Westridge Capital Management, WG Trading Investors, and WG Trading Company] is index arbitrage and that WG Trading does not employ any other investment strategies."

According to Barnacle, Walsh and Greenwood used investor funds for a host of unauthorized investments.  Walsh and Greenwood started acquiring shares of Signal Apparel ("Signal") in 1990 through a limited partnership called Walsh Greenwood & Co.  Both Walsh and Greenwood were on the board of directors of Signal, and Walsh served as chairman of the board.  Shortly after the initial investment, Signal had liquidity problems, and Walsh asked Greenwood if they could provide financial support.  Starting in 1992, Walsh and Greenwood used WG Trading Company to loan money to and purchase warrants in Signal.  WG Trading Company also guaranteed a $25 million loan to Signal.  In 1996 or 1997, around the time that Walsh and Greenwood began promoting the arbitrage strategy, they moved the Signal-related investments to the books of WG Trading Investors.  Greenwood said that they moved the Signal investment to WG Trading Investors because investors were told that WG Trading Company was involved only in index arbitrage, and he and Walsh wanted to keep the books clean.  Signal eventually declared bankruptcy, and Walsh and Greenwood lost over $100 million.

Barnacle also testified that in about 2002, Walsh and a money manager named Peter Rup started a fund-of-funds called Orion Constellation Partners ("Orion").  Walsh's role was to fund the start-up costs and to solicit investments.  From 2002 to 2004, an entity controlled by Walsh, SAM Group, provided

funding to Orion.  Eventually, Walsh and Greenwood discussed an investment in Orion as a way to fill the "hole" in WG Trading. Greenwood described the "hole" to Barnacle as the unauthorized investments and losses incurred, reflected in the WG Trading Investors' promissory notes signed by Greenwood and Walsh.  They invested approximately $180,000,000 in Orion, using the investor funds from WG Trading Investors.  After a Westridge employee discovered the investment, Greenwood initiated withdrawals from Orion, and some significant portion has been returned.

The Government introduced a financial statement for WG Trading Investors that was generated for the purposes of a National Futures Association audit.  According to Barnacle, Duffy told him that the financial statement was based on records she maintained.  The statement shows investments from WG Trading Investors to other entities not associated with the index arbitrage strategy.  Barnacle testified that Walsh and Greenwood made other unauthorized investments through WG Trading Investors, such as investments in real estate.

In addition, Barnacle testified to his conversations with Greenwood concerning the monthly performance figures provided to investors.  Greenwood stated that he and Walsh had monthly conversations about how to change the returns, and that Walsh consistently argued to show higher returns than what were actually achieved.  In 2008, given the large swings in the

market, WG Trading Company performed better than expected, and Greenwood and Walsh discussed understating the performance to pay down WG Trading Investors' debt.

After carefully considering Barnacle's testimony and the evidence offered by both parties, I find that the Government has established probable cause to believe that Walsh committed the securities fraud that provided the basis for the asset freeze. Although Barnacle testified that WG Trading Company employees stated that Walsh did not play much of a role in the firm and was rarely in the office, I find that there was sufficient evidence of Walsh's knowledge and participation to satisfy the Government's burden of probable cause.

## II. Probable Cause: Restraint of Proceeds

Under Monsanto, the Government must establish probable cause to believe that the proceeds of the sale of Half Moon Lane should not be released to Walsh. Specifically, it has been held that a court must consider whether the frozen funds are traceable to the fraud. SEC v. FTC Capital Mkts., Inc., No. 09 Civ. 4755 (PGG), 2010 WL 2652405, at *7-8 (S.D.N.Y. June 30, 2010); Coates, 1994 WL 455558, at *3.

In support of his application, Walsh argues that Half Moon Lane was purchased with "clean" funds and is therefore not traceable to the fraud. In 1983, Walsh and his then-wife, Janet Schaberg, purchased Arden Lane. They paid $900,000 for the

9

property and sold it in 1999 for over $4,000,000. Walsh contends that they then purchased Half Moon Lane for $3,125,000 directly from the Arden Lane sale proceeds. During the Monsanto hearing, Walsh introduced evidence showing that Half Moon Lane was purchased ninety minutes after the sale of Arden Lane, and that approximately $1,700,000 of the $3,150,000 purchase price was paid directly from the purchasers of Arden Lane to the seller of Half Moon Lane, bypassing the Walshes' accounts altogether.

The Government argues that, by virtue of the 2006 separation agreement (the "Agreement") between Walsh and Schaberg, Walsh received sole ownership of Half Moon Lane in exchange for, among other things, a distributive award of $12,500,000. In particular, the Government emphasizes transfers from the WG Trading Investors account to Schaberg of approximately $6,000,000. It argues that of this $6,000,000, Walsh transferred $3,000,000 to be credited toward the distributive award, and another $3,000,000 that Schaberg used before the divorce to purchase an apartment at United Nations Plaza in New York City. Schaberg retained that apartment after the divorce. According to the Government, the fact that the transfers of cash and Half Moon Lane were made pursuant to the same instrument shows that Walsh's acquisition of the home is traceable to misappropriated investor funds.

