

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 23, 2014

**By Hand and ECF**

The Honorable Miriam Goldman Cedarbaum
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    **United States v. Stephen Walsh**
              **09 Cr. 722 (MGC)**

Dear Judge Cedarbaum:

      The Government respectfully submits this letter in advance of the sentencing of Stephen Walsh, the defendant, currently scheduled for October 29, 2014. Pursuant to the plea agreement between the parties, Walsh stipulated to a Guidelines sentence of 240 months' imprisonment. For the reasons set forth below, the Government believes that a Guidelines sentence is warranted in this case.

**I. Offense Conduct**

    **a. Background**

      On February 25, 2009, Walsh and his co-defendant Paul Greenwood were arrested and charged in a complaint with securities fraud, wire fraud, and conspiracy. On July 24, 2009, an Indictment was returned charging the defendants with conspiracy, securities fraud, commodities fraud, wire fraud, and money laundering. On April 25, 2014, Walsh pled guilty to Count Two of Indictment 09 Cr. 722 (MGC), which charges Walsh with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2. Further, the defendant agreed to forfeit a sum of money equal to $50,743,779 in United States currency, representing all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Count Two of the Indictment.

      As described in more detail below, from 1996 through February 2009, Walsh and Greenwood orchestrated a scheme to defraud investors out of hundreds of millions of dollars. Among other things, Walsh and Greenwood solicited hundreds of millions of dollars from investors, while promising them that their funds would be invested pursuant to a low-risk trading

strategy. Instead, Walsh and Greenwood utilized investor funds for speculative unauthorized investments and misappropriated investor funds for their own personal benefit.[1]

    b. **The Solicitation of Funds from Investors**

From at least 1996 through February 2009, Greenwood and Walsh were the managing general partners of WG Trading Company Limited Partnership ("WG Trading Company"), a limited partnership that was a broker-dealer registered with the United States Securities and Exchange Commission (the "SEC") and a commodity pool operator registered with the United States Commodity Futures Trading Commission (the "CFTC"). WG Trading Company was audited on an annual basis, and in the course of soliciting investors, Walsh and Greenwood stressed the fact that WG Trading Company was a regulated and audited entity. Walsh and Greenwood also controlled other affiliates that were not registered, the most prominent of which was WG Trading Investors LP ("WG Trading Investors"), a separate limited partnership of which Walsh and Greenwood were the managing general partners. Greenwood and Walsh told investors that WG Trading Investors was a pass-through entity, which meant that funds would be received by WG Trading Investors from investors and would be passed through to WG Trading Company. The funds, they told investors, would then be invested pursuant to a specific trading strategy, which they touted as low-risk and conservative. Contrary to this representation, however, Greenwood and Walsh used WG Trading Investors as a "piggy bank" from which they took hundreds of millions of dollars for their personal use and to make investments that were riskier and more speculative than that which had been described to investors.

From approximately 1996 to 2008, Walsh and Greenwood, and others acting on their behalf, solicited billions of dollars from institutional investors, including charitable and university foundations and pension and retirement plans. In the course of these solicitations, Walsh and Greenwood, and others acting on their behalf, told investors, both orally and in writing, that investor funds would only be invested pursuant to a strategy called "index arbitrage," which involved buying and simultaneously selling, through futures, the stocks of a well-known equity index (such as the Standard and Poor's 500 Index (the "S&P 500 Index")).

At various times during the life of the scheme, individuals working for Walsh and Greenwood would initially approach investors and propose the investment. Subsequently, Greenwood, Walsh, or another individual affiliated with a California-based investment advisor firm named Westridge Capital Management ("Westridge") who worked with Walsh and Greenwood would be brought in to explain the strategy and close the deal.[2] As represented, the

---

[1] The fraud carried out by Walsh and Greenwood is also described in detail in the Complaint, 09 Mag. 502 and in the Presentence Investigation Report prepared in connection with Walsh's sentencing ("PSR").

