G6T8GRES

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                          09 Cr. 722 (LAP)

5    PAUL GREENWOOD,

6

                      Defendant.
7
     ------------------------------x

8
                                             June 29, 2016
9                                            12:00 p.m.

10   Before:

11                    HON. LORETTA A. PRESKA

12                                           District Judge

13                         APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     JESSICA MASELLA
16        Assistant United States Attorney

17   FREDERICK P. HAFETZ
          Attorney for Defendant

18

19

20

21

22

23

24

25

G6T8GRES

1              (Case called)

2              THE COURT:  Is the government ready?

3              MS. MASELLA:  Yes, your Honor.  Good afternoon.

4    Jessica Masella for the government.

5              THE COURT:  Is the defense ready?

6              MR. HAFETZ:  Yes, I am.  Good morning, your Honor.

7              THE COURT:  Good morning.

8              Mr. Greenwood, can you hear me?

9              THE DEFENDANT:  I can.

10             THE COURT:  Excellent.

11             Counsel, in terms of proceeding, it seems to me that

12   Judge Cedarbaum found the total offense level, found the

13   criminal history category, and that we are really at the point

14   of counsel speaking for Mr. Greenwood.  The government made its

15   motion --

16             MS. MASELLA:  Correct, your Honor.

17             THE COURT:  -- under 5K1.

18             So I think we are at the stage where we would look to

19   counsel to speak on behalf of Mr. Greenwood.

20             MR. HAFETZ:  Thank you, your Honor.

21             THE COURT:  Yes, sir.

22             MR. HAFETZ:  Your Honor, I would like to begin with

23   the consideration of the personal history and characteristics

24   of Mr. Greenwood, which we submit is relevant to sentencing or

25   the resentencing.  As cases have said in this district, the

G6T8GRES

criminal conduct has to be assessed with regard to the overall

behavior of the defendant and his conduct hereto, in addition

to the criminal conduct.  And we submit here that looking at

the whole life of Mr. Greenwood, Mr. Greenwood has been a

person who really for decades, almost throughout his entire

life, is an individual who has performed not only good deeds,

but extraordinary deeds.

          Many letters to the court depict this, I think, in

very strong fashion.  And the letters just overall, I believe,

your Honor, many of them, are prior to the criminal conduct,

prior to any money that Mr. Greenwood may have obtained from

criminal conduct; they antedate that by decades.  Much of the

good conduct that he has done and the good deeds were done

anonymously, not for recognition.  And I believe the kind of

conduct, as described in the 80 or so letters that were

submitted to the court, show Mr. Greenwood to be a person who

truly not only has performed good deeds, but extraordinary

deeds; a person who has devoted himself to helping others

throughout his life.

          His wife Robin, who by the way is unable to be here

today, she had planned to be here on Tuesday, but she had some

business commitments, a business that she runs in North

Carolina, that she absolutely could not change, and so is not

able to be here today.  She has submitted two letters to the

court.  And her letter I think aptly summarizes what Mr.

G6T8GRES

```
1    Greenwood has been throughout his life.  She says in her letter
2    he is the first to offer help, and that really I think
3    signifies Mr. Greenwood's attitude towards how he conducts
4    himself with regard to other people.
5           Of particular note, your Honor, in the letters, I
6    would say, are the letters with regard to the tuition that Mr.
7    Greenwood has paid, either in full or a significant part, for
8    persons who otherwise would not have otherwise gone to college.
9    I am sure your Honor is familiar with the letters, but just to
10   note a few of them.
11          There is a letter of Alice Debany Clero, who writes in
12   her letter how she went to New York University.  Mr. Greenwood
13   offered her a life-changing proposal; this is while she was
14   working for him.  "If I worked for him, he wanted me to go to
15   university and he would pay for all of my tuition.  I went to
16   New York University for five years at night while working for
17   Paul.  He continued to be like a father to me.  He read all of
18   my papers.  He gave me all kinds of advice about life, and was
19   supportive of every venture I took on."
20          In a similar fashion, Dr. George Zabrecky writes that
21   the time when he was considering medical school -- this is
22   pre-fraud, pre-obtaining any money from criminal conduct.
23          By the way, your Honor, we are quite aware it's
24   serious criminal conduct and in no way do we attempt to argue
25   the conduct was not serious here.  I address here merely
```

G6T8GRES

3553(a)(1), personal history and characteristics, which the

courts have said is of extreme importance and relevance with

regard to the sentence that should be imposed.