In response, Walsh argues that the Agreement provides for the complex division of numerous assets in the marital estate, some of which pre-date the alleged fraud and are indisputably clean. As a result, according to Walsh, Half Moon Lane is not traceable to the fraud.

**A. Separation Agreement**

Under the Agreement, accepting Walsh's valuation, he received personal effects, $41,437 in Citibank accounts, $134,000 worth of cars, and Half Moon Lane. The cars and the Citibank accounts were not acquired before 1996, i.e., they did not pre-date the alleged fraud and are not indisputably clean assets. Walsh also retained his business interests, though there is reason to believe that his interests in the WG Trading entities have little current value.

Pursuant to the Agreement, Schaberg received assets valued at several million dollars. Walsh estimates that Schaberg received assets with a total value of approximately $24,800,000, and the Government estimates that their total value was closer to $31,500,000.[3] According to Walsh, approximately $2,150,000 of these assets were acquired before 1996 and thus pre-date the

_____

[3] The value of Schaberg's apartment at the United Nations Plaza in New York City is unclear. These figures assume that the apartment is valued at $3,000,000.

fraud charged in the indictment.[4]  The Government does not

dispute that $1,424,608 of the marital assets distributed to

Schaberg were acquired before 1996.  The single largest asset

that Schaberg received was the $12,500,000 distributive award to

be paid over time.

The Government has established probable cause to believe

that at least $6,000,000 of the marital estate -- transfers from

WG Trading Investors to Schaberg that correspond to the United

Nations Plaza apartment and the distributive award -- was

traceable to fraud.[5]  The undisputed evidence also shows that

some percentage of the marital estate was not traceable to

fraud.  Thus, the question is whether, pursuant to an agreement

in which traceable and untraceable assets were divided, Half

Moon Lane is traceable to fraud.

**B. Tracing in the Forfeiture Context**

If the Walshes' marital estate is analogized to a bank

account with commingled assets, and if Walsh's acquisition of

Half Moon Lane is analogized to a withdrawal, Second Circuit

case law on forfeiture offers guidance on the meaning of

---

[4] Walsh also argues that an additional $1,383,923 of clean assets
remained from the sale of Arden Lane, though these proceeds were
not linked to any particular asset distributed in the Agreement.
[5] For the purposes of this analysis, Walsh's payment of
$3,000,000 toward the distributive award is part of the marital
estate, as it "effectuate[s] the division or distribution of
property."  Majauskas v. Majauskas, 61 N.Y.2d 481, 489 (1984)
(quoting N.Y. Dom. Rel. Law § 236, pt. B, subd. 1, par. b).

"traceable."  In United States v. Banco Cafetero Panama, the
Court considered the meaning of 21 U.S.C. § 881, which provides
for the forfeiture of "proceeds traceable" to narcotics
exchanges.  797 F.2d 1154, 1158 (2d Cir. 1986).  Discussing bank
accounts with commingled proceeds from drug sales and legitimate
funds, the Second Circuit noted that there were three potential
approaches to tracing proceeds.  The third approach is most
relevant here: "If $100 from a drug sale is deposited into an
active account . . . [a] third approach is to consider
'traceable proceeds' to be any one withdrawal, or any asset
purchased with such withdrawal, to the extent of $100.  This
might be called a 'drugs-in, first-out' rule."  Id. at 1159; see
also United States v. Corey, No. 3:04CR349 (EBB), 2006 WL
1281824, at *7, *9 & n.11 (D. Conn. May 6, 2006) (applying the
"drugs-in, first-out" rule); United States v. One Parcel of Real
Prop., 34 F. Supp. 2d 107, 117-19 (D.R.I. 1999) (same).  But see
United States v. Voigt, 89 F.3d 1050, 1082, 1087 & n.22 (3d Cir.
1996) (rejecting the Banco Cafetero analysis and holding that
the government failed to show, under a preponderance of the
evidence standard, that jewelry purchased from a commingled
account was traceable to fraud).

Under Banco Cafetero's "drugs-in, first-out" rule, the net
proceeds of Half Moon Lane, $3,800,000, may be analogized to a
withdrawal from a commingled account, i.e., the marital estate.

13

Because the Government has shown probable cause to believe that at least $6,000,000 of the marital estate is traceable to fraud, there is probable cause to believe that Half Moon Lane, as a withdrawal from a commingled account, is also traceable to fraud.

## CONCLUSION

For the foregoing reasons, the Government has established probable cause to believe that Walsh committed securities fraud. Applying the "drugs-in, first-out" rule to the marital estate, there is probable cause to believe that the proceeds of the sale of Half Moon Lane are traceable to the fraud. Thus, under the teaching of the Second Circuit, the proceeds of the sale of Half Moon Lane may not be released to Walsh to pay the legal fees of his privately retained counsel. Accordingly, Walsh's application is denied.

SO ORDERED.


Dated:    New York, New York
          May 30, 2012

                         S/_____
                            MIRIAM GOLDMAN CEDARBAUM
                            United States District Judge