[2] Over time, Walsh became less directly involved in the investor solicitations because Greenwood and the other Westridge employee had decided that Walsh had a tendency to confuse the investors. That Walsh and Greenwood changed tacks in their solicitation of funds from investors is of no moment. Greenwood and Walsh talked regularly about solicitations of potential investors. Walsh continued to play a substantial role in researching and managing the

linchpin of the investment strategy was that Westridge would use a portion of the investor funds to purchase futures and that WG Trading Company would use the balance of the funds to invest in the index arbitrage strategy. The index arbitrage strategy purportedly consisted of selling short futures in an index (usually the S&P 500 index), and simultaneously buying shares of the stock in the index. The difference between the proceeds realized from selling the futures plus dividends distributed on the stock that was purchased minus the cost of buying the stock and margin interest usually resulted in a small but consistent profit. The marketing materials explained that fifteen percent of any investment would be managed by Westridge as follows: five percent would be used to buy futures and ten percent would be set aside to cover margin costs, while the remaining 85 percent would be transferred to WG Trading and would be managed in its index arbitrage fund. The co-conspirators created the expectation that the return on the cash managed by WG Trading Company would exceed the cost of futures purchased by Westridge and result in a profit.

Investors were told that the index arbitrage strategy was the *only* strategy employed by WG Trading Company and that it was a safe, low-risk strategy, and that the returns from the strategy had consistently outperformed the S&P 500 index for a period of more than ten years. Investors were offered the opportunity to invest in WG Trading's index arbitrage strategy through different mechanisms: an investor could (1) purchase a limited partnership interest in WG Trading Company, the broker-dealer; (2) invest through WG Trading Investors by delivering funds to WG Trading Investors in exchange for a promissory note from WG Trading Investors to the investor, which note would pay interest at a rate similar to the rate of return realized by an equivalent limited partnership interest in WG Trading Company[3]; or (3) purchase an interest in an offshore fund, which in turn would invest the investor funds through WG Trading Investors in exchange for a promissory note issued by WG Trading Investors to the offshore fund.

    **c.**    **Walsh's and Greenwood's Misuse of Investor Funds**

Contrary to the representations to investors that the funds would be invested pursuant to the safe, low-risk, index arbitrage trading strategy, however, Walsh and Greenwood misappropriated the investors' funds to finance their own lavish personal lifestyles, make payments in connection with an investment in a publicly traded company that went bankrupt, and make unauthorized investments, such as:

- use of the funds by Walsh, among other things, to finance businesses started by his children and to pay millions of dollars to Walsh's ex-wife, which, from

---

*ultra vires* investments that were fundamental to the fraud, including acting as Chairman of Signal, organizing the Orion fund investment through a close friend, and leading Walsh's and Greenwood's investments in the unauthorized real estate transactions. And, of course, Walsh continued to receive a substantial financial benefit from the continuation of the fraud.

[3] These investors were told that WG Trading Investors was itself a limited partner of WG Trading Company, and that the majority of their funds would be passed through to WG Trading Company for investment pursuant to the index arbitrage strategy.

- about January 1, 1999, through on or about January 9, 2009, caused WG Investors to divert approximately $50 million for Walsh's personal benefit;

- use of the funds by Greenwood, among other things, to finance a construction project at his home in North Salem, New York, purchase and operate a horse farm, and purchase expensive antique collectible items, which, from on or about January 1, 1999, through on or about February 6, 2009, caused WG Investors to divert approximately $80 million for Greenwood's personal benefit;

- investments that were not consistent with the index arbitrage strategy and were therefore unauthorized, including providing financial support to a company called Signal Apparel, Inc. ("Signal"), a publicly-traded company that sold licensed apparel, in which Greenwood and Walsh had an investment, by (1) using investor funds to lend money to Signal and to provide funds to Signal in exchange for warrants to purchase additional stock[4], and (2) causing WG Trading Company to pay $25 million pursuant to its guarantee of bank loan to Signal, resulting in a loan of approximately $100 million to Signal, all of which was lost[5];

- undisclosed investments in real estate ventures; and

- undisclosed investments in a hedge fund called Orion Constellation Partners, LLC ("Orion"), resulting in a loan, at Walsh's direction, from WG Trading Investors, of approximately $1 million to Orion, most of which has been repaid, and an investment, at Walsh and Greenwood's direction, via funds from WG Trading Investors Merrill Lynch Account in an amount of approximately $180 million in Orion.[6]

---

[4] From 1992 to 1996, WG Trading Company was used to provide financing to Signal. In 1996, Greenwood and Walsh moved the Signal investment to the books of WG Trading Investors in order to conceal the investment from auditors and investors.