Dr. Zabrecky describes also, he says:  "I was

considering attending medical school.  This was an important

decision for my career advancement.  It would put extreme

pressure, both financial and emotional, on me and my family.

There would be no money coming in since I would not be working;

there would be money going out to pay the medical school

tuition."  He was married at the time with several children.

"Generously, Mr. Greenwood agreed to pay for most of the

tuition.  Over the years at medical school, whenever I was in

doubt about continuing, I would speak with Paul.  His support

was instrumental in my completing medical school.  Graduation

would not have been possible without his personal and financial

support."

In similar fashion, other people describe Mr.

Greenwood paying for their college tuition.  He didn't have to

do that; he just did it because it is such an engrained part of

his nature.

Karina Bustamante, the daughter of an immigrant from

Venezuela who worked with Mr. Greenwood, writes that Mr.

Greenwood also, essentially, paid for a substantial amount of

her tuition so she could receive a college degree.

Other letters also describe Mr. Greenwood doing the

same for people who would not have had that opportunity, except for the good acts, extraordinary good deeds by Mr. Greenwood.

In addition to the help for educational purposes for people who have not been able to have that in life, Mr. Greenwood also throughout his life, prior to crime, after the crime, throughout his life has been a significant force in stepping in where there were health-care crises, some of them life-threatening, in order to enable people to receive proper medical attention.  There are numerous letters that were written to the court with regard to that.  In some cases Mr. Greenwood provided the funding, in some cases Mr. Greenwood organized financial support from himself and others, and in some cases he became a staunch advocate with the health insurance company in order to obtain the help for people. These were people, as I say, who had health crises, some of them life-threatening, some of them extremely serious conditions.

The letter from Brian Simonson talks about the individual, his partner at the time, who worked for Mr. Greenwood, who was paralyzed; and not knowing whether it would be a lifelong paralysis or not from an accident, Mr. Greenwood stepped in and organized the care which brought him back to health.

A young man, Frank Florenzino, 26, diagnosed with lymphoma cancer at the time, writes that Mr. Greenwood was the

G6T8GRES

person who stepped in and both helped fund and organize the

medical support that has brought him back to health.

Basically, in his letter, the quote says that Mr. Greenwood

saved his life.

Kenneth and Jami Adams -- by the way, these are not

relatives; they are not family.  These are friends, and

sometimes complete strangers, that Mr. Greenwood barely knew,

but Mr. Greenwood was of such a decent and compassionate nature

that he would step in and do what many other people would not

do.  He would come to basically the aid of these people in

substantial ways.

He did the same for the daughter of Kenneth and Jami

Adams, and they have written a letter to the court, talked

about their daughter who had a serious life-threatening

condition.  Mr. Greenwood was the person who was responsible

for obtaining the health care for the daughter and brought her

back to health.  As they say in the letter, "Paul saved our

daughter's life and changed ours for ever, and we are eternally

grateful to him and will always consider him a friend."

There are many others who write in similar fashion

about the health care that Mr. Greenwood was the person who was

singly responsible for obtaining for them and for bringing them

back to a healthful state.

Also, Mr. Greenwood was, because of his compassion,

was cognizant of those who are handicapped persons.  There is a

G6T8GRES

1    letter from Wondrous Burns, who writes a letter to the court

2    stating that she was born with polio -- not born, but had

3    infantile paralysis and had to wear braces from that point on,

4    but she decided she wanted to try horseback riding.  With Mr.