[5] The Receiver has calculated that WG Trading Company, WG Trading Investors, and a related entity, paid over $198 million in connection with the Signal investment, which included, among other things, non-open market financing and investing prior to 1997, purchasing Treasury bills and cash deposits to guarantee Signal's bank loans, payments directly to Signal's lenders, cash advances to Signal, and payments of Signal's investments. (*See* CFTC Action Dkt. No. 110; SEC Action Dkt. No. 102).

[6] Investors were not told that their funds would be used for a loan of capital to operate a hedge fund or for an investment in a hedge fund. In fact, Greenwood and Walsh created a separate entity known as K & L Investments ("K&L") in order to conceal the Orion investment from their investors.

### d. Walsh's and Greenwood's Execution of Promissory Notes

In order to conceal their fraud, Greenwood and Walsh issued promissory notes to WG Trading Investors, which were carried as assets on the books of WG Trading Investors. Specifically, from in or about 1998 through in or about 2008, Greenwood issued promissory notes to WG Investors totaling approximately $293 million ("Greenwood Notes"). From in or about 1998 through in or about 2008, Walsh issued promissory notes totaling approximately $261 million ("Walsh Notes"). The notes included amounts representing: (a) the funds that were transferred to or for the benefit of Greenwood and Walsh, respectively; (b) expenses of WG Trading Company that had been improperly allocated to WG Trading Investors; and (c) write-offs in unauthorized losing investments that Greenwood and Walsh had made through WG Trading Company and WG Trading Investors. The notes generally provided that the amounts of the note were "representative of the general partners share of losses, withdrawals and payments" during the year covered by the notes, and that they were due and payable upon 90 days written notice from WG Trading Investors, which was controlled by Walsh and Greenwood.

### e. The Scheme Unravels

Walsh's and Greenwood's fraud scheme unraveled in February 2009 when the National Futures Association, a regulatory body that oversees commodities brokers ("NFA"), conducted an audit of WG Trading Company and its affiliates and requested information concerning WG Trading Investors, the unregistered entity that Walsh and Greenwood used as a "piggy bank" to misappropriate investors funds for their personal use and for their unauthorized investments.

At the request of the examiners, Deborah Duffy, Chief Compliance Officer at WG Trading Company, prepared a balance sheet[7] for WG Trading Investors as of December 31, 2008, which listed approximately $812 million in assets, including: (1) approximately $77 million in an entity called WGI, LLC (which related to the investment in Signal); (2) approximately $2.9 million in DLA, which related to real estate investments; and (3) $4.6 million related to Orion and $68.7 million related to K&L Investments, which related to funds transferred to Orion. The balance sheet listed $553 million in notes receivable, which related to the promissory notes executed by Walsh and Greenwood. Under liabilities, the balance sheet identified approximately $666.9 million in notes payable, which represented funds transferred by investors to WG Trading Investors pursuant to the promissory note investment mechanism.

Greenwood was extremely nervous about the NFA's inquiry into WG Trading Investors because he was afraid that the NFA would discover the promissory notes and the fact that investor money was missing from the companies. Walsh and Greenwood had several discussions during the days that the NFA examiners were at the WG Trading offices, and in

---

[7] This balance sheet was admitted as Government Exhibit 102 at the hearing held pursuant to *United States* v. *Monsanto*, 924 F.2d 1186 (2d Cir. 1991) before the Court in May and June 2011.

these conversations, Walsh and Greenwood discussed the examination. However, both Walsh and Greenwood agreed in their conversations that the discovery of the true facts about WG Trading Investors meant that they were "done," meaning that "they were going to be discovered by the NFA and they were going to go to jail." Greenwood described the tone of these conversations as "panicked." Indeed, Walsh and Greenwood were arrested only two weeks later, on February 25, 2009.