5    Greenwood's concern, financial support and devotion to her, she

6    writes that she was able to compete in the Paralympics of

7    horseback riding.  As she puts it, it was Mr. Greenwood who

8    helped give her her dignity in life.

9         There are others who talk about Mr. Greenwood coming

10   to their aid, who are also handicapped, and Mr. Greenwood again

11   stepped in to help them.  He didn't have to do that.  It wasn't

12   like he was accumulating letters because he was going to be

13   sentenced some day.

14        THE COURT:  I have a pretty good sense of that.

15        MR. HAFETZ:  There is a letter from the immigrant

16   George Bustamante, Mr. Greenwood helped bring his family up

17   from Venezuela, obtained visas for them and provided housing

18   for them.

19        The letters go on and on, people with everyday kind of

20   needs.  There is Rosemary DeAngelis, who writes a letter about

21   her home, and someone Mr. Greenwood barely knew.  She lived in

22   a community that developed a toxic environmental problem in the

23   home.  She had to move out.  Mr. Greenwood immediately and

24   spontaneously offered her his own home to live in.

25        So I think the letters are a testament to an

G6T8GRES

1    individual who has had an extraordinary concern, compassion,

2    and has spent a good amount of his life, over the period of

3    life, performing these acts.

4           In addition to these letters, which describe these

5    extraordinary good deeds and the nature of Mr. Greenwood, in

6    terms of really exhibiting virtues that are what we would

7    consider admirable in our fellow men and women, in addition to

8    this, which bears heavily, I believe, your Honor, on the 3553

9    factors, also in the personal and history considerations of

10   significance is the situation with respect to Mr. Greenwood's

11   daughters.  He has two daughters -- Karen 21, Laura 17 -- both

12   adopted.  Unfortunately, they have had extreme emotional and

13   psychological problems virtually throughout their entire life.

14          Mr. Greenwood's sister-in-law, Dr. Audrey Griesbach,

15   whose husband James sits in the courtroom today -- James being

16   Mr. Greenwood's brother -- a pediatrician and a developmental

17   behavioral specialist, describes in her letter the nature of

18   that condition and the difficulties they have had.

19          The younger one Laura, as Robin states in her

20   supplemental recent letter to the Court, Laura now being 17 is

21   in her latest therapeutic school, having been kicked out of

22   several others previously, and as Robin states in her letter,

23   Laura has gotten worse, her condition remains unabated and, if

24   anything, has gotten worse.  Throughout their life, the

25   troubled life, as described in Robin's letter, Paul Greenwood

G6T8GRES

1    was always the rock of really relating to the daughter.  Robin

2    is a wonderful mother.  It turns out that Paul Greenwood was

3    the one who was really the rock of trying to accomplish

4    stability for them.

5        We understand Mr. Greenwood is not going home from

6    jail tomorrow.  I understand he is going to be there for a

7    period of years more.  But Laura is now 17, Mr. Greenwood is

8    69, and we have requested that the Court impose, as the

9    presentence report recommends, a five-year prison sentence on

10   him.  There is a significant difference, I submit, in terms of

11   Laura's future development if she sees her father as getting

12   out of jail within the next three, three-and-a-half years, with

13   the year he has already been in, at age 72, 73, as opposed to

14   getting out of jail at age 76 or 77.

15       THE COURT:  What date did Mr. Greenwood surrender on,

16   more or less?

17       MR. HAFETZ:  It's a little more than a year ago.

18       THE DEFENDANT:  March 15th of last year.

19       MR. HAFETZ:  Further, with regard to consideration,

20   still on the subject of the personal and history circumstances,

21   is Mr. Greenwood's conduct in prison.  As *Pepper v. U.S.*, the

22   Supreme Court case 2011 --

23       THE COURT:  I have your letter.

24       MR. HAFETZ:  -- states, he really exhibited, I

25   believe, quite impressive rehabilitative conduct in prison.  He

G6T8GRES

1    is a man of abilities.  He has used his abilities to the

2    benefit of prisoners at Butner who are much less fortunate in

3    life.  He spent, I believe, 30 hours or so tutoring inmates,

4    many of them drug defendants.