## II. The Relevant Sentencing Factors

While the sentencing statute requires this Court to consider all the relevant sentencing factors listed in 18 U.S.C. § 3553(a) and any other information relevant to sentencing, two factors are particularly salient in this case—the nature of the fraud and the cover-up and the duration and extent of Walsh's criminal conduct. When these factors are taken into account, for the reasons set forth below, the Government believes a Guidelines sentence of 240 months' imprisonment sentence would be adequate in this case to satisfy all the sentencing objectives of Section 3553(a) and, in particular, to "reflect the seriousness of the offense," "to provide just punishment," and to "afford adequate deterrence" to others. 18 U.S.C. § 3553(a).

### A. The Nature of the Fraud and the Cover-Up Warrants a Guidelines Sentence

Walsh and Greenwood formulated a complex fraudulent scheme that was extremely hard to detect. Indeed, in addition to constructing the fraudulent scheme, both Walsh and Greenwood engaged in additional criminal conduct in order to cover up the fraud, so that the scheme could continue operating for a period of approximately fourteen years. In particular, among other things, Walsh and Greenwood inflated the returns that were reported to investors for the years prior to 2008, thereby preventing investors from detecting their losses. In addition, Walsh and Greenwood executed promissory notes to WG Trading Investors, which were carried as assets on the books of WG Trading Investors, but which Walsh and Greenwood never intended to repay. The promissory notes executed by Walsh alone totaled more than $250 million. (*See infra* at 5).

Because of these actions by Walsh and Greenwood, investors saw no diminution in value of their investments. Quite the contrary. The picture painted by Walsh and Greenwood to unwitting investors was that of a robust and profitable investment, with a steady and conservative growth curve. This served a dual purpose for Walsh and Greenwood: current investors had no reason to withdraw or decrease their investment and new investors were lured in. Even the most careful of investors would have had little reason to attempt to look behind the financial statements of WG Trading Company, which was an audited and regulated entity. To be sure, there is no indication that the scheme would have been uncovered—or that Walsh's and Greenwood's criminal conduct would have ended—but for the fact that the NFA happened to conduct an audit in the early part of 2009.

Given the nature of this conduct, which includes a relatively complicated fraudulent scheme that was covered up by further fraudulent statements and documents, a significant term of imprisonment is warranted to "afford adequate deterrence to criminal conduct." 18 U.S.C. §

3553(a)(2)(B). In particular, a significant term of imprisonment will serve the goal of general deterrence. When a defendant who participated in a hard-to-detect crime is finally apprehended and convicted, and now stands before this Court for sentencing, the punishment must be sufficiently serious to serve the important goal of general deterrence—to send a message to anyone who might be tempted to commit such a fraud. Only a significant term of imprisonment can deter others from committing similar crimes, where there is a perceived low risk of detection and potential for significant personal financial gain. A Guidelines sentence in this case will demonstrate that, once called to answer for such a such a crime, the consequences to the perpetrators are severe.

To the extent that Walsh attempts to argue for a lenient sentence based on the fact that the investor victims eventually recovered much of their money (*see*, *e.g.*, Def. Mem. at 28), that argument misses the point. While true that many investors eventually recovered much of their initial investment money in this case, that was only because the fraud was fortuitously discovered as a result of the NFA audit and, at that time, there were substantial assets that could be liquidated by the diligent work of the Receiver and returned to the victims. Had the fraud continued—and there were no signs that Walsh or Greenwood intended to stop it—the investors likely would have lost their money when the misappropriation of tens of millions of dollars by Walsh and Greenwood and the losses on the risky and authorized investments outpaced their ability to keep up the scheme. In addition, although investors largely recovered their initial investment money, the victim investors, many of which were retirement and pension funds, lost out on the ability to make profits on their investment—which they were told would be steady and low-risk—and which could have been significant given the length of time during which the fraud operated. Given these circumstances, even though the investor victims recovered much of their initial investment does not cut against a lengthy sentence in this case. Instead, a significant term of imprisonment will serve to deter others from victimizing similar institutions and causing the victims' lost opportunity for profit as well as a total loss in other schemes that might not be detected in time.