5            Just in terms of basic financial rudiments --

6            THE COURT:  I really had the letter.  I read it.

7            MR. HAFETZ:  So we submit all of these factors, your

8    Honor, with regard to the personal and history and

9    characteristics militate, we believe, strongly in favor of a

10   sentence that we would request of five years.

11           Additionally, as stated in our papers, Mr. Greenwood

12   has rendered substantial assistance to the government.  The

13   government's 5K submission to the Court makes clear Mr.

14   Greenwood's cooperation with the government was prompt, it

15   began really about the time of the criminal charge against him,

16   long-standing, continued over a period of five years, and it

17   was substantial, as is detailed in the submission by Ms.

18   Masella to the Court.

19           THE COURT:  Yes, sir.

20           MR. HAFETZ:  In addition, he has also cooperated

21   substantially with the court appointed receiver in the recovery

22   of assets so that approximately 95 percent of the amount of

23   investors' investment has been recovered at this point with Mr.

24   Greenwood's efforts contributing to that.

25           THE COURT:  The presentence report says 90.  Has it

G6T8GRES

1   increased to 95?

2           MR. HAFETZ:  It has, your Honor.

3           MS. MASELLA:  I think it's even higher than that at

4   this point.  I think it's closer to 98 or 99.

5           THE COURT:  How did that get done?

6           MS. MASELLA:  How did the recovery get done?

7           THE COURT:  In reading the papers, it seemed that, for

8   example, some of the funds invested perhaps went to the

9   building of a house.  How did those funds get recovered to the

10  extent of over 95 percent?

11          MS. MASELLA:  Both Mr. Greenwood and his codefendant

12  consented to orders of forfeiture with respect to property.

13  But I believe the bulk of the money that was recovered was

14  actually from investments that were in fact made, and I think

15  that Mr. Greenwood helped in identifying and aiding the

16  receiver in recovering that money.

17          MR. HAFETZ:  I believe that includes advice on how to

18  liquidate assets for maximum recovery.

19          With regard to the Second Circuit reversed

20  resentencing, the grounds, there was no record evidence with

21  regard to a finding on which the prior judge relied for

22  sentencing, claimed that there were many small investors who

23  were injured or devastated.  As we state in our papers, there

24  is no evidence on the record of many small investors, the small

25  investors being devastated or injured with regard to the

G6T8GRES

1    criminal conduct.

2           Finally, your Honor, I would like to address the

3    shadow guidelines, the American Bar Association task force

4    recommendations.  The task force was appointed in, I believe,

5    2014.  Included on it are several distinguished jurists from

6    this circuit:  Judge Lynch, then Judge Gleeson, Judge Rakoff.

7    All were members of this commission.  The commission was formed

8    in reaction to the extremely high, draconian guidelines in

9    fraud cases.

10          THE COURT:  I am actually familiar with them.

11          MR. HAFETZ:  I am sure you're more familiar with them

12   than I am, your Honor.  And I am sure your Honor is familiar

13   with the at least three decisions that I was able to find in

14   the last year, in which judges in this district -- not this

15   district, the Eastern District, Judge Vitaliano, who in the

16   face of lifetime guidelines, imposed a sentence of five years,

17   and Connecticut cases as well which gave extremely lower

18   sentences than the severe guideline sentences caused by the

19   fraud guideline calculation.

20          Significant, I believe, is that in none of those cases

21   was there any cooperation by the defendant.  Those sentences

22   were given without 5Ks and there were trials; there was no plea

23   of guilty, acknowledgement of remorse.  The shadow guidelines

24   here calculate, I believe to be seven to nine and a quarter

25   years, but that's without taking into account at all the

G6T8GRES

1   substantial assistance 5K, which generally, I believe in this

2   district, plays a significant role in going below the

3   guidelines, as well as the plea of guilty and the

4   acknowledgement of guilt.