### B. The Duration and Extent of Walsh's Criminal Conduct Warrants a Guidelines Sentence

The duration and extent of Walsh's criminal conduct in this case warrants a Guidelines sentence, because, given that conduct, such a sentence is necessary "to reflect the seriousness of the offense" and "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The fraudulent scheme in this case persisted for nearly fourteen years—from about 1996 through 2009. This fact alone shows that this is not a case where the defendant suffered from a momentary lapse in judgment in an otherwise law-abiding life. Instead, throughout that entire period of time from 1996 through 2009—and certainly each time Walsh solicited funds from new investors or executed another promissory note to continue the fraud and enrich himself—he could very well have decided to stop and go no further. Indeed, throughout this time period, the management and execution of this fraud scheme was Walsh's primary occupation. Even if it would have been unrealistic to expect anyone in the defendant's position to come forward and implicate himself in past wrongdoing, Walsh simply could have refused to

continue the multi-year fraud. He could have engaged in other lawful occupations, and found another way to make a living. The defendant chose not to do so.

As set forth above, for over a decade, Walsh and his co-conspirators misrepresented to investors how their funds were being invested. Rather than investing all of their investors' funds as promised in the index arbitrage program, Walsh wagered on, among other things, a shaky clothing company and other speculative real estate ventures. Moreover, of course, Walsh and Greenwood "borrowed" hundreds of millions of dollars in investor funds, which they converted to their own use and never intended to repay. This was the sole source of significant income for Walsh and Greenwood during this fourteen-year period. Despite their apparent intelligence and financial acumen, neither had any source of legitimate income or pursued any lawful occupation. Even in 2009, in the face of the request of NFA examiners, Walsh and Greenwood attempted to continue the cover-up of their fraud. At that time, they had their co-conspirator (Duffy) prepare a financial statement for WG Trading Investors that listed, among other things, about hundreds of millions of dollars in notes payable—representing funds transferred to WG Trading Investors pursuant to the fraudulent promissory note investment operation—when, in truth, these were not loans for the benefit of their clients but an attempt by the defendant to cover the tracks of their theft. Even when it appeared that the fraud was unraveling and that they would be caught, and despite the breadth and scope of this fraud, instead of desisting from further criminal activity, Walsh consciously decided to run the risk and continue on his criminal course.

## IV.     Restitution and Forfeiture

Both the Government and the Probation Department believe that restitution is appropriate in this case under the Mandatory Victim Restitution Act. Here, there were no doubt victims who were monetarily defrauded as a result of the defendant's scheme. The parties believe—and have stipulated (Plea Agreement a 1-2)—that the amount of loss fairly attributable to this defendant is actually $50,743,779 and, therefore, will submit a proposed Order of Restitution in that amount for the Court's consideration.

As part of the plea agreement, the defendant entered into a Consent Order of Forfeiture in the amount of $50,743,779, and, therefore, the Government will submit a proposed Order of Forfeiture in that amount for the Court's consideration.

**V.     Conclusion**

For all the foregoing reasons, notwithstanding the mitigation arguments presented by the defendant in support of his request for a more lenient sentence, the Government respectfully requests that this Court sentence the defendant to a Guidelines sentence of 240 months' imprisonment, which is fair, appropriate, and warranted in this case.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     _____/s/_____
Jessica Masella
Benjamin Naftalis
Assistant United States Attorneys
(212) 637-2288/-2456

cc:     Michael Tremonte, Esq. (by email)
Justin Sher, Esq. (by email)