5              So, in toto, your Honor, in sum, Mr. Greenwood is now

6   69 years old, the crime is a serious one, as we certainly

7   acknowledge Mr. Greenwood has acknowledged his remorse for it,

8   but the picture with regard to sentencing, the full picture

9   under the very significant 3553(a) factors on what kind of life

10  he has lived in his seven decades, in terms of the

11  extraordinary, truly extraordinary good acts he has performed

12  steadily for decades, as well as the other factors, the

13  consideration with regard to the delicate family situation,

14  with regard to his rehabilitative conduct in the last 15

15  months, the very strong assistance to the government, as shown

16  in the 5K submission from the government, and the ABA

17  recommendations, the shadow guidelines, which we ask your Honor

18  to consider in the case, in sum, with regard to all of this, we

19  ask that your Honor sentence Mr. Greenwood to a prison term of

20  five years.

21             THE COURT:  Thank you.

22             Mr. Greenwood, would you like to speak on your own

23  behalf?

24             THE DEFENDANT:  Yes, please, just briefly.

25             THE COURT:  Yes, sir.

G6T8GRES

1          THE DEFENDANT:  First, I would like to apologize to

2     the Court for my serious criminal misconduct.  I have accepted

3     full responsibility for my fraudulent conduct.  I cannot

4     express deeply enough my remorse for what I have done.

5          Next, I would like to apologize to those who put their

6     trust in me, to my friends, my wife Robin, our two daughters,

7     and the rest of our family, for the grief and heartache that my

8     actions have caused.  I am truly sorry.

9          Finally, I have done my best during my time in prison

10    and will continue to use my abilities to help others less

11    fortunate than I.

12         Thank you.

13         THE COURT:  Yes, sir.  Thank you.

14         Does the government wish to be heard?

15         MS. MASELLA:  Just very briefly, your Honor.

16         We did submit a 5K letter and made a motion pursuant

17    to 5K1.1.  I would just like to underscore or emphasize a few

18    points about Mr. Greenwood's cooperation.

19         First of all, it was very early in the process that he

20    agreed to cooperate, and did cooperate fully.  He came in for

21    proffer sessions with the government very shortly after the

22    time he was arrested and charged in this case.  And the arrest

23    and the charge in this case was the first indication to him

24    that the government was aware of the conduct.

25         Secondly, he did cooperate fully.  From the first

G6T8GRES

moment that he attended proffer sessions, he was fully

forthcoming and candid with the government about the full

extent of his conduct.  He assisted not only the government,

but the court appointed receiver, as laid out in the letter, in

terms of recovering the assets.

          Finally, your Honor, his cooperation was significant,

in the sense that his codefendant, Mr. Walsh, fought his case

for nearly five years and it wasn't until a month or maybe six

weeks before a trial date that he agreed to plead guilty and

accept responsibility for his crime.

          Mr. Greenwood's testimony at the trial, for which the

government had already begun to meet with Mr. Greenwood and to

prepare, would have been significant, in the sense that Mr.

Walsh had many fewer dealings directly with investors.  We had

fewer witnesses who could have said that Mr. Walsh made

representations to investors about the nature of the

investments.

          So Mr. Greenwood, although there were documents

demonstrating Mr. Walsh's involvement in the crime, Mr.

Greenwood really would have provided the narrative link at

trial that would have explained Mr. Walsh's involvement and his

knowledge of the full extent of the fraud; and, therefore, in

the government's view, it would have been significant

testimony.

          THE COURT:  Thank you.

G6T8GRES

1        Anything else, Mr. Hafetz?

2        MR. HAFETZ:  No, your Honor.

3        THE COURT:  Thank you.

4        Counsel, I will not repeat what Judge Cedarbaum said

5   about the significance of Mr. Greenwood's cooperation, but I

6   agree that Mr. Greenwood provided substantial assistance to the

7   government, that it was particularly significant with respect

8   to Mr. Walsh.

9        I accept the government's evaluation that Mr.

10  Greenwood's assistance was forthcoming and candid, and I

11  particularly note his working with the receiver to recover over

12  95 percent of the funds that had been lost.

13        With respect to the nature and circumstances of the

14  offense, certainly, the presentence report accurately reflects

15  them.  I take Mr. Hafetz's point that the operation of the

16  fraud guidelines results in an inaccurate total offense level

17  with respect to this crime and crimes of this nature with the

18  amount of the loss in these very high numbers.  Nevertheless,

19  it was a serious crime.  The deception of all of these people

20  who looked to invest is a serious matter, which in the normal

21  case would require a lengthy prison sentence, perhaps not the

22  sentence that is required by the guidelines, but certainly a

23  lengthy sentence.

24        With respect to the history and characteristics of the

25  defendant, I do take Mr. Hafetz's point, as illustrated by the

G6T8GRES

<table>
<tr><td>1</td><td>numerous letters, that Mr. Greenwood was extraordinarily</td></tr>
<tr><td>2</td><td>charitable long before he had any involvement with the law and</td></tr>
<tr><td>3</td><td>long before there were any proceeds of any illegal activities</td></tr>
<tr><td>4</td><td>to use for those charitable acts.  Thus, I weigh them</td></tr>
<tr><td>5</td><td>particularly heavily.</td></tr>
</table>

1  numerous letters, that Mr. Greenwood was extraordinarily

2  charitable long before he had any involvement with the law and

3  long before there were any proceeds of any illegal activities

4  to use for those charitable acts.  Thus, I weigh them

5  particularly heavily.

6          In addition, the other major factor influencing this

7  sentence is, of course, Mr. Greenwood's timely and significant

8  cooperation with the government; not only with respect to

9  prosecuting his codefendant, but also in obtaining money to

10  restore to the victims of the fraud.

11          As I mentioned, going down to the paragraph 2 factors,

12  there ordinarily would be a need for a serious prison sentence

13  to reflect the seriousness of the offense.  Here, because of

14  the two personal characteristics of Mr. Greenwood that I

15  pointed out -- his cooperation and his prior extraordinary

16  charitable works -- the need for such a lengthy sentence is not

17  present.

18          Similarly, a lengthy sentence would be ordinarily

19  required for public deterrence.  Here, as to private

20  deterrence, I have full confidence that we do not need to

21  incarcerate Mr. Greenwood to protect the public from further

22  crimes of his.

23          The paragraph D factors of educational and vocational

24  rehabilitation are, of course, of very little weight here.  I

25  have in mind the paragraph 3, 4 and 5 factors.

G6T8GRES

1          And with respect to paragraph 6, the need to avoid

2     unwarranted sentencing disparities, I think there are two

3     things that work here.  One is the unfortunate operation of the

4     fraud guidelines in cases like this.  The second, of course, is

5     the personal characteristics of Mr. Greenwood.

6          Finally, with respect to restitution, Mr. Greenwood

7     has done a great deal of work with respect to restitution, and

8     he is to be applauded for that.

9          May I ask a question?  I notice in the earlier

10    judgment the amount of restitution was to be determined.  Where

11    are the parties on restitution at this point in time?

12         MS. MASELLA:  One moment, your Honor.

13         Your Honor, the government had prepared and submitted

14    a restitution order for the codefendant, Mr. Walsh.  I can go

15    ahead and submit one for Mr. Greenwood.  At this point, he has

16    surrendered in excess of 20 or 25 million dollars worth of

17    assets to the receiver.  So we don't believe that there are

18    substantial assets remaining, but the government will prepare

19    and submit a restitution order in the event that additional

20    assets are recovered.

21         THE COURT:  All right.  What is your view of payment

22    going forward, other than the location of other assets?  Page

23    36 of the presentence report, the probation officer recommends

24    monthly payments of 10 percent of gross monthly income.

25         MR. HAFETZ:  As I understand it, Mr. Greenwood really

G6T8GRES

```
 1   doesn't have any assets anymore.  If he had them, he has
 2   basically turned them over.
 3           THE COURT:  I am asking a different question.  I am
 4   asking about going forward, a percentage of gross monthly
 5   income.
 6           MR. HAFETZ:  I certainly have no objection to that.
 7           THE COURT:  OK.
 8           Taking all of these factors into account, counsel, it
 9   is my intention to impose a sentence of five years'
10   incarceration, followed by a period of three years of
11   supervised release on all counts.
12           It is my intention to impose the recommended special
13   conditions with respect to credit charges and financial
14   information.
15           It is not my intention to impose a fine.
16           It is my intention to impose a restitution order
17   requiring monthly payments of 10 percent of Mr. Greenwood's
18   gross monthly income.  And it is my intention to impose the
19   $600 special assessment.
20           Is there any reason, counsel, why such a sentence
21   should not be imposed?
22           MR. HAFETZ:  No, your Honor.
23           MS. MASELLA:  No, your Honor.
24           THE COURT:  Very well.
25           Mr. Greenwood.
```

G6T8GRES

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Sir, you're sentenced to a period of five

3    years' incarceration.  Following that time, you will spend a

4    period of three years on supervised release on all counts, to

5    run concurrently, for a total of three years.

6          During that time, you will comply with all of the

7    standard terms and conditions of supervised release, which

8    include that you shall not commit another federal, state or

9    local crime, you not illegally possess a controlled substance,

10   and you not possess a firearm or other destructive device.

11         In addition to those and all of the other standard

12   terms and conditions of supervised release, during that period

13   you will provide the probation officer with access to any

14   requested financial information.  In addition, you will not

15   incur any new credit charges or open any additional lines of

16   credit without the approval of the probation officer, unless

17   you are in compliance with the installment payment schedule.

18         As I mentioned, I do not impose a fine, but will

19   consider the restitution order that will be submitted by

20   counsel.  When the amount of restitution is determined, you

21   will begin payments within one month of the entry of this

22   amended judgment.  During the period of incarceration, if you

23   are engaged in a non-UNICOR work program, you will pay $25 per

24   quarter toward the criminal financial penalties.  If you

25   participate in the BOP's UNICOR program at a grade 1 through 4,

22

G6T8GRES

1   you will pay 50 percent of your monthly UNICOR earnings toward

2   the criminal financial penalties, consistent with BOP

3   regulations at 28 C.F.R., Section 545.11.  Any payment made

4   that's not paid in full shall be divided proportionately among

5   the persons named.

6          Upon release, sir, you will continue to pay

7   restitution in monthly installments of no less than 10 percent

8   of your gross monthly income.  Those payments will commence 30

9   days after your release.

10          Finally, sir, to the extent it has not been paid, I

11   must impose and do impose the $600 special assessment.

12          Mr. Greenwood, it is my duty to inform you that unless

13   you have waived it, you have the right to appeal this sentence,

14   and you might have the right to appeal in forma pauperis, which

15   means as a poor person, with the waiver of certain fees and

16   expenses.

17          Counsel, is there anything further?

18          MR. HAFETZ:  No, your Honor.

19          MS. MASELLA:  No, your Honor.

20          THE COURT:  Mr. Greenwood, I appreciate what you said

21   about the seriousness of your criminal behavior.  It was indeed

22   very serious and very harmful to many people.  On the other

23   hand, I salute you for your prior charitable works, and

24   particularly for your cooperation in this case, and

25   particularly for working with the receiver to obtain payment

G6T8GRES

1    for as many of the victims as possible.

2             Good afternoon, counsel.  Thank you for your

3    assistance.

4             THE DEFENDANT:  Thank you very much.

5             THE COURT:  Yes, sir.

6                          oOo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25